**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVERSE MORTGAGE INVESTMENT | ) | Case No. 22-11225 (MFW) |
| TRUST INC., *et al.*,[1] | ) | |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |
| | ) | |

**DEBTORS' MOTION SEEKING ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO
(A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT
SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS
RELATED THERETO, (C) MAINTAIN EXISTING BUSINESS FORMS,
AND (D) CONTINUE TO PERFORM INTERCOMPANY TRANSACTIONS,
(II) GRANTING ADMINISTRATIVE EXPENSE STATUS TO POST-PETITION
INTERCOMPANY BALANCES, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (this "Motion"):[2]

**RELIEF REQUESTED**

1.      The Debtors seek entry of interim and final orders, substantially in the forms

attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and

the "Final Order"), (a) authorizing the Debtors to continue to (i) operate their cash management

system and maintain their existing bank accounts, including honoring certain prepetition

obligations related thereto, (ii) maintain existing business forms, and (iii) continue intercompany

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, include: Reverse Mortgage Investment Trust Inc. (3421); Reverse Mortgage Funding LLC (0209); RMIT
Cash Management LLC (6241); RMIT Operating I LLC (1844); and RMIT Operating II LLC (2301).  The
location of the Debtors' service address for purposes of these chapter 11 cases is: 1455 Broad Street, 2nd Floor,
Bloomfield, NJ 07003.

[2]     A detailed description of the Debtors and their business, and the facts and circumstances supporting this Motion
and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Tanya Meerovich, Chief
Restructuring Officer, in Support of Chapter 11 Filings and First Day Motions* (the "First Day Declaration"),
filed contemporaneously herewith.

transactions and funding consistent with the Debtors' historical practices, subject to the terms described herein, (b) granting administrative expense priority to post-petition intercompany balances, and (c) granting related relief.  In addition, the Debtors request that the Court (as defined below) schedule a final hearing within approximately 21 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

## JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1(m).

## BACKGROUND

5.      Reverse Mortgage Investment Trust Inc., together with its debtor and non-debtor affiliates, is an originator and servicer of reverse mortgage loans.  The Debtors, who have approximately 111 employees, assist senior American homeowners in accessing the

unencumbered value of their real estate property. The Debtors originate, acquire, and service both Federal Housing Administration-insured Home Equity Conversion Mortgage ("HECM") loans and proprietary (non-agency) reverse mortgage loans, and they also securitize such reverse mortgage loans in Ginnie Mae ("GNMA") guaranteed and private label securitization vehicles. The Debtors are one of the largest originators of reverse mortgage loans in the United States.

6.    On November 30, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these chapter 11 cases. Additional information regarding the Debtors' business, their capital structure, and the circumstances leading to these chapter 11 filings is contained in the First Day Declaration.

## THE CASH MANAGEMENT SYSTEM

### I.    Overview.

7.    In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect, concentrate, and disburse funds generated by their operations (the "Cash Management System"). The Cash Management System is similar to cash management systems used by other large reverse mortgage lending and servicing businesses. The Cash Management System enables the Debtors to operate each segment of the Debtors' business efficiently and provides a seamless accounting function across all entities in a single location, reducing banking expenses, permitting prompt and accurate liquidity tracking, and allowing accurate intercompany allocations and transfers. It is critical that the Cash Management System

remain intact during these chapter 11 cases to ensure the seamless and uninterrupted operation of the Debtors' loan origination and servicing platforms, among other things.

8.        The Cash Management System is managed through a system of bank accounts with certain domestic banks (the "Cash Management Banks") in the ordinary course of business.[3]  As of the Petition Date, the Debtors' Cash Management System is comprised of approximately 44 bank accounts, each of which is identified on **Exhibit 1** annexed to **Exhibit A** and **Exhibit B** attached hereto (collectively, the "Bank Accounts").[4]  The Debtors maintain three (3) Bank Accounts with TIAA, FSB ("TIAA Bank"), three (3) with TD Bank, N.A. ("TD Bank"), one (1) with Evolve Bank & Trust ("Evolve") and the remaining 37 Bank Accounts are maintained with Texas Capital Bank ("TCB").

