**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| REVERSE MORTGAGE INVESTMENT | ) | Case No. 22-11225 (MFW) |
| TRUST INC., *et al.*,[1] | ) |  |
|  | ) | (Joint Administration Requested) |
| Debtors. | ) |  |
|  | ) |  |

**DEBTORS' MOTION FOR ENTRY**
**OF INTERIM AND FINAL ORDERS (I)**
**AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION**
**EMPLOYEE COMPENSATION, WAGES, SALARIES, OTHER**
**COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE**
**EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion (the "Motion"):[2]

**RELIEF REQUESTED**

1.      The Debtors seek entry of interim and final orders, substantially in the forms

attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"),

authorizing the Debtors to (a) pay prepetition wages, salaries, other compensation, and

reimbursable employee expenses and (b) continue employee compensation and benefits programs

in the ordinary course, including payment of certain prepetition obligations related thereto.  In

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Reverse Mortgage Investment Trust Inc. (3421); Reverse Mortgage Funding LLC (0209); RMIT Cash Management LLC (3421); RMIT Operating I LLC (3421); and RMIT Operating II LLC (3421).  The location of the Debtors' service address for purposes of these cases is: 1455 Broad Street, 2nd Floor, Bloomfield, NJ 07003.

[2]      A detailed description of the Debtors and their business, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Tanya Meerovich, Chief Restructuring Officer, in Support of Chapter 11 Filings and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

addition, the Debtors request a final hearing be scheduled by the Court (as defined below) within approximately 21 days of the commencement of these chapter 11 cases to consider entry of the Final Order.

## JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), 541(b)(1), 1107(a) and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101−1532 (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1(m).

## BACKGROUND

5.      Reverse Mortgage Investment Trust Inc., together with its debtor and non-debtor affiliates, is a leading fully integrated finance company that focuses on the reverse mortgage industry.  The Debtors, who have approximately 111 employees, assist senior American homeowners in accessing the unencumbered value of their real estate property.  The Debtors

originate, acquire, and service both Federal Housing Administration-insured Home Equity Conversion Mortgage ("HECM") loans and proprietary (non-agency) reverse mortgage loans, and they also securitize such reverse mortgage loans in Ginnie Mae ("GNMA") guaranteed and private label securitizations.  The Debtors are one of the largest originators of reverse mortgage loans in the United States.

6.      On November 30, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these chapter 11 cases.  Additional information regarding the Debtors' business, their capital structure, and the circumstances leading to these chapter 11 filings is contained in the First Day Declaration.

## THE DEBTORS' WORKFORCE

7.      As of the Petition Date, the Debtors employ approximately 107 full-time employees (the "Full-Time Employees"), four part-time employees (the "Part-Time Employees"), and 11 temporary employees from agencies (the "Temporary Employees," and collectively with the Part-Time Employees and Full-Time Employees, the "Employees").  In addition, prior to the Petition Date, on November 29, 2022, approximately 472 employees (the "Former Employees") were separated from employment as discussed more fully in the First Day Declaration.

8.      The Debtors' Employees perform a variety of critical functions, including sales, brokerage, origination, loan servicing, collections, foreclosures, customer service, administrative, legal, accounting, finance, and management-related tasks.    The skills and experience of the

Debtors' Employees, their relationships with customers, government-sponsored enterprises, warehouse lenders, and trustees, and knowledge of the Debtors' infrastructure are essential to the Debtors' ongoing operations during these chapter 11 cases.

9.      The Employees rely on their compensation and benefits, as applicable, to pay their daily living expenses.  These individuals could experience significant financial hardship if the Bankruptcy Court does not permit the Debtors to continue paying their compensation and providing them with health and other benefits.  Accordingly, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

## EMPLOYEE COMPENSATION AND BENEFITS

10.      Like many similarly-situated companies, the Debtors maintain certain compensation and benefits programs, and pay various administrative fees and insurance premiums in connection therewith (collectively, the "Employee Compensation and Benefits Programs"), including the following (each as defined below):

- Employee Compensation;

- Payroll Taxes and Deductions;

- Supplemental Workforce and Supplemental Workforce Agencies;

- Reimbursable Expenses;

- Non-Employee Director Compensation;

- Processing Fees;

- Health and Welfare Programs;

- the 401(k) Plan;

- Paid and Unpaid Leave;

- Bonus Programs; and

- Other Employee Programs.

11.     Subject to Court approval and the terms and conditions set forth herein, the Debtors intend to continue to administer the Employee Compensation and Benefits Programs in the ordinary course, as the Debtors may elect to modify, change, and/or discontinue any such programs in their discretion in the ordinary course of business.  The Debtors estimate that, as of the Petition Date, they owe approximately $5,623,500 in connection with the Employee Compensation and Benefits Programs (the "Prepetition Employee Obligations").  Pursuant to the Interim Order, the Debtors request authority, but not direction, to pay up to $2,431,500 that will become due and owing in the first 21 days of these chapter 11 cases.