9.        As of the Petition Date, the Debtors have approximately $12.56 million in their Bank Accounts, $10.15 million of which is available cash and $2.40 million of which is restricted cash.  These balances exclude any funds held in the Custodial Accounts (as defined below).  As of the Petition Date, there is approximately $222.77 million held in such Custodial Accounts.

10.       To assist the Court in understanding the Debtors' need to maintain their existing Cash Management System, a diagram reflecting the manner in which the Debtors have historically received funds and made disbursements is attached as **Exhibit C** (the "Cash Flow Diagram").  The

---

[3]    Additionally, in the event that the Debtors open a new bank account, they will likely open it at one of their existing Cash Management Banks that is an Authorized Depository (as defined below) or at a new bank that is an Authorized Depository.  Post-petition, the Debtors intend to use an existing Bank Account at one of their existing Cash Management Banks that is an Authorized Depository to fund adequate assurance payments for their utility providers pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Determining Adequate Assurance of Payment for Future Utility Services, and (III) Establishing Procedures for Determining Adequate Assurance of Payment*, filed contemporaneously herewith.

[4]    The Debtors believe that **Exhibit 1** is a complete list of their Bank Accounts.  The Debtors request that the Interim Order and Final Order apply to all Bank Accounts actually in, or linked to, the Cash Management System.  To the extent that any Bank Account has inadvertently been omitted from **Exhibit 1**, the Debtors request that the Interim Order and Final Order apply to such account.

Cash Flow Diagram provides a representative depiction of the Cash Management System related to cash movements within the Debtors' business enterprise and in connection with the Debtors' reverse mortgage origination and servicing obligations.

11.    As depicted in the Cash Flow Diagram, the Debtors receive and collect cash and wires through various entry points in the Cash Management System, which allows for the flow of cash between Bank Accounts and between Debtor entities as required or needed, in accordance with the Debtors' cash management practices.  The Debtors primarily receive operating cash through the collection of fees and other amounts related to servicing reverse mortgage loans on behalf of third parties and from the sale of originated loans.

## II.    The Bank Accounts.

12.    The Debtors seek to continue using its 44 Bank Accounts, subject to the Debtors' right to open and close certain accounts in their discretion and subject to all the restrictions and requirements regarding accounts contained in the Debtors' proposed financing and cash collateral order (the "Cash Collateral Order"), to be filed soon hereafter this Motion.  The Bank Accounts generally can be categorized as (a) Operating Accounts; (b) Restricted Accounts; (c) Custodial Accounts, or (d) Warehouse Related Accounts, each as defined herein.[5]

---

[5]    Certain of the Bank Accounts do not fall within any of the aforementioned categories; however, such Bank Accounts were merely set up to comply with certain state-based licensing and other requirements and are not utilized to hold or transfer any funds.

| Bank Accounts[6] | Descriptions of Accounts |
|---|---|
| **Operating Accounts** | The Debtors maintain five (5) operating accounts at TCB, three (3) operating accounts at TD Bank and one (1) operating account at Evolve (collectively, the "Operating Accounts"). The Operating Accounts are linked to one another and serve as the ultimate collection points for funds moving through the business. Specifically, funds earned by the Debtors are deposited into a core Operating Account and are then disbursed into secondary Operating Accounts earmarked for payment of operating expenses, including, without limitation, expenses related to trade vendors, payroll, retirement account contributions, and health savings account contributions, among other accounts payable and general corporate expenses. |
| **Restricted Accounts** | The Debtors maintain two (2) restricted cash accounts (the "Restricted Cash Accounts") at TCB and TIAA Bank. The Debtors' Restricted Cash Accounts contain cash comprised primarily of cash collateral for certain of the Debtors' financing facilities pursuant to their applicable credit agreements. |
| **Custodial Accounts** | In connection with the Debtors' servicing and securitization activities, the Debtors hold reverse mortgage borrower payments that are due to various third parties such as securitization trusts, bondholders, taxing authorities, insurance companies, government-sponsored enterprises, and other third parties. Such funds do not represent assets or liabilities of the Debtors and are maintained in custodial accounts that are segregated from the Debtors' other Bank Accounts (the "Custodial Accounts") and maintained at TCB and TIAA Bank. The Debtors maintain twenty-three (23) Custodial Accounts. When the Debtors' subservicer ("Celink") makes loan payment collections in connection with the Debtors' reverse mortgage servicing business, a portion of such collections is deposited by Celink into the applicable Custodial Account based on: (i) which third party is to receive the funds; and (ii) which securitization vehicle such funds apply to. |
| **Warehouse Related Accounts** | As described in greater detail in the First Day Declaration, the Debtors are also parties to several warehouse facilities that finance their day-to-day operations including to fund: (i) the origination and purchase of reverse mortgage loans; (ii) securitizations of such reverse mortgage loans; and (iii) related buyout obligations, among other things. When Celink makes the loan payment collections described above, a portion of such collections is also deposited by |