12.     Of the Prepetition Employee Obligations that the Debtors are obligated to pay to, or fund, on account of any Employee (excluding the Withholding Obligations (as defined below)), seven (7) Employees are owed a total of approximately $40,000 in excess of the $15,150 priority cap described in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code (the "Statutory Cap").  None of the employees with amounts in excess of the Statutory Cap are insiders or executives of the Debtors.  The Debtors seek to make any payments to Employees in excess of the Statutory Cap only pursuant to the Final Order and only for current Employees.

13.     Any loss of Prepetition Employee Obligations would cause the Employees to experience substantial financial hardship and could result in Employee departures.  Because the Debtors' ordinary course operations and continued servicing of mortgage loans depends on Employees' continued service, it is imperative that Debtors be authorized to pay their Employees any accrued but unpaid Prepetition Employee Obligations and to continue honoring and paying

Employee Compensation and Benefits Programs in the ordinary course post-petition consistent with past practices.

**I.     Wages, Salaries, and Other Compensation.**

    A.    <u>Employee Compensation</u>.

14.    In the ordinary course of business, Employees are paid on a semi-monthly basis, one week in arrears for unpaid wages, salaries, and commissions (the "<u>Employee Compensation</u>")[3] on the 15th and last day of the month, or the preceding workday if the normal payday falls on a holiday or weekend.  The Debtors' payroll obligations include wages, salaries, commissions, and payments on account of used paid time off.  On average, the Debtors' gross payroll is approximately $2.6 million per semi-monthly pay period.

15.    As of the Petition Date, the Debtors estimate they owe approximately $290,000 to Employees and Former Employees on account of prepetition Employee Compensation, which amount includes accrued but unpaid wages, salaries, and commissions.  The Debtors estimate that approximately $150,000 of Employee Compensation will become due and owing within the first 21 days of the chapter 11 cases.  The Debtors request authorization to pay $290,000 to Employees and Former Employees on account of prepetition Employee Compensation pursuant to the Interim Order.

16.    Pursuant to the Final Order, the Debtors request authority, but not direction, to pay any unpaid amounts owed in Employee Compensation and not paid through the Interim Order in

---

[3]    In addition, the Debtors take part in an equity incentive plan (the "<u>Incentive Plan</u>"), through which certain of the Debtors' executives and senior managers receive equity shares in non-Debtor affiliates based on performance of the Debtors.  The Incentive Plan does not involve any direct interest in any of the Debtors. Out of an abundance of caution, the Debtors request authority to honor any outstanding prepetition obligations related to the Incentive Plan and to continue to honor obligations that arise under the Incentive Plan.

the ordinary course of business and consistent with past practice and to continue the Employee Compensation in the ordinary course during the administration of these chapter 11 cases, including payment in full for the current Employees that exceed the Statutory Cap. The Debtors do not seek authority to pay any amounts in excess of the Statutory Cap to any Employee pursuant to the Interim Order.

       B. <u>Payroll Taxes and Deductions</u>.

       17.    Federal and state laws require the Debtors to withhold amounts related to federal, state, and local taxes (collectively, the "<u>Withheld Amounts</u>"). The Debtors must then pay from their own funds for various withholdings, based on a percentage of gross payroll (collectively the "<u>Employer Payroll Taxes</u>," and together with the Withheld Amounts, the "<u>Payroll Taxes</u>"). The Debtors estimate that in the aggregate, the Payroll Taxes, including both the Employee and employer portions, total approximately $1.1 million per semi-monthly pay period. In addition, as of the Petition Date, the Debtors estimate they owe approximately $500,000 from deferred 2020 Payroll Taxes under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act.[4] The Debtors estimate that $1.6 million remains outstanding on account of prepetition Payroll Taxes.

       18.    For each applicable pay period, the Debtors routinely deduct certain amounts from each Employee's gross payroll (collectively, the "<u>Deductions</u>"). The Debtors deduct a total of approximately $845,000 from Employees' paychecks per semi-monthly pay period, which the Debtors remit to the appropriate third-party recipients. Accordingly, the Debtors request payment of approximately $1.6 million on account of prepetition Payroll Taxes pursuant to the Interim Order. Pursuant to the Final Order, (i) the Debtors seek authority, but not direction, to pay Payroll Taxes not paid through the Interim Order in the ordinary course and consistent with past practice

---

[4]     Pub. L. No. 116-136 (March 27, 2020).

and to continue to payment of Payroll Taxes post-petition and (ii) to the extent any of the Deductions or Payroll Taxes have not have been remitted to the appropriate third-party recipients, the Debtors seek authority, but not direction, to remit prepetition Deductions and Payroll Taxes and to continue to remit Deductions and Payroll Taxes on a post-petition basis, whether or not related to the prepetition period, to the applicable third-party recipients in the ordinary course of business and consistent with past practice.[5]

C.    Supplemental Workforce and Supplemental Workforce Agencies.

19.    In addition to their Employees, the Debtors rely on services from a supplemental workforce (the "Supplemental Workforce") comprised of approximately eight independent contractors related to the Debtors' operations.  The Debtors remit fees for the services provided by the Supplemental Workforce to the various agencies that provide the independent contractors retained by the Debtors (the "Supplemental Workforce Agencies") on a monthly basis through accounts payable.  The Debtors pay the Supplemental Workforce Agencies approximately $200,000 per month.