---

[6]    Additionally, the Debtors maintain two (2) inactive accounts at TCB where there are de minimis amounts held.

| Bank Accounts[6] | Descriptions of Accounts |
|---|---|
| | Celink into accounts earmarked for the payment of the financing facilities (the "Warehouse Related Accounts") maintained at TCB and TIAA Bank.  The Debtors maintain eight (8) Warehouse Related Accounts.  To the extent such collections exceed the amounts payable by the Debtors on account of such warehouse facilities, such excess cash amounts are transferred to the core Operating Account. |

### III.    The Cash Management System's Compliance with the U.S. Trustee Guidelines and Section 345 of the Bankruptcy Code.

13.    The *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines") generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the U.S. Trustee (an "Authorized Depository").  As of the Petition Date, 40 of the Debtors' 44 Bank Accounts—the TCB and TD Bank Accounts—were with an Authorized Depository.  Each Bank Account that is an Authorized Depository is party to a uniform depository agreement with the U.S. Trustee, and therefore the Debtors believe that the Bank Accounts at these institutions will be collateralized in a manner consistent with the requirements of section 345 of the Bankruptcy Code.

14.    With respect to the remaining three (3) TIAA Bank accounts and one (1) Evolve account, such accounts are insured by the FDIC, but TIAA Bank and Evolve are not Authorized Depositories.  The Debtors submit that cause exists to allow the Debtors to continue utilizing such accounts consistent with historical practices, as TIAA Bank and Evolve are well positioned to perform depository and cash management functions during the chapter 11 cases.  The Debtors assert that they can maintain the Bank Accounts, and the Debtors assert that based on their business

relationships with such banks, the Cash Management Banks are well-capitalized and financially stable financial institutions.

15.     Each of the Cash Management Banks is insured by the Federal Deposit Insurance Corporation (the "FDIC").   In the event that the Bank Accounts cease to comply with the requirements of section 345(b) of the Bankruptcy Code during the chapter 11 cases, the Debtors request that the Court provide the Debtors with 45 days to bring the Bank Accounts into compliance with section 345(b) of the Bankruptcy Code or to seek appropriate relief from the Court.

16.     Continuation of the Debtors' prepetition Cash Management System is critical to the Debtors' ongoing stability and in ensuring a smooth transition into chapter 11.  Requiring the Debtors to transfer any of the Bank Accounts to a designated Authorized Depository would not render a perceptible benefit to the Debtors' estates, while placing a needless administrative burden on the Debtors, imposing significant costs to the Debtors' estates.   Furthermore, the TIAA Warehouse Facility (as defined in the First Day Declaration) requires that the Debtors maintain TIAA Bank Accounts with respect to such facility.  Accordingly, it is not feasible for the Debtors to utilize a different bank in place of TIAA Bank and Evolve.