20.    As of the Petition Date, the Debtors estimate that they owe the Supplemental Workforce Agencies approximately $415,000 on account of prepetition services provided by the Supplemental Workforce, $200,000 of which will come due within the first 21 days of these chapter 11 cases and request authority, but not  direction, to pay $415,000 pursuant to the Interim Order.  The Debtors believe that if these amounts go unpaid, the Supplemental Workforce may stop providing their services to the Debtors.  Pursuant to the Final Order, the Debtors request

---

[5]    Concurrently herewith, the Debtors have sought authority, but not direction, to pay certain prepetition taxes, assessments, fees, and other charges in the ordinary course of business pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* (the "Tax Motion").  By this Motion, the Debtors do not seek authority to pay prepetition claims that may be covered by the relief sought in the Tax Motion.

8

authority to pay, in their sole discretion, and to continue to pay, any unpaid amounts owed to the Supplemental Workforce Agencies not paid through the Interim Order in the ordinary course of business and consistent with past practice.

D.  Reimbursable Expenses.

21.    In the ordinary course of business, the Debtors reimburse Employees for travel and other business-related expenses, including expenses the Debtors are required to reimburse under applicable state and federal law (collectively, the "Reimbursable Expenses").  To the extent the Reimbursable Expenses are not paid directly by the Debtors, Employees must submit their expenditures in accordance with the Debtors' expense policies in order to qualify for reimbursement.  Upon approval of the business expenses, the Debtors reimburse such Employees through an electronic transfer of funds to the Employees' bank accounts.

22.    Various Employees incur Reimbursable Expenses through the use of corporate credit cards,[6] cell phones, and Wi-Fi hotspots (collectively, the "Corporate Expenses").  The Debtors remit the requisite payments incurred for Corporate Expenses on a monthly basis.  The Debtors estimate that approximately $495,000 in Reimbursable Expenses is incurred for Corporate Expenses every month.

23.    On a prepetition basis, the Debtors estimate that they owe approximately $490,000 on account of Reimbursable Expenses, $370,000 of which will come due within the first 21 days of these chapter 11 cases and request authority, but not direction, to pay $490,000 pursuant to the Interim Order.  Pursuant to the Final Order, the Debtors seek authority, but not direction, to pay all prepetition amounts owed on account of Reimbursable Expenses in the ordinary course of

---

[6]    The Debtors maintain the corporate credit cards with Texas Capital Bank ("TCB") and remit these expenses directly to TCB on a monthly basis.

9

business and consistent with past practice, including all amounts payable with respect to the Corporate Expenses, and to continue to pay such obligations in the ordinary course of business post-petition.

E.  Non-Employee Director Compensation.

24.    As of the Petition Date, the Debtors maintains a board of directors, which includes two independent directors (each an "Independent Director" and collectively, the "Independent Directors").[7]  One Independent Director is compensated approximately $40,000 per month, payable one month in advance, and the other Independent Director is paid $37,500 per quarter and in advance (together, the "Independent Director Payments").  In addition, the Independent Directors will be reimbursed for all reasonable and documented out-of-pocket business expenses incurred in connection with the non-Employee services to the Debtors as a member of the Board (the "Independent Director Fees").  The Independent Directors will also be covered by the Debtors' directors' and officers' insurance policy, in an amount and on terms as reasonably determined by the Board (the "Director Insurance Coverage" and, collectively with the Independent Director Payments and Independent Director Fees, the "Independent Director Compensation").

25.    The Debtors believe there are no outstanding amounts with respect to the Director Compensation as of the Petition Date.  However, the Debtors request the authority, but not direction, to honor any prepetition obligations on account of Independent Director Compensation and to continue paying such Director Compensation on a post-petition basis in the ordinary course of business and consistent with historical practice.  The Debtors do not seek to make any Independent Director Compensation on an interim basis.

---

[7]    Neither of the Independent Directors are employed by Starwood Capital Group or otherwise affiliated with Starwood Capital Group, or any of its related affiliates.  Aside from the Independent Directors, none of the members of the Board are being compensated through this Motion or for their role on the Board.