**IV.     Bank Fees.**

17.     The Debtors incur periodic service charges and other fees in connection with the use and maintenance of the Cash Management System ("Bank Fees").  As of the Petition Date, the Debtors estimate that they incur approximately $60,000 in Bank Fees per month based on historical monthly averages.  However, such fees are offset by the Debtors' "earnings credit rates," which the Debtors receive in connection with cash balances in certain of the Debtors' non-interest-bearing Bank Accounts.  As of the Petition Date, the Debtors estimate that they are current on all such Bank Fees.  Notwithstanding the foregoing, out of an abundance of caution, the

Debtors seek authority to pay prepetition accrued Bank Fees (if any) and to continue paying Bank Fees, in the ordinary course on a post-petition basis, consistent with historical practices. Payment of the Bank Fees, if any, is in the Debtors' best interest and all parties in interest as it will prevent unnecessary disruption to the Cash Management System and ensure that the receipt of the Debtors' funds is not delayed.

**V.     Intercompany Transactions.**

18.     Because not all Debtor entities generate revenue, in the ordinary course of business, the Debtors engage in routine business relationships with each other (collectively, the "<u>Intercompany Transactions</u>") resulting in intercompany receivables and payables (the "<u>Intercompany Balances</u>").[7]  Accordingly, at any given time there may be Intercompany Balances owing between the Debtors.

19.     The Debtors engage in Intercompany Transactions to process payroll, provide enterprise-wide management and support services, and facilitate operations on a daily basis. The Intercompany Transactions are trackable, and the Debtors intend to account for all post-petition Intercompany Transactions in accordance with past historical practice. The Debtors have historically reflected Intercompany Balances as journal entry receivables and payables, as applicable, in their respective accounting systems. The Debtors closely track all Intercompany Transactions fund transfers in their respective accounting systems and, therefore, can ascertain,

---

[7]   This Motion provides an illustrative overview of the Debtors' typical Intercompany Transactions. The relief requested herein is applicable with respect to all Intercompany Transactions and is not limited to those Intercompany Transactions specifically described. To the extent that there are any outstanding prepetition transactions related to Intercompany Transactions not described herein, the Debtors, out of an abundance of caution, seek authority to continue such transactions. For the avoidance of doubt, the relief requested in this Motion with respect to the post-petition Intercompany Transactions and the Intercompany Balances resulting therefrom does not constitute an admission of the Debtors or any other party as to the validity, priority, or status of any prepetition Intercompany Balance or any Intercompany Transaction from which such Intercompany Balance may have arisen.

trace, and account for all Intercompany Transactions. For the avoidance of doubt, such Intercompany Transactions do not include transactions with non-debtor affiliates, and the Debtors are not aware of any such transactions that take place in the ordinary course of business.

20.    Any interruption of the Intercompany Transactions would severely disrupt the Debtors' entrance into chapter 11 and result in great harm to the Debtors' estates and their stakeholders. Accordingly, the Debtors seek the authority to continue the Intercompany Transactions in the ordinary course of business, in a manner consistent with prepetition practice. In addition, the Debtors request that all post-petition payments from the Debtors to another Debtor entity under any post-petition Intercompany Transactions authorized hereunder are hereby accorded administrative expense status under section 503(b) of the Bankruptcy Code.

## VI.    Business Forms.

21.    The Debtors use certain limited, preprinted correspondence and business forms, such as letterheads (collectively, the "Business Forms"), in the ordinary course of their business. The Debtors also maintain books and records to document, among other things, their profits and expenses. To minimize unnecessary additional expenses to their estates, the Debtors request that the Court authorize their continued use of their Business Forms to the limited extent they are preprinted, all as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors-in-possession, rather than requiring the Debtors to incur the unnecessary expense, nuisance, and delay of ordering entirely new forms as required under the U.S. Trustee Guidelines. Once the Debtors have exhausted their existing stock of Business Forms, they will ensure that any new Business Forms are clearly labeled "Debtor In Possession" and, with respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor In Possession."