F.   Processing Fees.

26.    The Debtors use ADP Workforce Now ("ADP") as their third-party payroll administrator for Employees and fund payroll, and certain other Employee Compensation and Benefits, by direct deposit through an electronic transfer of funds to the Employees' bank accounts.[8]  As of the Petition Date, the Debtors estimate they owe approximately $50,000 on account of prepetition payroll processing services (the "Processing Fees"), $25,000 of which will come due within the first 21 days of these chapter 11 cases and request such amounts be paid pursuant to the Interim Order.  Pursuant to the Final Order, the Debtors seek authority, but not direction, to pay the Processing Fees in the ordinary course and consistent with past practice and to continue payroll processing during the administration of these chapter 11 cases.

II.    **Employee Benefit Programs.**

A.   Health and Welfare Programs.

27.    The Debtors offer a number of health and welfare benefits programs to eligible current Employees, including the Health Insurance Programs, the Life and AD&D Insurance, the Disability Benefits, and the Workers' Compensation Program, and pay certain fees to third-party providers associated with such programs (each as defined herein, and collectively, the "Health and Welfare Programs").

1.    **Health Insurance Programs.**

28.    The Debtors offer their Employees the opportunity to participate in a number of health benefit plans, including the Medical Plan, the FSA, the HSA, the Dental Plans, and the Vision Plans (each as defined herein, and collectively, the "Health Insurance Programs").[9]  The

---

[8]      This process is used for all Employees except one, which receives payroll via a physical check.

[9]      Employees become eligible for all Employee Benefits Programs the first of the month following 30 days of employment.

Debtors also subsidize or continue to provide certain benefits to certain Former Employees after their termination, retirement, or disability leave, including (without limitation) benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").

29.     The Debtors offer medical insurance, including prescription drug coverage, (the "Medical Plan") to current Employees, which is provided by Cigna.  The coverage in the Medical Plan and associated premiums differ depending on the level of coverage Employees elect to receive and whether the Employee has dependents covered by the applicable plan.  The Debtors estimate that they spend approximately $525,000 in fees under the Medical Plan each month.  As of the Petition Date, the Debtors estimate that approximately $525,000 remains due and owing on account of the Medical Plan, which amount includes administrative fees related to the Medical Plan.

30.     The Debtors offer Employees the opportunity to contribute a portion of their pre-tax compensation to pay for certain health care expenses or dependent care expenses through a health savings account program (the "HSA Program") or flexible spending account programs (the "FSA Programs").  Pursuant to the HSA Program and FSA Programs, the Debtors withhold funds from program participants' pre-tax payroll.  The Debtors do not make any contributions to any Employee's FSA.  The Debtors estimate that they withhold approximately $45,000 per month in connection with such programs.  As of the Petition Date, the Debtors estimate that approximately $45,000 remains due and owing on account of the programs, which amount includes administrative fees related to the HSA Program and FSA Programs.

31.     The Debtors also offer to current Employees dental benefit programs (the "Dental Plans"), and vision benefit programs (the "Vision Plans"), provided by Cigna.  The coverage in the Dental Plans and the Vision Plans differs depending on (a) the level of coverage Employees

elect to receive and (b) whether such coverage is provided by an in- or out-of-network provider. Monthly health care premiums differ depending on the Dental Plan or Vision Plan in which the Employee is enrolled and whether the Employee has dependents covered by the applicable plan.

32.     The total cost of the Dental Plans and the Vision Plans is approximately $42,000 per month.  The Debtors request authority, but not direction, to honor any prepetition obligations on account of the Dental Plans and the Vision Plans and to continue the Dental Plans and the Vision Plans on a post-petition basis in the ordinary course of business and consistent with past practice.

33.     The Debtors pay approximately $612,000 per month in the aggregate for their contributions to and the administrative and premium payments for the Health Insurance Programs. As of the Petition Date, the Debtors estimate they owe approximately $612,000 of accrued but unpaid obligations on account of the Health Insurance Programs, $520,000 of which will come due within the first 21 days of these chapter 11 cases and request authority, but not direction, to pay $612,000 pursuant to the Interim Order.  Pursuant to the Final Order, the Debtors request authority, but not direction, to honor any prepetition obligations on account of Health Insurance Programs and to continue administering such Health Insurance Programs on a post-petition basis in the ordinary course of business and in a manner consistent with past practice.

34.     The Debtors also provide Former Employees with certain health benefits following their departure from the Debtors.  More specifically, pursuant to COBRA, Former Employees of the Debtors (the "COBRA Employees") may continue to receive Medical Plans, Dental Plans, and Vision Plans (the "COBRA Benefits").  COBRA Employees are entitled by law to continue to receive COBRA Benefits for up to 18 months, and in some instances up to 36 months, following termination of employment.  As of the Petition Date, there were approximately four former

full-time Employees that were COBRA Employees, excluding the Employees' dependents.  The

Debtors recently terminated a significant portion of their workforce prepetition and such Former

Employees may elect for COBRA Benefits in the post-petition period.