## BASIS FOR RELIEF

**I.    The Court Should Approve the Debtors' Continued Use of the Cash Management System as Essential to the Debtors' Operations and Restructuring Efforts.**

22.    Pursuant to 28 U.S.C. § 586(a)(3) and the U.S. Trustee Guidelines, debtors in possession are required to, among other things: (a) close all existing bank accounts and open new debtor in possession accounts; (b) establish one debtor in possession bank account for all estate monies required for the payment of taxes, including payroll taxes; and (c) maintain a separate debtor in possession account for cash collateral.  These requirements are intended to provide a clear line of demarcation between prepetition and post-petition transactions and operations and to prevent inadvertent payment of prepetition claims.

23.    The continuation of the Cash Management System is nevertheless permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course without notice or a hearing."   Section 363(c)(1) of the Bankruptcy Code also allows a debtor in possession to engage in ordinary course transactions required to operate its business without additional oversight from its creditors or the Court.  *See, e.g.*, *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) ("Section 363(c)(1) of the Bankruptcy Code authorizes a debtor-in-possession to enter into transactions involving property of the estate within the ordinary course of business without notice or a hearing."); *In re Enron Corp.*, Case No. 01-16034 (AJG), 2003 WL 1562202, at *15 (Bankr. S.D.N.Y. Mar. 21, 2003) (stating same).  Included within the purview of section 363(c) of the Bankruptcy Code is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system.  *In re Frigitemp Corp.*, 34 B.R. 1000, 1010 (S.D.N.Y. 1983), *aff'd*, 753 F.2d 230 (2d Cir. 1985); *see also Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996).

24.     Here, requiring the Debtors to adopt a new, segmented cash management system during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations.  Importantly, the Cash Management System provides the Debtors with the ability to ensure cash availability to the enterprise and reduce administrative costs through a centralized method of coordinating the collection and movement of funds.  As a result, any disruption of the Cash Management System would have a severe and adverse effect on the Debtors' restructuring efforts.  Indeed, absent the relief requested herein, requiring the Debtors to adopt a new, segmented cash management system would cause the Debtors' operations to grind to a halt, needlessly destroying the value of the Debtors' business enterprise.  By contrast, maintaining the current Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying post-petition debts and eliminating administrative inefficiencies.   Finally, maintaining the current Cash Management System will allow the Debtors' treasury and accounting employees to focus on their daily responsibilities.

25.     Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter."    *See In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).  Additionally, courts have noted that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash."   *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993).  As a result, courts have concluded that the requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient."   *Id.* 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111,

1114 (5th Cir. 1995) (noting that maintaining an existing cash management system allows debtors "to administer more efficiently and effectively its financial operations and assets").

26.     Parties in interest will not be harmed by the Debtors' maintenance of the Cash Management System, including maintenance of the Bank Accounts and the Intercompany Transactions.  The Debtors have implemented appropriate mechanisms to ensure that Debtor entities will not make unauthorized payments on account of prepetition or post-petition obligations. In addition, although not all of the Debtors' Bank Accounts are with Authorized Depositories, such Bank Accounts are with banks that are stable financial institutions of similar quality.  Specifically, with respect to the TIAA Bank and Evolve accounts, the Debtors believe, based on their business relationship with such banks, that TIAA Bank[8] and Evolve[9] are well-capitalized and financially stable financial institutions.  Additionally, as described above, the TIAA Warehouse Facility requires that the Debtors maintain TIAA Bank Accounts with respect to such facility.  Accordingly, the Debtors submit that maintaining the Cash Management System and authorizing the Debtors' use of their existing Bank Accounts is in the best interest of their estates and creditors, and request authorization to continue utilizing the Cash Management System in accordance with historic prepetition practice.

27.     The Debtors further request that the Court authorize the Cash Management Banks to receive, process, honor, and pay any and all checks, electronic fund transfer, credit card, ACH payments and other instructions, and drafts payable through, or drawn or directed on, such Bank

---

[8]     TIAA Bank is an online bank offering full-service personal banking and other financial products and services. Fortune 100 company TIAA (formerly TIAA-CREF) purchased Florida-based EverBank in 2017 and renamed it TIAA Bank.

[9]     Founded in 1925, Evolve is a technology-focused financial services organization and Banking-as-a-Service (BaaS) provider specializing in consumer and commercial banking, mortgage lending, physicians lending, SBA lending, community funding and trust services.

Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto, irrespective of whether such checks, drafts, electronic fund transfers, credit card, or ACH payment are dated prior or subsequent to the Petition Date, but only to the extent consistent with the Cash Collateral Order.  The Debtors also respectfully request that, to the extent a Cash Management Bank honors a prepetition check or other item drawn on any account that is the subject of this Motion, either at the direction of the Debtors or in a good-faith belief that the Court has authorized such prepetition check or item to be honored, such Cash Management Bank will not be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item honored post-petition.

28.    The relief requested is reasonable and appropriate because the Cash Management Banks are not in a position to independently verify or audit whether the Debtors may pay a particular item in accordance with a Court order or otherwise.  Considering the breadth of their operations, the Debtors need to conduct transactions by debit, electronic fund, ACH payments, and other similar methods.  If the Debtors are denied the opportunity to conduct transactions by debit, electronic fund, ACH payments, or other methods used in the ordinary course of business, the Debtors likely would have difficulty performing on their contracts and obligations, burdening the Debtors and their creditors with additional costs.

29.    Courts in this district regularly allow debtors in complex chapter 11 cases to maintain their existing cash management systems and such relief is generally non-controversial. *See, e.g.*, *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022) (authorizing the debtors to continue using the cash management system maintained by the debtors prepetition); *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Nov. 18, 2021) (same); *In re Alex and Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. July 14, 2021) (same); *In*

*re HighPoint Res. Corp.*, No. 21-10565 (CSS) (Bankr. D. Del. Mar. 26, 2021) (same); *In re Town Sports Int'l, LLC*, No. 20-12168 (CSS) (Bankr. D. Del. Oct. 14, 2020) (same).[10]

## II.   Payment of Fees and Prepetition Obligations Related to the Bank Accounts Will Facilitate a Smooth Transition into Chapter 11 and Benefit the Debtors' Estates.

30.     The relief requested herein is warranted under sections 105(a) and 363 of the Bankruptcy Code.  Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate.  *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *see also In re Windstream Holdings Inc.*, 614 B.R. 441 (S.D.N.Y. 2020), *appeal dismissed as moot sub nom.*, 838 F. App'x 634 (2d Cir. 2021), *cert. denied sub nom.*, 142 S. Ct. 226 (2021); *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y.1989); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983).  In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims.

31.     Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions."  *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring

---

[10]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

the debtor to show a "good business reason" for a proposed transaction under section 363(b) of the Bankruptcy Code); *see also Windstream Holdings*, 614 B.R. at 457, 460 (affirming order to pay critical vendor prepetition claims in reliance of section 363 to benefit the Debtors' estates for all creditors); *Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of certain prepetition wages).

32.     Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, which codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business. *See Just for Feet*, 242 B.R. at 825−26. Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *See, e.g.*, *Ionosphere Clubs*, 98 B.R. at 176; *In re Lehigh & New England Ry Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the business). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175−76 (citing *Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286 (1882)). Indeed, at least one court

has recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *See CoServ*, 273 B.R. at 497.

33.     Certain payments to the Cash Management Banks, such as the payment of prepetition Bank Fees, if any, will ensure the continued support of the Debtors' Cash Management Banks on a go-forward basis at this critical juncture of the Debtors' chapter 11 cases. Continuation of such payments play a role in the efficient and effective operations of the Debtors' business, allowing the Debtors' employees to focus their efforts on the tasks that make a difference to the Debtors' ultimate performance and minimizing administrative tasks. The Debtors believe that any interference or delay in any of these programs is unnecessary and unduly burdensome.

**III.    The Debtors Should Be Granted Authority to Use Existing Business Forms.**

34.     To avoid disruption of the Cash Management System and unnecessary expense, the Debtors request that they be authorized to continue to use their Business Forms, substantially in the form existing immediately before the Petition Date, without reference to their status as debtors in possession. The Debtors submit that, given the limited nature of the preprinted Business Forms, parties in interest will not be prejudiced if the Debtors are authorized to continue to use their Business Forms substantially in the forms existing immediately before the Petition Date. Parties doing business with the Debtors undoubtedly will be aware of their status as debtors in possession and, thus, changing forms such as letterhead would be an unnecessary additional expense and unduly burdensome. Once the Debtors have exhausted their existing stock of Business Forms, they will ensure that any new Business Forms are clearly labeled "Debtor In Possession" and with respect to any Business Forms that exist or are generated electronically, to the extent reasonably practicable, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor In Possession."