35.     As such, pursuant to the Final Order, the Debtors seek authority, but not direction,

(a) to pay any prepetition amounts outstanding on account of the COBRA Benefits solely out of

an abundance of caution, (b) to continue to offer the COBRA Benefits, including to Former

Employees and those Employees who may be terminated after the Petition Date, and honor all

obligations related thereto on a post-petition basis in the ordinary course of business and consistent

with past practices, and (c) to continue to pay fees related to the COBRA Benefits on a post-

petition basis in the ordinary course of business and consistent with past practices.

### 2.     Life and AD&D Insurance.

36.     The Debtors provide life (the "Basic Life Insurance"), which includes an employee

assistance program, and accidental death and dismemberment insurance coverage (the "AD&D

Insurance") to current Employees through Equitable, which each provide maximum coverage of

approximately $350,000 for non-commission employees and $100,000 for commission only

employees in the event of an Employee's death or dismemberment.

37.     The Debtor also offers a voluntary life insurance program through Equitable which

is fully paid by the Employees (the "Voluntary Life Insurance" and collectively with the Basic

Life Insurance and AD&D, the "Life and AD&D Insurance").

38.     In the last twelve (12) months, the Debtors paid approximately $64,000 on account

of premiums for the Life and AD&D Insurance.  As of the Petition Date, the Debtors estimate that

the amount of accrued but unpaid obligations on account of the Life and AD&D Insurance is

approximately $6,500.  The Debtors estimate that approximately $6,500 on account of Life and

AD&D Insurance will become due and owing within the first 21 days of the chapter 11 cases and request such amounts be paid pursuant to the Interim Order.  Pursuant to the Final Order, the Debtors request authority, but not direction, to honor any prepetition obligations on account of Life and AD&D Insurance not paid through the Interim Order, and to continue providing such Life and AD&D Insurance on a post-petition basis in the ordinary course of business and consistent with past practice.

**3.    Disability Benefits.**

39.    The Debtors provide Employees with short- and long-term disability benefits (the "Disability Benefits") through Equitable.  Under the short-term disability benefits program, Employees are entitled to, among other things, continuation of up to 50% percent of their base wages, depending on such Employee's length of service with the Debtors, in the event of a short-term medical disability due to an illness or injury (the "Short-Term Disability Benefits").  Under the long-term disability benefits program, Employees are entitled to, among other things, continuation of 60% percent of their wages, up to a monthly limit of approximately $10,000, in the event of a long-term medical disability due to illness or injury (the "Long-Term Disability Benefits" and, together with the Short-Term Disability Benefits, the "Disability Benefits").

40.    Employees' Short-Term Disability Benefits begin 7 days after an Employee's first day of absence due to illness or injury and continue for up to a maximum of 12 weeks.  The Long-Term Disability Benefits begin after an Employee is continuously absent for 90 days and continue until the Employee no longer meets the eligibility criteria or has reached the Social Security Normal Retirement Age.

41.    The Debtors pay for the Short-Term Disability Benefits, with no costs to the Eligible Employees.  The Debtors pay Equitable approximately $6,000 per month in premiums on

account of the Short-Term Disability Benefits. Currently, approximately one Employee is receiving Short-Term Disability Benefits. The Employees pay for the Long-Term Disability Benefits as a requirement of employment. Currently, approximately one Employee is receiving Long-Term Disability Benefits.

42.     In the last twelve (12) months, the Debtors paid Equitable approximately $165,000 in administrative fees and premiums on account of the Disability Benefits.

43.     In addition, the Debtors are required by New York state law to provide additional Disability Benefits for its New York state employees. These obligations are approximately $15,000 per quarter and the Debtors estimate that the unpaid amounts are approximately $30,000.

44.     As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations on account of Disability Benefits, is approximately $45,000, $30,000 of which will come due within the first 21 days of these chapter 11 cases and request that $45,000 be paid pursuant to the Interim Order.

45.     Pursuant to the Final Order, the Debtors request the authority, but not direction, to honor any prepetition obligations on account of Disability Benefits not paid through the Interim Order, and to continue providing such Disability Benefits on a post-petition basis in the ordinary course of business and consistent with past practice.

### 4.     Workers' Compensation Program.

46.     The Debtors maintain workers' compensation insurance for Employees at the levels required by applicable laws in the states in which the Debtors operate (collectively, the "Workers' Compensation Program"). All Employees participate in the Debtors' Workers' Compensation Program, which is self-insured by the Debtors up to approximately $1 million per occurrence. The Debtors maintain coverage for the Workers' Compensation Program through Travelers Insurance

("<u>Travelers</u>").  The Debtors pay approximately $15,000 monthly to Travelers for maintaining the Workers' Compensation Program.  The Debtors do not estimate that there are any outstanding amounts due to Travelers as of the Petition Date, and therefore do not request payment of such pursuant to the Interim Order

47.    The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.

48.    In addition, to the extent any Employees assert claims under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with their claims under the Workers' Compensation Program.  This required modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

49.    Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that disrupt the chapter 11 process.  As of the Petition Date, there is one open claim under the Workers' Compensation Program, but the Debtors currently have no outstanding obligations on account of the Workers' Compensation Program.  Out of abundance of caution, the Debtors seek authority, pursuant to the Interim and Final Orders, to (a) honor any pre-petition obligations on account of the Workers Compensation Program, (b) continue paying such Workers' Compensation Program on a post-petition basis in the ordinary course of business and consistent with past practice, and (c) to modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program.