35.     Courts in this district have allowed debtors to use their prepetition business forms without the "debtor in possession" label in other large chapter 11 cases.  *See, e.g.*, *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022) (authorizing debtors continued use of preprinted check stock without a "Debtor in Possession" marking); *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Nov. 18, 2021) (same); *In re Alex and Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. July 14, 2021) (same); *In re HighPoint Res. Corp.*, No. 21-10565 (CSS) (Bankr. D. Del. Mar. 26, 2021) (same); *In re Town Sports Int'l, LLC*, No. 20-12168 (CSS) (Bankr. D. Del. Oct. 14, 2020) (same).[11]

## IV.     The Court Should Authorize the Debtors to Continue Engaging in Post-Petition Intercompany Transactions.

36.     Allowing the Debtors to engage in post-petition Intercompany Transactions is in the best interests of the Debtors' estates and their creditors, and the Debtors seek authority to enter into such post-petition Intercompany Transactions in the ordinary course of business.[12]  The Debtors respectfully submit that post-petition Intercompany Transactions arising in the ordinary course are authorized as a matter of law pursuant to section 363(c)(1) of the Bankruptcy Code for which no additional relief is required.

37.     The Debtors respectfully submit that the relief requested herein fairly balances the Debtors' needs to facilitate the ordinary course operation of their business, minimize disruption, and preserve value with the interests of their stakeholders in transparency.  As noted above, the Debtors request authority to continue post-petition Intercompany Transactions in

---

[11]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

[12]    Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among similar enterprises, the Debtors believe the post-petition Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval.

the ordinary course (including with respect to "netting" or setoffs taken in the ordinary course). The Debtors respectfully submit that such a structure reflects a fair balance of interests.

38.     Additionally, the Debtors respectfully request that the Court order that all valid post-petition payments from a Debtor to another Debtor on account of a post-petition Intercompany Transaction shall be accorded administrative expense status.  As noted above, the Debtors believe such relief is necessary to ensure that a particular Debtor's estate will not be required to fund the operations of other Debtors without adequate recompense.

39.     Similar relief has been granted in other comparable multi-debtor chapter 11 cases in this district and others.  *See, e.g.*, *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022) (authorizing postpetition intercompany transactions and granting administrative expense status to intercompany claims); *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Nov. 18, 2021) (same); *In re Alex and Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. July 14, 2021) (same); *In re HighPoint Res. Corp.*, No. 21-10565 (CSS) (Bankr. D. Del. Mar. 26, 2021) (same); *In re Town Sports Int'l, LLC*, No. 20-12168 (CSS) (Bankr. D. Del. Oct. 14, 2020) (same).[13]

## V.     Cause Exists for Waiving the U.S. Trustee Guidelines Regarding Authorized Depositories.

40.     To the extent the Cash Management System does not strictly comply with section 345 of the Bankruptcy Code, the Debtors further seek a waiver of the deposit and investment requirements set forth therein.

41.     Section 345(a) of the Bankruptcy Code authorizes deposit or investment of money of estates, such as cash, as "will yield the maximum reasonable net return on such money, taking

---

[13]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

into account the safety of such deposit or investment." For deposits that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of a corporate security, "unless the court for cause orders otherwise." Additionally, under the U.S. Trustee Guidelines, debtors in possession must, among other things, close prepetition bank accounts and open new "debtor in possession" operating, payroll, and tax accounts at one or more Authorized Depositories.