17

B.  The 401(k) Plan.

50.     The Debtors provide all Employees with the opportunity to participate in a 401(k) program (the "401(k) Plan"), which is administered by the Debtors.  Employees become eligible for the 401(k) Plan on the first of the month commencing after three months of employment.  The 401(k) Plan generally provides for pre-tax or post-tax (Roth) salary deductions of Employee Compensation up to limits set by the Internal Revenue Code.  Each Employee's 401(k) contributions are deducted automatically from each paycheck in the amount requested by the Employee.  The 401(k) Plan is a "safe harbor" plan, which has non-elective contribution not less than 3% of the Employee Compensation but only if the 401(k) Plan sponsor amends such plan and provides a supplemental notice.  Under the 401(k) Plan, the Debtors also make disbursements on account of payroll deductions for repayment of loans that Employees previously drew from their individual 401(k) accounts (the "401(k) Participant Loan Payments").

51.     In the last twelve (12) months, the Employees contributions on account of 401(k) Contributions averaged approximately $375,000 per month.  The Debtors make a contribution to the 401(k) Plan through a non-elective safe harbor contribution.  The safe harbor contribution accrues throughout each year but is paid in October of the following year.  As of the Petition Date, the Debtors have accrued approximately $1,800,000 of prepetition obligations on account of the 401(k) Plan and owed to Employees.  The Debtors estimate that no amounts on account of the 401(k) Plan will become due and owing within the first 21 days of the chapter 11 cases, but out of an abundance of caution, request authority, but not direction, to pay $1,800,000 that may become due pursuant to the Interim Order.

18

C. Paid and Unpaid Leave.

52.     The Debtors maintain several paid leave benefit programs for Employees, providing paid leave for PTO, ETO, Holidays, FMLA Leave, as applicable, and Other Paid Leave (each as defined below, and collectively, the "Paid Leave").

53.     In the ordinary course of business, the Debtors provide paid time off ("PTO") to the Employees as a Paid Leave benefit.  PTO accrues at a specified rate based on the Employee's years of service and date of hire.  Employees may carry over up to a maximum of 204 hours of unused PTO into the next calendar year as extended time off ("ETO").  ETO may be used as a Paid Leave benefit for qualifying absences under the Family and Medical Leave Act (the "FMLA").  Employees who are terminated or resign are entitled to a cash payment in lieu of the accrued but unused PTO and ETO.

54.     The Debtors estimate that, as of the Petition Date, they do not have any obligations on account of accrued but unused PTO.  In the event this amount were greater than zero, it would not be a current cash payment obligation unless an Employee were to leave the Debtors' employment or were terminated.  As stated, employees who voluntarily leave the Debtors' employment or are terminated are entitled to a cash payout of their accrued but unused PTO and ETO.

55.     In addition, the Debtors provide certain other forms of Paid Leave and Unpaid Leave, including: 11 paid holidays throughout the year (the "Holidays"), during which Employees are not required to work and are paid their base rate of pay, and in certain departments, Employees receive time and a half plus holiday pay if required to work on a Holiday; paid and unpaid leave under the FMLA for: (a) birth, adoption, or foster care, (b) family care, (c) medical emergencies, (d) military exigencies, and (e) military caregiving needs (the "FMLA Leave"); and other paid and

unpaid leaves of absence for personal reasons, many of which are required by law, including missed work time in the ordinary course of business for bereavement leave, jury or court attendance, sick time, volunteer time, or time spent voting (the "Other Paid Leave") and unpaid leaves of absence for family medical leaves and military leaves (the "Unpaid Leave").

56.     The Debtors believe that the continuation of the Paid Leave and Unpaid Leave policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases.  Further, the policies are broad-based programs upon which all Employees have come to depend.  The Debtors anticipate that their Employees will utilize any accrued Paid Leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations. Certain states in which the Debtors operate require payment of PTO upon termination.  Through the Interim Order, the Debtors request authority to continue the Paid Leave and Unpaid Leave policies in accordance with prior practice.

D.  Bonus Programs.

57.     The Debtors have historically maintained certain bonus programs as an additional component of certain revenue-generating Employees' compensation structure (the "Bonus Programs").  The Debtors seek authority, in the exercise of their discretion, to continue the Bonus Programs in the ordinary course of business and consistent with past practice.  The Debtors maintain these programs to motivate and recognize non-insider Employees for their contributions to the Debtors and  believe the Bonus Programs are necessary to continue to retain these non-insider Employees.  The Debtors do not seek to make any payments pursuant the Bonus Programs with respect to "insiders" as such term is defined in section 101(31) of the Bankruptcy Code.