42.    Courts may waive compliance with the Bankruptcy Code section 345 and the U.S. Trustee Guidelines for "cause." In evaluating whether "cause" exists, courts have considered a number of factors such as:

a.    the sophistication of the debtor's business;

b.    the size of the debtor's business operations;

c.    the amount of the investments involved;

d.    the bank ratings (Moody's and Standard & Poor) of the financial institutions where the debtor in possession funds are held;

e.    the complexity of the case;

f.    the safeguards in place within the debtor's own business for ensuring the safety of the funds;

g.    the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

h.    the benefit to the debtor;

i.    the harm, if any, to the debtor;

j.    the harm, if any, to the estate; and

k.    the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

*See In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

43.     Because the Bank Accounts are vital to the Cash Management System, requiring the Debtors to transfer funds to other banks would be unduly burdensome and potentially cause severe tax consequences to the detriment of the Debtors' estates. In addition, the Bank Accounts are maintained at well-capitalized, and highly rated FDIC-insured banks. Therefore, the Debtors submit that cause exists to waive the U.S. Trustee Guidelines and allow the Debtors to continue to maintain the Bank Accounts in the ordinary course of business.

44.     Courts in this district have regularly waived section 345 of the Bankruptcy Code and the U.S. Trustee Guidelines on the grounds that they may be potentially disruptive to a debtor's postpetition business operations and restructuring efforts. *See, e.g., In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 26, 2019) (granting waiver of section 345(b) of the Bankruptcy Code); *In re VER Techs. Holdco LLC*, No. 18-10834 (KG) (Bankr. D. Del. May 4, 2018 (same); *In re PES Holdings, LLC*, No. 18-10122 (KG) (Bankr. D. Del. Jan. 23, 2018) (granting waiver of section 345(b) with respect to inactive accounts); *In re Altegrity, Inc.*, No. 15-10226 (LSS) (Bankr. D. Del. Mar. 16, 2015) (granting interim waiver of section 345(b) and providing that waiver shall become final if no timely objections are filed); *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. June 4, 2014) (granting waiver of section 345(b) of the Bankruptcy Code).

## PROCESSING OF CHECKS AND ELECTRONIC FUND TRANSFERS SHOULD BE AUTHORIZED

45.     The Debtors have sufficient funds to pay amounts described in the Motion by virtue of anticipated access to cash collateral and/or post-petition financing. Under the Debtors' existing Cash Management System, the Debtors have made arrangements to readily identify checks or wire transfer requests, as applicable. Accordingly, the Debtors believe that checks or wire transfer

requests that are not related to authorized payments will not be honored inadvertently.  Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion, but only to the extent consistent with the Cash Collateral Order.

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003(B) ARE SATISFIED

46.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' chapter 11 process. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support the relief requested herein.

## RESERVATION OF RIGHTS

47.     Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any party in interest's rights to dispute any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law, or (iv) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to dispute such claim subsequently.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h) REQUIREMENTS

48.     The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h).  As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

## NOTICE

49.     The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Pre-petition Lenders; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the Government National Mortgage Association; (h) the Federal Housing Administration; (i) the United States Department of Housing and Urban Development; (j) the Cash Management Banks; (k) the attorneys general in the states where the Debtors conduct their business operations; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **NO PRIOR REQUEST**

50.     No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors request entry of the Interim Order and the Final Order, substantially in the forms attached hereto as **<u>Exhibit A</u>** and **<u>Exhibit B</u>**, granting the relief requested herein and granting such other relief as the Court deems appropriate under the circumstances.

Dated:  November 30, 2022
        Wilmington, Delaware

Respectfully submitted,

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

   */s/ Jennifer R. Hoover*
Michael J. Barrie (DE No. 4684)
Jennifer R. Hoover (DE No. 5111)
Kevin M. Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
1313 North Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: mbarrie@beneschlaw.com
       jhoover@beneschlaw.com
       kcapuzzi@beneschlaw.com
       jgentile@beneschlaw.com

*-and-*

**SIDLEY AUSTIN LLP**

Stephen Hessler (admitted *pro hac vice*)
Thomas Califano (admitted *pro hac vice*)
Anthony Grossi (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email: shessler@sidley.com
      tom.califano@sidley.com
      agrossi@sidley.com

*Proposed Counsel to the Debtors*