58.    The Debtors' bonus programs include annual discretionary bonuses, quarterly, and monthly Bonus Programs in order to incentivize non-insider Employees.  The Debtors estimate they pay approximately $190,000 under the Bonus Programs per payroll.

59.    As of the Petition Date, approximately $310,000 is due and owing under the Bonus Programs, $225,000 of which will come due within the first 21 days of these chapter 11 cases and request authority, but not direction, to pay $310,000 pursuant to the Interim Order.[10] The Debtors do not seek authority to pay any amounts under the Bonus Programs in excess of the Statutory Cap to any Employee or Former Employee pursuant to the Interim Order.

60.    Accordingly, pursuant to the Final Order, the Debtors request authority, but not direction, to pay and continue paying, as applicable, any unpaid amounts owed for the Bonus Programs in the ordinary course of business and consistent with past practice to non-insider Employees.

E.    Other Employee Programs.

61.    The Debtors also provide other employee programs that accrue only *de minimis* costs  Those programs are: Compliance HR and Clear Law Institute used in the ordinary course of the Debtors' business for HR purposes (the "Other Employee Programs").  The Debtors estimate that these programs in the aggregate cost the incur costs of  $5,000 on a monthly basis.

62.    The Debtors believe that there are no amounts outstanding with respect to the Other Employee Programs as of the Petition Date. The Debtors estimate that $5,000 will become due

---

[10]    The Debtors anticipate that approximately 15 Employees will be eligible to receive payments under the Bonus Programs during the first 21 days of these chapter 11 cases, pursuant to processor and operational bonus programs.  Such Employees hold titles indicative of their non-insider status, including: (a) Processing Lead; (b) Processing Supervisor; (c) Closing Manager; (d) Intake Specialist; (e) Pipeline Manager; (f) Facility Technician; and (g) Wholesale Underwriting Lead.  These Employees do not report to the Board, nor were such Employees appointed by the Board and otherwise do not hold characteristics that would indicate they are insiders pursuant to the Bankruptcy Code.

and owing on account of the Other Employee Programs within the first 21 days of the chapter 11 cases and request such amounts be paid pursuant to the Interim Order.  The Debtors request the authority, but not direction, to honor any prepetition obligations on account of Other Employee Programs and continue these programs in the ordinary course on a post-petition basis.

63.    Subject to entry of an Interim Order and a Final Order, the Debtors intend to continue their applicable prepetition Employee Compensation and Benefits Programs in the ordinary course.  Out of an abundance of caution, the Debtors further request confirmation of their right to modify, change, or discontinue any of their Employee Compensation and Benefits Programs and to implement new programs, policies, and benefits in the ordinary course of business on a post-petition basis during these chapter 11 cases in the Debtors' sole discretion and without the need for further Court approval, subject to applicable law.

64.    As of the Petition Date, the Debtors estimate that they owe approximately $5,623,500 on account of accrued but unpaid Employee Compensation and Benefits Programs, $2,723,500 of which will come due within the first 21 days of these chapter 11 cases and request authority, but not direction, to pay $5,623,500 pursuant to the Interim Order.  By this Motion, the Debtors seek authority, but not direction, from the Court to make the payments related to prepetition amounts owed on account of the Employees Compensation and Benefits Programs, and to continue making payments in the ordinary course of business on a final basis.

**BASIS FOR RELIEF**

I.    **Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits.**

A.    Certain of the Employee Compensation and Benefits Are Entitled To Priority Treatment.

65.      Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Employee Compensation and Benefits to priority treatment.  As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims, given priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, for (a) wages, salaries or commissions, including vacation, severance, and sick leave pay earned by an individual and (b) contributions to an employee benefit plan).  To the extent that an Employee receives no more than $15,150 on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Employees and does not have any material negative impact on recoveries for general unsecured creditors.  Indeed, the Debtors submit that payment of the Employee Compensation and Benefits Programs at this time enhances value for the benefit of all interested parties.  Finding, attracting, and training new qualified talent would be extremely difficult and would most likely require higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees.

B.  Payment of Certain Employee Compensation and Benefits Is Required by Law.

66.      The Debtors seek authority to pay withholding obligations to appropriate third-party payees.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' wages. Indeed, certain withholding obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' wages on another party's behalf.  *See* 11 U.S.C. §§ 541(b)(1), (d).  Further, federal and state laws require the Debtors to withhold certain tax payments from Employees' wages and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.,* 41 F.3d 92, 95-97 (3d

Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.,* 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because certain withholding obligations may not be property of the Debtors' estates, the Debtors request authorization to transmit such withholding obligations to the proper parties in the ordinary course of business. *See In re Dameron*, 155 F.3d 718, 721 (4th Cir. 1998).

67.    Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations.

## II.    Payment of the Employee Compensation and Benefits Is Warranted Under Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity.

68.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1). Courts in the Third Circuit and other circuits have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g., In re Montgomery Ward Holding Corp*., 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy Code); *see also In re Phx. Steel Corp*., 82 B.R. 334, 335–36 (Bankr. D. Del. 1987). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-*

24

*Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

69.     The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New England Railway, Co.*, 657 F.2d 570, 581 (3d Cir. 1981).  The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan).

70.     Moreover, the doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary

25

to avert a serious threat to the Chapter 11 process"); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

71.    Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.,* 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*

72.    Consistent with a debtor's fiduciary duties, courts have also authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See, e.g., In re Ionosphere Clubs,* 98 B.R. at 175 (finding that there was a sound business justification to justify payment of prepetition wages); *see also Armstrong,* 29 B.R. at 397 (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors).

73.    The Debtors submit that the payment of the Employee Compensation and Benefits Programs represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections

105(a) and 363(b) of the Bankruptcy Code.  Paying prepetition wages, employee benefits, and similar obligations, and continuing to make such payments in the ordinary course throughout the pendency of these chapter 11 cases, will benefit the Debtors' estates and their creditors. Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits Programs and the loss of valuable Employees would be distracting at this crucial time when the Debtors need to focus on stabilizing their business operations.

74.    Indeed, courts in this district have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested here.  *See, e.g., In re Carestream Health, Inc.,* No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022) (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a postpetition basis); *In re Lear Cap. Inc.*, No. 22-10165 (BLS) (Bankr. D. Del. Mar. 4, 2022) (same); *In re Am. Eagle Delaware Holding Co. LLC*, No. 22-10028 (JKS) (Bankr. D. Del. Jan. 8, 2022) (same); *In re Sequential Brands Grp., Inc.*, No. 21-11194 (JTD) (Bankr. D. Del. Sept. 1, 2021) (same); *In re Town Sports Int'l, LLC*, No. 20-12168 (CSS) (Bankr. D. Del. Sept. 16, 2020) (same).[11]

75.    Accordingly, the Debtors respectfully request that the Court authorize and direct the Debtors to pay any prepetition amounts accrued and unpaid on account of the Employee Compensation and Benefits Programs and to continue the Employee Compensation and Benefits Programs on a post-petition basis in the ordinary course of business and consistent with past practices.

---

[11]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

**III.    A Limited Waiver of the Automatic Stay for Workers' Compensation Claims is Appropriate Here.**

76.    Section 362(a) of the Bankruptcy Code operates to stay "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . ." 11 U.S.C. § 362(a)(1).

77.    The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their claims against the Workers' Compensation Program in the appropriate judicial or administrative forum.  The Debtors believe that cause exists to modify the automatic stay because staying the Employee's workers compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture.  Such departures could cause a significant disruption in the Debtors' business to the detriment of all stakeholders.  In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states.  Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Debtors' Workers' Compensation Program to proceed.

**IV.    Processing of Checks and Electronic Fund Transfers Should Be Authorized.**

78.    The Debtors have sufficient funds to pay any amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from post-petition financing and anticipated access to cash collateral (subject in all events to the terms and conditions of the proposed interim order and associated budget).  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating

28

to an authorized payment in respect of the Employee Compensation and Benefits Programs obligations. Accordingly, the Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003(b) ARE SATISFIED

79.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. Accordingly, the Debtors submit that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## RESERVATION OF RIGHTS

80.     Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken by the Debtors pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be:  (a) an admission as to the amount of, basis for, priority, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any

grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

81.     The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

## NOTICE

82.     The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable: (a) the Office of the United States Trustee for the District of

Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Prepetition Lenders; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the Government National Mortgage Association; (h) the Federal Housing Administration; (i) the United States Department of Housing and Urban Development; (j) the Employees and Former Employees; (k) the attorneys general in the states where the Debtors conduct their business operations; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

83.    No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

31

WHEREFORE, the Debtors respectfully request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:  November 30, 2022
        Wilmington, Delaware

Respectfully submitted,

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

     */s/ Jennifer R. Hoover*
Michael J. Barrie (DE No. 4684)
Jennifer R. Hoover (DE No. 5111)
Kevin M. Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
1313 North Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: mbarrie@beneschlaw.com
        jhoover@beneschlaw.com
        kcapuzzi@beneschlaw.com
        jgentile@beneschlaw.com

*-and-*

**SIDLEY AUSTIN LLP**

Stephen Hessler (admitted *pro hac vice*)
Thomas Califano (admitted *pro hac vice*
Anthony Grossi (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email:  shessler@sidley.com
        tom.califano@sidley.com
        agrossi@sidley.com

*Proposed Counsel to the Debtors*