## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVERSE MORTGAGE INVESTMENT | ) | Case No. 22-11225 (MFW) |
| TRUST INC., *et al.*,[1] | ) | |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |
| | ) | |

### DEBTORS' MOTION FOR ENTRY OF
### INTERIM AND FINAL ORDERS (A) AUTHORIZING
### THE DEBTORS TO (I) CONTINUE HONORING REVERSE
### ISSUER AND SERVICING OBLIGATIONS AND (II) SELL
### CERTAIN NEWLY ORIGINATED LOANS, (B) MODIFYING
### THE AUTOMATIC STAY ON A LIMITED BASIS TO FACILITATE THE
### DEBTORS' ONGOING OBLIGATIONS, AND (C) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors," and, collectively with their non-debtor subsidiaries, the "Company") respectfully state the following in support of this motion (the "Motion"):[2]

## PRELIMINARY STATEMENT

### I.    Overview of the Company Business Operations.

1.    The Company is part of an important industry that serves the national policy of facilitating the aging of seniors in their homes. Specifically, as an originator and servicer of reverse mortgages, the Company plays an integral role in the national economy by making loans

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Reverse Mortgage Investment Trust Inc. (3421); Reverse Mortgage Funding LLC (0209); RMIT Cash Management LLC (6241); RMIT Operating I LLC (1844); and RMIT Operating II LLC (2301). The location of the Debtors' service address for purposes of these chapter 11 cases is: 1455 Broad Street, 2nd Floor, Bloomfield, NJ 07003.

[2]    A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Tanya Meerovich, Chief Restructuring Officer of Reverse Mortgage Investment Trust Inc.* (the "First Day Declaration"), filed contemporaneously herewith. Capitalized terms used but not immediately defined shall have the meanings ascribed to such terms in the First Day Declaration or later in this Motion.

available to older homeowners that allow them to convert the equity in their homes into cash to pay living expenses. Reverse mortgages serve many seniors who do not meet the income requirements or are unable to meet the monthly payment obligations of alternative financing options, such as cash-out refinance mortgages and home equity lines of credit. These loans do not require borrowers to make monthly principal and/or interest payments. All interest and fees accrue to the balance of the loan, which is typically paid after the homeowner moves out of the home or passes away.[3] Borrowers may use the proceeds of their reverse mortgage loans to fund expenses such as maintenance, tax, utility, and other living expenses.

2.       The Company originates and services reverse mortgage loans (most of which are insured by the FHA).[4] The majority of the loans Company originates and services are FHA-insured reverse mortgages (Home Equity Conversion Mortgage loans, or "HECM Loans"), which are typically pooled into Ginnie Mae[5] securitizations (Home Equity Conversion Mortgage-Backed Securities, or "HMBS") issued by the Company. As a servicer of HECM Loans, the Company pools the loans' subsequent draws and ongoing costs and fees (including interest, servicing fees, and mortgage insurance premiums) and issues additional HMBS ("Tail Securitizations") in order to generate revenue. The Company also originates and services non-agency reverse mortgage loans ("Proprietary Reverse Mortgage Loans"), which are

---

[3]    Other events, such as default, may lead to a required repayment.

[4]    The Federal Housing Administration (the "FHA") is an agency within the U.S. Department of Housing and Urban Development ("HUD").

[5]    The Governmental National Mortgage Association ("Ginnie Mae") is a federal corporation within the FHA that guarantees timely payment of principal and interest payments for mortgage-backed securities made up exclusively of mortgages insured or guaranteed by the federal government. The Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation ("Fannie Mae" and "Freddie Mac," respectively) are government-sponsored enterprises ("GSEs") chartered by Congress that buy and securitize mortgage loans originated by mortgage lenders. Unlike Fannie Mae and Freddie Mac, Ginnie Mae does not purchase or securitize mortgages—it guarantees mortgage-backed securities issued by approved issuers (such as banks or credit unions) in accordance with the Ginnie Mae securitization guide (the "Ginnie Mae Guide").

typically sold into private label securitizations.  The Company's primary profit drivers and liquidity generators were its originations business (largely through the gain-on-sale of HMBS and private label securitizations), the gain-on-sale of Tail Securitizations, and servicing fees.

3.      As described in the First Day Declaration, certain macroeconomic trends have led to significant financial and operational stress for the Company—and ultimately have led to a series of events of default under the Company's debt facilities.  Notwithstanding the Company's efforts to address its distress, including the pausing of originations on November 21, 2022 (the "Origination Pause"), the Company determined that no feasible alternative could be implemented in an out-of-court setting, and the Debtors determined it was in the best interests of the estates to commence these Chapter 11 Cases to facilitate an orderly transition of the assets and implement a wind-down plan to preserve value for all of the Company's stakeholders.  In connection therewith, the Debtors seek authority herein to continue certain ordinary course servicing and securitization activities while it facilitates a transition of such activities during these Chapter 11 Cases which will inure to the benefit of the Debtors' estates and ensure that the critical financial support provided to the Debtors' mortgagors continues without interruption to the extent possible.[6]

## II.    Origination of Reverse Mortgage Loans.

4.      The Company is one of the largest originators of reverse mortgage loans in the United States, with approximately 12% market share in reverse mortgage loan originations in the year to date through the third quarter of 2022.  Through Debtor RMF, the Company is licensed to originate and/or acquire HECM Loans in 50 States, Puerto Rico, and the District of

---

[6]    Additionally, as described further herein and in connection with the Debtors' orderly transition of the assets, the Debtors seek authority, but not direction, to sell approximately $3 million of loans originated prepetition that were in closing at the time of the Origination Pause to Longbridge Financial LLC ("Longbridge") pursuant to a loan sale agreement between the Debtors' and Longbridge (the "Longbridge Loan Sales").

Columbia.  The Company originates HECM Loans through its retail and wholesale operations, and it also acquires HECM Loans recently closed by other lenders through additional channels.

5.     In 2018, the Company diversified its originations business to include an expansion into Proprietary Reverse Mortgage Loan products.  Through the launch of the Company's proprietary Equity Elite loans, the Company offered a financing solution to meet the needs of borrowers whose preferences fit outside of the FHA's lending requirements, for example, because they do not meet the age requirements or would like to borrow in excess of the Maximum Claim Amount limits.  The Equity Elite loan product appeals to cost-sensitive borrowers, because borrowers do not need to pay an upfront mortgage insurance premium or an ongoing mortgage insurance premium as are required for HECM Loans.  Equity Elite loans also are available to borrowers starting at age 55[7]—in contrast to age 62 for HECM Loans—and they have a higher maximum loan balance.  The Equity Elite loan product is originated through retail and wholesale operations and is currently available in 28 states and the District of Columbia.

6.     Once the Company originates a reverse mortgage loan, the Company uses the loan as collateral for its warehouse financing until it later sells the loan in a securitization transaction. Through the securitization transaction, the Company converts the future cash flows associated with the eventual repayment of the loan balance into cash available to the Company in the near term. The originated loans also provide value to the Company because the Company acquires the rights to service the underlying loans ("Mortgage Servicing Rights" or "MSR") and retains such rights when it securitizes the loans.

---

[7]     Higher minimum age requirements apply in some states.

### III.    The Company's Securitization Activities.

7.    When reverse mortgage loan borrowers take an initial draw of their loans, the Company securitizes the initial loan amount and upfront fees by pooling those amounts (referred to as "participations") with participations in other reverse mortgage loans and financing the pools in the secondary market as mortgage-backed securities.  The Company also securitizes into separate "tail securitizations" the ongoing monthly servicing fees, annual mortgage insurance premiums, accrued interest, and subsequent draws on the loan by the mortgage borrower.  The company pools HECM Loans and tails into HMBS securitizations for which Ginnie Mae has guaranteed timely payment of principal and interest payments.

8.    The Company also issues other securitizations that are not guaranteed by Ginnie Mae, including private label securitizations of Buyout HECM loans that are not assignable to the FHA and securitizations of its Proprietary Reverse Mortgage Loans.  Unlike HMBS securitizations, securitizations of Buyout loans and the Company's Proprietary Reverse Mortgage Loan securitizations involve whole loans, not participations.

9.    By executing these securitizations, the Company is able to generate cash and income on a regular basis from a mortgage asset that does not receive monthly borrower principal and interest payments like a Traditional Forward Mortgage Loan.  The Company uses this cash, in turn, to fund additional loan originations and other operations of its business.

10.    As of October 31, 2022, the Company has approximately $21.371 billion of issued and outstanding HMBS participations and approximately $2.393 billion of issued and outstanding private label securitization notes.

## IV.    The Company's Servicing Activities.

11.    The Company holds the Mortgage Servicing Rights and acts as the servicer for the reverse mortgage loans held in its portfolio.  As a servicer, the Company is responsible for servicing activities including fulfilling Buyout obligations, mailing monthly statements, answering borrowers' phone calls, and foreclosing on delinquent borrowers.

12.    The Company has contracted with a subservicer, Compulink Corp., d/b/a Celink ("Celink"), to assist with the servicing of its reverse mortgages.  The Company maintains an internal servicing oversight team, with employees in Michigan (within driving distance of Celink's office) and at its Bloomfield, New Jersey location.  RMF's Servicing Oversight department reviews Celink servicing activities on a daily, weekly and monthly basis, depending on the function and frequency of reporting.  The Servicing Oversight department is split into five core teams with unique monitoring functions based on the different stages of the life cycle of a reverse mortgage loan: Active, Default and Due & Payable, Foreclosure, REO,[8] and HUD Claims.  The Active Loan Oversight team's functions include new loan boarding and transfers, audits of payment plan changes, adjustable-rate mortgage adjustments, draw requests, customer inquiries and complaints and HUD assignments.    The Default and Due & Payable team's oversight functions include monitoring loans in default for death, non-occupancy, and tax or insurance defaults, and working with Celink on possible mitigation activities.  The Foreclosure team monitors critical HUD timelines related to the foreclosure process.  The REO oversight team monitors the Company's REO properties through the listing, contract, and sale of such properties to ensure that the Company incurs minimal losses.  Lastly, the HUD Claims oversight

---

[8]    REO or "real estate owned" properties are lender-owned properties that failed to sell during the foreclosure process.

team monitors the FHA claims process and audits initial and supplemental claims filed by Celink to ensure all applicable funds are claimed.

13.    The Company is heavily focused on servicing HECM Loans, which comprise 96% of its MSR portfolio.  Pursuant to the requirements of Ginnie Mae's HMBS program, the Company must ensure that it services all of the HECM Loans underlying the HMBS that it issues in compliance with FHA and Ginnie Mae servicing requirements.  The FHA's servicing guidelines (the "<u>FHA Servicing Guidelines</u>") impose numerous obligations on the Company's servicing of HECM Loans.[9]  If the Company fails to comply with the FHA Servicing Guidelines, it could face possible termination of its servicing rights without compensation.

14.    As a servicer of Fannie Mae-owned reverse mortgage loans (collectively, the "<u>Fannie Mae Loans</u>"), the Company is and was obligated to service the Fannie Mae Loans in accordance with, and subject to, the Fannie Mae Mortgage Selling and Servicing Contract, the Fannie Mae Selling Guide, the Fannie Mae Servicing Guide, the Reverse Mortgage Loan Servicing Manual, and all supplemental servicing instructions or directives provided by Fannie Mae, all applicable master agreements, recourse agreements, repurchase agreements, indemnification agreements, loss-sharing agreements, and any other agreements between Fannie Mae and the Debtors, and all as amended, restated or supplemented from time to time (collectively, the "<u>Fannie Mae Lender Contract</u>"), which is the unitary, indivisible master servicing contract comprising all the rights, duties, obligations, representations, warranties, covenants and agreements between the Company and Fannie Mae governing the servicing of the Fannie Mae Loans.  The Fannie Mae Lender Contract generally provide that Fannie Mae can

---

[9]    The FHA Servicing Guidelines include regulations promulgated in 24 C.F.R. § 206; U.S. Dep't of Housing and Urban Dev., Home Equity Conversion Mortgages Handbook 4330.1, and various Mortgagee Letters available at https://www.hud.gov/program_offices/housing/sfh/hecm/hecmml.

terminate servicers either at will or for cause, among other reasons.  Accordingly, if the Company does not honor its servicing obligations with respect to the Fannie Mae Loans, Fannie Mae may take the position that it has the right to unilaterally terminate the Company's servicing rights, which could result in the loss of a portion of the Company's revenue.

15.     The Company is the largest servicer of owned Mortgage Servicing Rights in the reverse mortgage industry.  As of October 31, 2022, RMF managed reverse mortgage loans with an unpaid principal balance of approximately $25.572 billion.

## JURISDICTION AND VENUE

16.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Amended Standing Order").  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

17.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

18.     The bases for the relief requested herein are sections 105, 362, 363, and 364 of title 11 of the United States Code (the "Bankruptcy Code") and Bankruptcy Rules 4001, 6003, and 6004.

## BACKGROUND

19.    On November 30, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these chapter 11 cases.  Additional information regarding the Debtors' business, their capital structure, and the circumstances leading to these chapter 11 filings is contained in the First Day Declaration.

## RELIEF REQUESTED

20.    Through this Motion, pursuant to sections 105(a), 362, 363(c), 363(f) 364(d), 1107(a), and 1108 of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004, the Debtors seek authority, but not direction, to continue in the ordinary course of business and consistent with past practices, to:

A.  (i) continue their securitization activities, (ii) honor the Ginnie Mae Agreements and the Fannie Mae Lender Contract;  and (iii) remit the Ginnie Mae Commitment Fee, the Ginnie Mae Guaranty Fee, amounts due from Borrower Paydowns, and certain administrative fees arising from the Company's securitization activities and amounts due under the Fannie Mae Lender Contract;

B.  (i) honor the Servicing Obligations, (ii) honor and pay the Curtailment Obligations, (iii) collect and securitize the Servicing Fees, and (iv) remit the Servicer Advances;

C.  continue assignment and claim reimbursement activities;

D.  continue honoring the Company's indemnification obligations to FHA in connection with defective loans;

E.  consummate the Longbridge Loan Sales; and

F.  fulfill compliance and regulatory obligations.

21.     In addition, the Debtors request that the Court grant the Debtors discretion to waive the automatic stay in connection with foreclosure and eviction proceedings.

22.     A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "Interim Order") and on a final basis is annexed hereto as **Exhibit B** (the "Final Order").

**OVERVIEW OF THE COMPANY'S**
**OBLIGATIONS AS MBS ISSUER AND LOAN SERVICER**

I.     **Obligations as MBS Issuer.**

      a.  **Ginnie Mae Buyouts.**

23.     Unlike Fannie Mae or Freddie Mac, Ginnie Mae does not issue, sell, or buy MBS, nor does it purchase mortgage loans.   Instead, Ginnie Mae guarantees MBS secured by mortgage loans that have been pooled and securitized by the Company as an approved issuer.   Specifically, Ginnie Mae guarantees the Company's timely payment of interest and repayment of Company-issued MBS.

24.     As mentioned above, the Company has ongoing obligations (the "Ginnie Mae Buyout Obligations") as an issuer in connection with its previously securitized HECM Loans. Such obligations include, among other things, repurchasing loans in accordance with the requirements of the Ginnie Mae securitization guide (the "Ginnie Mae Guide") and the Company's servicing agreement with Ginnie Mae (collectively, with the Ginnie Mae Guide, the "Ginnie Mae Agreements").   The Ginnie Mae Agreements require the Company to repurchase mortgage loans when certain defaults occur or the loans reach ninety-eight percent (98%) of the Maximum Claim Amount, which is generally the lesser of appraised value of the underlying property or the maximum principal amount for a one-unit dwelling that FHA can lawfully insure for forward mortgages in the geographical area as provided by Section 203(b)(2) of the National

Housing Act.   Upon repurchasing mortgage loans as a result of a Ginnie Mae Buyout Obligations, the Company is repaid in one of three ways: (i) a borrower (or the borrower's heir) pays the Company the total amount owed under the mortgage loan, (ii) if the loan is a performing loan (*i.e.*, a loan that is not in default), FHA reimburses the Company upon the Company's filing of an assignment claim for such loan to FHA, or (iii) if the loan is a defaulted loan, the Company liquidates the loan and seeks reimbursement from FHA to the extent the liquidation proceeds do not satisfy the total obligations owed under the loan.   The Company's Ginnie Mae Buyout Obligations are approximately $150 million each month.   By this motion, the Debtors are not asking for authority to honor any Ginnie Mae Buyout Obligations.   The Debtors are in ongoing discussions with stakeholders to otherwise satisfy the Ginnie Mae Buyout Obligations.

**b.   Securitization Activities and Payments Related Thereto.**

25.   When borrowers make subsequent draws on their loans, the Company securitizes such draws into pools that are referred to as "tail securitizations."   In addition to securitizing the amount of borrower draws in each tail securitization, the Company securitizes mortgage insurance premiums, Servicing Fees, vendor payments, and interest payments that the Company makes on behalf of the borrowers or accrues to the loan.   The Company securitizes approximately $70 million to $100 million in new tail securitizations on a monthly basis in connection with the HECM Loans and Proprietary Reverse Mortgage Loans.

26.   Additionally, the Company is required to remit various fees to Ginnie Mae in connection with the aforementioned HECM Loans securitization activities.   First, the Company must obtain authority from Ginnie Mae to issue up to an authorized dollar amount of securities at any given point in time.   In connection with each application, the Company remits a commitment fee (the "<u>Ginnie Mae Commitment Fee</u>") based on the amount of the requested

commitment.   The Ginnie Mae Commitment Fee is automatically deducted from the Company's account at the time the Company's application is processed.   The Company estimates that the Ginnie Mae Commitment Fees for 2022 will be approximately $350,000.

27.     Second, the Company is required to pay Ginnie Mae a guaranty fee (the "Ginnie Mae Guaranty Fee") on account of each security for which the Company is the issuer of record. The Ginnie Mae Guaranty Fee is computed by multiplying the aggregate principal balance of the guaranteed securities outstanding at the beginning of the monthly reporting period by the applicable annual rate divided by twelve (12).   The Company remits approximately $1 million in Ginnie Mae Guaranty Fees on a monthly basis.

28.     Third, the Company must pay certain administrative fees to Ginnie Mae-approved document custodians.   Such document custodians (i) review the loan documentation submitted by the Company in connection with its securitizations, (ii) certify to Ginnie Mae that the loan documentation accurately represents the mortgages placed in such custodians' control, and (iii) maintain control of the loan documents over the life of the loan.   Following the custodians' certification to Ginnie Mae, the Company delivers the securities to a settlement agent.   If a document custodian determines that the Company submitted an incomplete loan package, the Company must also pay fees to post letters of credit in accordance with the Ginnie Mae Agreements.   The Company remits approximately $80,000 in such administrative fees on a monthly basis.

29.     The Company is also required to remit the loan collections amounts related to the loans that the Company has securitized to the MBS investors.   Such amounts include borrower pay-offs, partial pay-downs, and claim payments (collectively, the "Borrower Paydowns").   The Company remits approximately between $250 million and $350 million of

Borrower Paydowns on a monthly basis in connection with the HECM Loans and Proprietary Reverse Mortgage Loans.

30.     The Company's failure to remit the aforementioned fees and Borrower Paydowns could result in a default under the Ginnie Mae Agreements and the terms and conditions of other Company Agreements, which would hinder the Company's ability to transition servicing and securitization activities during these Chapter 11 Cases and could negatively impact the financial wellbeing of the Company's reverse mortgagors who rely on the Company's continued servicing and securitization activities to fund their retirement.

31.     Accordingly, the Debtors seek authority, but not direction, to (i) continue their securitizing activities, (ii) honor the Ginnie Mae Agreements; and (iii) remit the Ginnie Mae Commitment Fee, the Ginnie Mae Guaranty Fee, amounts due from Borrower Paydowns, and certain administrative fees arising from the Company's securitization activities, in each case, in the ordinary course of business and consistent with past practices in connection with the HECM Loans and Proprietary Reverse Mortgage Loans.

## II.    Obligations as Loan Servicer.

32.     The Company is also obligated to perform a variety of servicing functions in its capacity as servicer and subservicer.  Such servicing functions differ depending on whether the loan is performing or whether the loan is in default.

### a.    Servicing Obligations in Connection with Performing Loans.

33.     When borrowers comply with the terms of their loan agreements, the underlying loans are characterized as performing loans.  The Company's servicing obligations in connection with such loans include (i) funding scheduled and unscheduled borrower draws, (ii) funding mortgage insurance premiums; (iii) corresponding with borrowers regarding the status of their

loans, (iv) monitoring and disbursing borrower's insurance loss draft funds (v) monitoring borrowers' timely payment of taxes and homeowner's insurance, (vi) monitoring borrowers' compliance with certain occupancy requirements, (vii) making other servicer advances, which are fully reimbursable from third-party investors, in accordance with the applicable servicing agreements, and (viii) remediating errors or lack of compliance with laws or regulations (collectively, the "Performing Loan Servicing Obligations"). With respect to (i) above, the Company, in its role as servicer, funds on a monthly basis approximately $6 million on account of scheduled borrower draws and approximately $60 million to $70 million on account of unscheduled borrower draws. In connection with loans that the Company subservices, the Company receives cash to fund scheduled and unscheduled borrower draws directly from third-party owners of such loans.

34. At any given point in time, the borrower on a performing loan may sell the mortgaged property for at least the lesser of the outstanding loan balance or the appraised value and remit the proceeds to the Company.

35. The Company must perform the Performing Loan Servicing Obligations in accordance with the requirements set forth by FHA in the FHA Servicing Guidelines and by Fannie Mae under the Fannie Mae Lender Contract. A failure to comply with the FHA Servicing Guidelines or the Fannie Mae Lender Contract, as applicable, may lead to a termination of the Company's servicing rights without compensation again hampering the Company's ability to transition servicing and securitization activities during these Chapter 11 Cases.

36. A failure to honor such obligations may also result in additional defaults in connection with the Proprietary Reverse Mortgage Loans, which, for similar reasons, would have a detrimental effect on the Debtors' estates negatively impact the Debtors' mortgagors.

Accordingly, the Debtors request authority to honor the Performing Loan Servicing Obligations in the ordinary course of business and consistent with past practices in connection with the HECM Loans and Proprietary Reverse Mortgage Loans.

### b. Servicing Obligations in Connection with Non-Performing Loans.

37.    A substantial portion of the Company's servicing activities arise in connection with loans that are in default (*i.e.*, non-performing loans).   Such obligations differ based upon whether defaults can be cured by borrowers and may include (i) entering into, and performing under, existing repayment plans, and (ii) engaging in foreclosure activities (collectively, the "Default Servicing Obligations" and together with the Performing Loan Servicing Obligations, the "Servicing Obligations").  The Company generally assists borrowers in their efforts to cure defaults.

38.    In most instances, however, defaults are not cured (especially as the most common form of default is the death of the last surviving borrower).   In such cases in connection with HECM Loans, for example, FHA regulations, handbooks, and mortgagee letters (collectively, the "FHA Guidelines") provide the borrower or the borrower's heirs the option to (i) pay off the outstanding loan balance, (ii) sell the mortgaged property for at least 95% of the appraised value and remit the proceeds to the Company, or (iii) provide the Company with a deed in lieu of foreclosure, which conveys the borrower's title in the mortgaged property to the Company.  If a loan is not paid off, the Company forecloses on the mortgaged property to satisfy the outstanding loan obligations.

### i. Foreclosure Sales.

39.    Upon commencing any foreclosure process, the Company notifies borrowers of its intent to foreclose and carries out the foreclosure in accordance with the laws of the jurisdiction in which the property is located.    Counsel retained by the Company typically requests or

schedules a foreclosure sale date, attends a foreclosure sale (the "Foreclosure Sale"), and enters a bid based on instructions provided by the Company.   The property is subsequently transferred to the winning bidder through a foreclosure deed that is executed and recorded with the county recorder's office.   If the property is sold to a third party at a Foreclosure Sale, the Company obtains funds from the successful third-party buyer before the foreclosure deed is issued.

### ii.    REO Property Preservation and Disposition.

40.    To the extent that foreclosed properties are not sold to third parties at Foreclosure Sales and the Company is the successful bidder at the Foreclosure Sale, the Company may market and sells such property (commonly referred to as real estate owned property (collectively, "REO Property")) with the assistance of real estate brokers.   To the extent that the REO Property is owned by a third-party investor, the Company remits the net proceeds from the sale of the REO Property to the third-party investor.

41.    In conjunction with consummating a sale of a REO Property to a third party, the Company is required to deliver marketable and insurable title.   In light of the commencement of these chapter 11 cases, certain title insurance companies, escrow agents, and related third parties may refuse to insure REO Properties, pass clear title to third-party purchasers, or otherwise perform functions necessary to facilitate the sale of the REO Property absent a Court order confirming the Company's authority to sell REO Property in the ordinary course of business.   If the Company is unable to sell REO Property due to an inability to deliver marketable and insurable title to third-party purchasers, such third-party purchasers may refuse to proceed with sale closings, which would significantly impair the Company's revenues.   Moreover, the value of REO Property becomes increasingly uncertain the longer such property remains on the market. Thus, any delay to the sale of REO Property can lead to significant purchase price reductions. To avoid substantial harm to the Debtors' estates, the Company must be able to provide title

insurance companies, escrow agents, and related third parties with assurances that the Company can obtain and deliver marketable and insurable title without disruption.   Accordingly, the Debtors seek authority to continue selling, in their capacities as owners and/or servicers of loans, REO Property (i) on an "as is where is" basis and without any representation and warranties except for title, in the ordinary course of business, in their discretion and subject to their business judgment, and consistent with past practices, and (ii) free and clear of any and all liens and encumbrances (a) under section 363(f) of the Bankruptcy Code to the extent the Debtors own the REO Property, and (b) to the extent permitted pursuant to applicable non-bankruptcy law for REO Property owned by third parties.

42.    The Company must perform the Default Servicing Obligations in accordance with the requirements set forth by FHA in the FHA Servicing Guidelines and by Fannie Mae in the Fannie Mae Lender Contract.   As previously mentioned, a failure to comply with the FHA Servicing Guidelines or the Fannie Mae Lender Contract may lead to a termination of the Company's servicing rights without compensation and interrupt the Company's ability to transition such servicing rights during these Chapter 11 Cases.   Such a result would substantially harm the value of the Debtors' loan servicing operations and negatively impact the Debtors' estates, creditors, and parties in interest, particularly the Debtors' mortgagors who financially rely on such servicing activities.   A failure to honor such obligations in connection with Proprietary Reverse Mortgage Loans, moreover, would similarly have a detrimental effect on the Debtors' estates and stakeholders.   Accordingly, the Debtors request authority to honor the Default Servicing Obligations in the ordinary course of business and consistent with past practices in connection with the HECM Loans and Proprietary Reverse Mortgage Loans.

### c.  Curtailment.

43.    Debenture interest payable under FHA mortgage insurance contracts accrues on the total debt of a loan after it is deemed "due and payable" until a claim on account of such loan is reimbursed by FHA.    Failure to meet any of the processing deadlines during the default, foreclosure, and claim cycles, may stop the accrual of debenture interest otherwise payable under an FHA claim.    When such failure occurs, the Company is obligated to make the third-party investor or servicer whole for interest curtailed by FHA (the "<u>Curtailment Obligations</u>").    In certain instances, including with respect to the Fannie Mae Loans, failure to honor the Curtailment Obligations could lead to the termination of the Company's servicing rights without compensation and a possible transfer of the Company's servicing rights to a third-party servicer. To avoid this irreparable harm, the Debtors request authority, but not direction, to honor and pay the pre-and post-petition Curtailment Obligations in the ordinary course of business and consistent with past practices.

### d.  Servicing Fees.

44.    The Company earns servicing fees in connection with the Performing Loan Servicing Obligations and the Default Servicing Obligations.    Such fees are either (i) equal to a specified percentage of the unpaid principal balance of the loans being serviced or (ii) a flat fee. In certain circumstances, the Company's fees also include interest income earned on the interest rate spread on securitized loans (the fees described herein are collectively referred to as the "<u>Servicing Fees</u>").    The Servicing Fees (excluding the fees described in (i)) are added to or are part of the borrowers' loan balances and may be eligible to be subsequently securitized by the Company.    The Company accrues approximately $6.2 million in Servicing Fees on a monthly basis.

**e. Servicer Advances.**

45.    In connection with the Servicing Obligations, the Company must fund certain advances to protect and preserve the value of the underlying collateral.   With respect to non-performing loans, a failure to fund such advances may lead to the imposition of tax liens on the mortgaged property, which would significantly hinder the Company's ability to liquidate the property through Foreclosure Sales or subsequent dispositions. The various advances remitted by the Company include the following:

    i.    tax payments and home insurance premiums (the "T&I Advances");

    ii.    home owners' association dues in super-lien states;

    iii.    fees and expenses to various servicing vendors (*e.g.*, property inspectors and maintenance contractors); and

    iv.    fees and expenses associated with enforcement or judicial proceedings, including foreclosures, bankruptcies, evictions, or litigation actions; and costs to preserve foreclosed property prior to liquidation (each of the above, collectively, and with other similar payments, the "Servicer Advances").

46.    When performing Servicing Obligations as a servicer, the Company funds the Servicer Advances.   When performing the Servicing Obligations as a subservicer, the Company receives the Servicer Advances from third-party investors of loans before remitting such funds to the requisite third parties.   The Company remits approximately $5 million to $6 million in Servicer Advances on a monthly basis in connection with its servicing and subservicing activities.

47.    Accordingly, the Debtors seek authority, but not direction, to (i) honor the Servicing Obligations, including by continuing to perform under the Fannie Mae Lender Contract, (ii) honor and pay the Curtailment Obligations, (iii) collect and securitize the Servicing Fees, and (iv) remit the Servicer Advances, in each case, in the ordinary course of business and

consistent with past practices in connection with the HECM Loans and Proprietary Reverse Mortgage Loans.

**III.    FHA Claims Process.**

48.    The Company is entitled to submit claims for the assignment of performing loans and the reimbursement of Servicer Advances and various other expenses with FHA depending on whether the applicable HECM Loans are performing or non-performing.  The Company is required to submit these claims for all HECM Loans that it services and subservices.  When the Company submits a claim for HECM Loans owned by third- party investors, FHA either remits the claim payment (a) directly to the third-party investors or (b) to the Company who subsequently remits the claim payment to the applicable third-party investors.

**a.    Performing Loan Claims.**

49.    When a performing HECM Loan reaches ninety-eight percent (98%) of the Maximum Claim Amount, the Company may file a claim with FHA to assign the loan to FHA and receive up to one-hundred percent (100%) of the Maximum Claim Amount.   For FHA to approve the loan assignment, the Company must submit documentation and evidence that a given HECM Loan is meeting all of FHA's performance requirements.  Such requirements include: (i) loan documents evidencing title free from defects, (ii) confirmation from taxing authorities that all tax payments are current, (iii) confirmation from insurance carriers that all insurance policies remain in effect and the relevant premiums have been paid, (iv) a certificate reflecting that home owners association dues (where applicable) are current, (v) evidence of death of any deceased co-borrower, and (vi) inspection certificates for any required repairs during the life of the loan. Failure to meet any of the aforementioned requirements can impact the timing of FHA's approval of the loan assignment and claim payment.

50.    Accordingly, the Debtors seek authority, but not direction, to submit HECM Loans for assignment and execute the applicable documentation in connection therewith and seek claim payments from FHA in the ordinary course of business consistent with past practices.

**b.  Non-Performing Loan Claims.**

51.    FHA requires the HECM Loan owner to service all defaulted loans, a process that can take several years between default and ultimate liquidation.   As previously mentioned, the majority of defaulted HECM Loans in the Company's portfolio result in foreclosure and, to the extent that foreclosed properties are not sold to third parties through Foreclosure Sales, the properties become REO Properties and are liquidated through sales facilitated by the Company. With respect to REO Property in connection with HECM Loans, the Company submits a reimbursement claim to FHA. FHA typically reimburses the Company following a comprehensive due diligence process.

52.    The ultimate amount reimbursed by FHA depends on the timing of the sale.  If the Company sells REO Property within six (6) months of acquiring the property by foreclosure or deed in lieu of foreclosure, or such additional time as provided by FHA, FHA reimburses the Company the difference between the outstanding loan balance and the purchase price of the property, including qualifying Servicer Advances.  If the Company sells REO Property after six (6) months of acquiring the property, FHA reimburses the Company the difference between the outstanding loan balance and the appraised value of the underlying property, but includes only qualifying Servicer Advances paid within six (6) months of acquiring the property.  Due to the potential for differential recovery, avoiding disruptions and delays in the REO Property sales process is essential to the Company's ability to recover one-hundred percent (100%) of the qualifying Servicer Advances.

53.     Accordingly, the Debtors seek authority, but not direction, to continue submitting reimbursement claims to FHA in the ordinary course of business and consistent with past practices.

## IV.    Indemnification Obligations.

54.     The Company continues to have ongoing indemnification obligations pursuant to the FHA Servicing Guidelines.   When a HECM Loan defect has been identified and reported to FHA, FHA determines whether any indemnification obligations have been triggered by a HECM Loan originated by the Company.   If so, the Company is required to indemnify FHA for any losses that FHA incurs in connection with the defective loan.   If the defective loan was purchased from a third party, FHA will seek indemnification from the original loan originator. As of the Commencement Date, the Company believes that approximately seven loans with an unpaid principal balance of approximately $2.8 million could require payments to FHA in connection with existing indemnification agreements.

55.     Accordingly, the Debtors seek authority, but not direction, to continue honoring the Company's indemnification obligations to FHA in connection with defective HECM Loans in the ordinary course of business and consistent with past practices.

## V.    Compliance and Regulatory Obligations.

56.     The Company is subject to state licensing requirements, including personal licenses, which licenses must be obtained, maintained, and renewed, as applicable, in the ordinary course.   In addition, the Company is subject to periodic state and federal regulatory exams and audits, which may carry certain costs and expenses.   Further, to the extent that the Company identifies, whether through internal or external audits, regulatory agencies, investors, client complaints, litigation, or other means, origination or servicing errors or lack of compliance

with state or federal laws or regulations, the Company is obligated to remediate such errors or violations, as applicable. Such remedial measures may require the Company (a) to make payments to borrowers (*e.g.*, in the form of reimbursements, refunds, and/or out-of-pocket expenses), (b) to forgive past due amounts and/or assessed but unpaid fees or other charges, (c) to pay fees, fines, and/or penalties, either directly to the applicable authority or through a vendor, (d) to incur and pay certain expenses, (e) to pay the costs and expenses of state and federal regulatory examinations, or (f) to take such other measures as may be required by, or agreed to with, state and federal regulators. As part of such activities, the Company reviews and reconciles accounts that belong to borrowers that are either currently or previously debtors in bankruptcy cases filed under chapter 13 of the Bankruptcy Code. As part of such reviews and reconciliations, the Company may waive amounts that are currently due on the borrower's account but are not collectible pursuant to the Bankruptcy Code or applicable non-bankruptcy law, or may perform other appropriate account adjustments.

57.     Through this Motion, the Debtors seek Court authority, but not direction, to continue in the ordinary course of business (a) to fulfill state licensing requirements and to pay related obligations, (b) to submit to, and comply with state and federal regulatory exams and audits and to pay related obligations, costs, and expenses, and (c) to remediate errors and/or lack of compliance with laws or regulations, including by continuing (i) to make payments to borrowers (*e.g.*, in the form of reimbursements, refunds, and/or out-of-pocket expenses), (ii) to forgive past due amounts and/or assessed but unpaid fees or other charges, (iii) to pay fees, fines and/or penalties, either directly to the applicable authority or through a vendor, (iv) to incur and pay certain expenses, (v) to pay the costs and expenses of state and federal regulatory examinations,

and (vi) to take such other measures as may be required by, or agreed to with, state and federal regulators.

**VI.    The Longbridge Loan Sales.**

58.    On November 21, 2022, the Debtors initiated the Origination Pause.  At the time of the Originations Pause, the Company's existing pipeline contained certain reverse mortgages that had already closed and the Company is obligated to fund those loans (the "Newly Funded Loans").  At the time of the Originations Pause, the Company had insufficient liquidity to fund the Newly Funded Loans from its own balance sheet and the Company's prepetition lender Texas Capital Bank indicated that they would not provide such funding unless the Company agreed to immediately assign the applicable Newly Funded Loans to Longbridge once funded.  Thereafter, the Company negotiated the Longbridge Loan Sales pursuant to which the loans would be assigned to Longbridge after funding.  Pursuant to the Longbridge Loan Sales agreement, Longbridge agrees to acquire the Newly Funded Loans at a purchase price agreed to between the Company and Longbridge.  Over the last week, all Newly Funded Loans have been sold above par at approximately $102.5 per $100 of unpaid principal balance.  The Debtors continue to expect to receive a price above par and to continue to generate positive cash flow from the Longbridge Loan Sales.  The aforementioned arrangement creates positive cash flow for the Debtors and also ensures that the underlying mortgagors receive funds they were expecting under the closed loans, thereby mitigating to the greatest extent possible any harm or disruption to consumers.  Accordingly, the Debtors seek authority, but not direction, to take any actions reasonably necessary to consummate the Longbridge Loan Sales.

## VII.    Limited Relief from the Automatic Stay.

### a.    Foreclosure and Eviction Proceedings.

59.    In its capacity as servicer or subservicer, the Company is currently party to approximately 4,500 judicial and non-judicial foreclosure proceedings and more than 320 eviction proceedings, which, as noted above, the Company seeks authority in its discretion to proceed with in the ordinary course.    In such proceedings it is not uncommon for borrowers and tenants to raise claims, defenses and related counter-claims against the Company to preserve their respective interests in underlying property as owner or tenant.    However, such claims, cross-claims, third-party claims, and counter-claims, whether asserted by borrowers in foreclosure actions or by tenants in eviction actions and whether commenced prior to, on, or after the Petition Date, are or may become subject to the automatic stay pursuant to section 362(a) of the Bankruptcy Code.    Requiring each of these parties to obtain stay relief in order to assert such counter-claims would likely add an unnecessary degree of complexity, costs, and delay to both the foreclosure process described herein and the administration of these chapter 11 cases.

60.    Accordingly, the Debtors request that the Court enter an order granting the Debtors discretion to waive the automatic stay in connection with foreclosure and eviction proceedings.

61.    The Debtors also request that the Court enter an order granting the Debtors discretion to waive the automatic stay imposed by section 362(a) of the Bankruptcy Code to allow borrowers, mortgagors, and lienholders (each, an "Interested Party") to assert and prosecute claims, cross-claims, third-party claims, and counter-claims related to judicial and non-judicial foreclosure and eviction proceedings brought by the Debtors to the limited extent such claims, cross-claims, third-party claims, and counterclaims, including the appeals of such, have the sole purpose of defending, unwinding, or otherwise enjoining or precluding any foreclosure or

eviction, and do not have an adverse effect on any of the Debtors' assets. Notwithstanding the foregoing, the Debtors request that absent further order of the Court, the automatic stay remain in full force and effect with respect to any and all other pending or future claims and counterclaims by Interested Parties, including with respect to (a) monetary relief of any kind or any nature against the Debtors, (b) claims of recoupment or setoff, (c) relief that if granted would affect the amount, validity, and/or priority of lien(s) on property owned or serviced by the Debtors, (d) relief that if granted would not terminate or preclude the prosecution and completion of a foreclosure or eviction, or (e) actions asserted in the form of a class action or collective action, and that, should there be any disagreements between or among any Interested Parties and/or the Debtors regarding whether any claims or counterclaims fall within the Debtors' discretionary exception to the automatic stay described herein approved by the Court, the Court retain exclusive jurisdiction to hear and resolve such disputes.

### b. Borrower Bankruptcy Proceedings.

62.     Certain of the borrowers on loans serviced or subserviced by the Debtors have sought, or may seek during the pendency of these cases, bankruptcy protection under chapters 7, 11, 12, or 13 of the Bankruptcy Code (such borrowers, the "Bankrupt Borrowers").    In connection with such cases, from time to time, the Debtors file, or direct their counsel or agents to file, documents required by the Bankruptcy Code and Bankruptcy Rules, including proofs of claims, notices of payment change, notices of post-petition fees, responses to notices of final cures, motions to lift the automatic stay, and related amendments and appeals.    Given the importance of allowing Bankrupt Borrowers to timely prosecute their bankruptcy cases, as well as the unnecessary degree of complexity and costs that would accrue against the Debtors' estates by requiring Bankrupt Borrowers, trustees duly appointed under the Bankruptcy Code in a Bankrupt Borrower's bankruptcy case (each, a "Bankruptcy Trustee"), or the United States

Trustees assigned to oversee such cases (each, a "United States Trustee"), to obtain stay relief with respect to routine actions in the prosecution of such Bankrupt Borrower's bankruptcy case, the Debtors believe that discretion to waive the automatic stay as described herein is merited.

63.     Accordingly, through this Motion, the Debtors request that the Court enter an order granting the Debtors discretion to waive the automatic stay pursuant to the following terms and conditions:

     i.     except as set forth herein and if consented to by the Debtors, and provided an action outlined below would not affect the value or validity of an asset or claim held by the Debtors, a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee shall be entitled:

          a.  to assert or continue to assert an objection to a proof of claim, notice of payment change, notice of post-petition fee, expense, or charge, or response to notice of final cure (collectively, the "Required Bankruptcy Documents") filed by the Debtors in the Bankrupt Borrower's bankruptcy case;

          b.  to assert or continue to assert an objection to a motion to lift the automatic stay filed by the Debtors in the Bankrupt Borrower's bankruptcy case;

          c.  to assert appeals with respect to the above; and

          d.  to seek an accounting from the Debtors with respect to the Bankrupt Borrower's loan;

     ii.     except as set forth herein and if consented to by the Debtors, a Bankrupt Borrower shall be entitled:

          a.     to engage in court-supervised or court-authorized loss-mitigation programs regarding the Bankrupt Borrower's loan; and

          b.     to engage in discussion with the Debtors and execute a modification of the Bankrupt Borrower's loan or otherwise discuss, enter into, and consummate settlements of claims and liens in accordance with the ordinary course of the Debtors' business and applicable law;

     iii.     absent further order of the Court or consent by the Debtors as set forth herein, the automatic stay shall remain in full force and effect with respect to all the

Bankrupt Borrower's, the Bankruptcy Trustee's, and the United States Trustee's direct claims, counterclaims, motions, or adversary proceedings:

iv.  for monetary relief of any kind and of any nature against the Debtors, with the exception of: (A) a reduction in the amount of arrearage listed on a proof of claim that would not affect the total amount of the claim; (B) an objection to the amount listed on a notice of payment change; or (C) an objection to the amount past due listed on a response to notice of final cure;

v.   for violation of any local, state, or federal statute or other law in connection with the origination of the Bankrupt Borrower's loan;

vi.  for relief that if granted, would have an effect on the amount, validity, or priority of the Debtors' claim or lien against a Bankrupt Borrower or the property of the Bankrupt Borrower securing such claim or lien of the Debtors; or

vii. asserted in the form of a class action;

viii. absent further order of the Court, the automatic stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Bankrupt Borrower on behalf of any other class of borrowers;

ix.  with the sole exception of objections to Debtors' proofs of claim permitted by subsection (a)(i) above, and solely for purposes of reducing any such claim and not for the purpose of obtaining an affirmative recovery or award, under no circumstances shall a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee be entitled to recoup, setoff, or collect from the Debtors any judgment or award related to any direct claim or counterclaim for which the automatic stay has been lifted, in the Debtors' discretion, by the terms of the Interim Order;

x.   the Debtors shall retain the right, upon appropriate motion and notice to any Bankrupt Borrower, Bankruptcy Trustee, or United States Trustee, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by the Interim Order, and to the extent such relief is sought, the Debtors will not object to such party's telephonic participation at any hearing on such motion;

xi.  nothing set forth herein shall preclude or limit any Bankrupt Borrower, Bankruptcy Trustee, or United States Trustee from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest; and

xii. should there be any disagreements between the Debtors, a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee regarding whether any actions, claims, or counterclaims fall within the Debtors' discretionary exception to the

automatic stay as approved by the Court, the Court shall retain exclusive jurisdiction to hear and resolve such dispute.

### c.  Actions Involving Amount, Validity, or Priority of Liens.

64.    The Debtors are often a party to actions involving the amount, validity, and/or priority of liens with respect to properties subject to mortgages owned or serviced by the Debtors (such actions, "Title Disputes").  Prosecuting such disputes allows the Debtors to clear title to the underlying property and thereby protect its rights and remedies with respect thereto.  Thus, for similar reasons of judicial economy and estate resources discussed above, the Debtors request that the Court enter a standing order granting the Debtors discretion to waive the automatic stay to allow Interested Parties to assert a defense, including the appeals of such, in Title Disputes.  Notwithstanding the foregoing, the Debtors request that absent further order of the Court, the automatic stay remain in full force and effect with respect to any and all other pending or future claims, cross-claims, third- party claims, and counterclaims against the Debtors, including with respect to (a) monetary relief of any kind or any nature against the Debtors, (b) relief that if granted would affect the amount, validity, and/or priority of lien(s) held by the Debtors, (c) actions for partition, eminent domain, or seizure of the property securing lien(s) held by the Debtors, (d) relief that is not necessary for the resolution of the Title Dispute, or (e) actions asserted in the form of a class action or collective action, and that, should there be any disagreements between or among any Interested Parties and/or the Debtors regarding whether any claims, cross-claims, third-party claims, or counterclaims fall within the fall within the Debtors' discretionary exception to the automatic stay described herein as approved by the Court, the Court retain exclusive jurisdiction to hear and resolve such disputes.

**BASIS FOR RELIEF**

I.    **The Court Should Authorize the Debtors to (i) Honor Issuer and Servicer Obligations in Ordinary Course of Business, (ii) to Honor Prepetition and Post-petition Obligations Related Thereto, and (iii) Consummate the Longbridge Loan Sales.**

65.    As set forth above, through this Motion, the Debtors seek authority, but not direction, to continue their securitization and servicing and subservicing activities in the ordinary course of business, to honor and pay prepetition and post-petition obligations related thereto, and the consummate the Longbridge Loan Sales. The requested relief is both appropriate and necessary under section 105(a) of the Bankruptcy Code as it (i) falls squarely within sections 363(c)(1), 1107(a), and 1108 of the Bankruptcy Code, which, taken together, authorize a debtor in possession to use, sell, or lease property of the estate in the ordinary course of its business and (ii) protects and conserves the value of the Debtors' estates, including by providing invaluable comfort to parties doing business with the Debtors.

a.    **The Debtors' Activities Satisfy Ordinary Course of Business Standard.**

66.    Section 363 of the Bankruptcy Code provides for a debtor's use, sale, or lease of property in either (a) the *ordinary course of business*, pursuant to section 363(c)(1) or (b) outside the *ordinary course of business*, pursuant to section 363(b)(1).    11 U.S.C. §§ 363(b)(1), 363(c)(1).    In particular, section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204 or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

67.    By contrast, section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary

course of business, property of the estate . . ." 11 U.S.C. § 363(b)(1).  In differentiating between ordinary and non-ordinary course transactions, section 363 "strike[s] a balance [between] allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets."  *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) (citing *In re Roth American, Inc.*, 975 F.2d 949, 952 (3d Cir. 1992)).

68.     Here, each of the activities for which the Debtors seek authorization to continue are consistent with both the Debtors' prepetition conduct and with customary practices in the reverse mortgage loan servicing industry.   Indeed, a hypothetical creditor would expect that the Debtors would engage in securitization and servicing activities, including certain transactions in connection therewith, and incur the related financial obligations, described in this Motion. Further, similar relief has been granted in the chapter 11 cases of numerous other mortgage originators, lenders, and/or servicers.   *See, e.g.*, *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Jul. 25, 2012) [Docket No. 898] (authorizing debtors to, among other things, (i) process and fund prepetition mortgage loan commitments, (ii) continue brokerage, origination, and sale activities, (iii) perform under certain mortgage loan purchase and sale agreements, (iv) pay certain prepetition amounts due to critical origination vendors, and (v) honor mortgage loan repurchase obligations); *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Jun. 15, 2012) [Docket No. 401] (authorizing debtors to continue, among other things, (i) service government sponsored loans, (ii) perform foreclosure activities related to certain GSE REOs, and (iii) pay certain prepetition amounts due to critical servicing vendors and foreclosure professionals); *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Jun. 15, 2012) [Docket No. 402] (authorizing debtors to, among other things, continue

to (i) service private label mortgage loans and (ii) engage in sales activities related to loans in foreclosure and REOs); *In re Thornburg Mortgage, Inc.*, No. 09-17787 (DWK) (Bankr. D. Md. May 6, 2009) [Docket No. 49] (authorizing debtors to, among other things, continue mortgage loan servicing, auditing, and fulfillment services in the ordinary course of business); *In re Am. Home Mortgage Holdings, Inc.*, Case No. 07-11047 (CSS) (Bankr. D. Del. Aug. 24, 2007) [Docket No. 358] (authorizing debtors to, among other things, (i) sell REOs in the ordinary course free and clear of any and all liens and encumbrances and (ii) continue funding servicing advances); *In re Aegis Mortgage Corp.*, Case No. 07-11119 (BLS) (Bankr. D. Del. Aug. 15, 2007) [Docket No. 35] (authorizing debtors to, among other things, (i) sell certain mortgage loans owned by the debtors, (ii) continue performing under existing subservicing agreements, and (iii) enter into new subservicing agreements); *In re Mortgage Lenders Network USA, Inc.*, Case No. 07-10146 (PJW) (Bankr. D. Del. Mar. 19, 2007) [Docket No. 304] (authorizing debtors to, among other things, (i) sell certain loans, (ii) honor certain loan commitments, and (iii) incur new servicing obligations in the ordinary course of business).

> ### b. The Court Should Authorize the Debtors to Sell the REO Property Free and Clear.

69.    Section 363(f) of the Bankruptcy Code provides that a debtor in possession:

> "may sell property . . . free and clear of any interest in such property of any entity other than the estate only if (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a monetary satisfaction of such interest.

11 U.S.C. § 363(f).

70.     At closing for the sales of REO Property, the Debtors are required to deliver marketable and insurable title free and clear of liens or encumbrances.  To convey marketable and insurable title to the prospective buyers at closing, the Debtors request authority to sell the REO Property free and clear of any lien or encumbrance either (a) under section 363(f) of the Bankruptcy Code to the extent the REO Property is owned by the Debtors or (b) to the extent permitted pursuant to applicable non-bankruptcy law for REO Property owned by third parties. The relief requested herein has been granted by other courts in a similar context.  *See, e.g.*, *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. June 15, 2012) [Docket No. 402] (authorizing the debtors to sell property free and clear of liens and encumbrances in the ordinary course); *In re Am. Home Mortg. Holdings, Inc.*, Case No. 07-11047 (CSS) (Bankr. D. Del. Aug. 24, 2007) [Docket No. 358] (confirming the debtors' authority to sell real estate owned or serviced by the debtors free and clear of liens and encumbrances in the ordinary course).

### c.  The Requested Relief is Both Necessary and Appropriate to Conserve the Value of Debtors' Estates.

71.     The Debtors, as debtors in possession operating their businesses pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, owe "fiduciary duties to the bankruptcy estate and must, among other things, protect and conserve property in [their] possession for the benefit of creditors and refrain from acting in a manner which could damage the estate, or hinder a successful reorganization of the business."  *In re Ashley River Consulting, LLC*, Case No. 14-13406 (MG), 2015 WL 1540941, *8 (Bankr. S.D.N.Y. 2015) (citing *In re Ionosphere Clubs, Inc. (Ionosphere II)*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) (internal quotations omitted)). As one court has recognized, "[i]mplicit in the duties of a Chapter 11 trustee or a debtor in possession as set out in Sections 1106 and 704 of the Bankruptcy Code is the duty of such a fiduciary to protect and preserve the estate, including an operating business's going-concern

value." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).   Accordingly, the Court may, pursuant to section 105(a) of the Bankruptcy Code, "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]," including the protection and conservation of the Debtors' estates.  11 U.S.C. § 105(a).

72.    As courts have previously explained, "[t]he ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.   It was articulated by the United States Supreme Court in *Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286 (1882) and is commonly referred to as either the 'doctrine of necessity' or the 'necessity of payment' rule.  This rule recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor." *In re Ionosphere Clubs, Inc. (Ionosphere I)*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989).   The "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the Court can exercise its equitable power to allow payment of prepetition claims *necessary* to "facilitat[e] the continued operation and rehabilitation of the debtor."    *Id*. at 176.

73.    The relief requested herein is necessary to allow the Debtors to conserve, enhance, and maximize the value of their estates for the benefit of all stakeholders and thereby fulfill their fiduciary duties.    The Debtors' business (and the mortgage servicing industry in general) is a structural feedback loop whereby the cash that leaves the business directly influences the cash that comes into the business (whether from securitization activities, mortgage servicing fees, etc.).  Without the uninterrupted payment of ordinary course prepetition obligations, the Debtors' revenue stream dries up and their going concern value is threatened.    Accordingly, the prepetition payments contemplated herein are unequivocally necessary to facilitate the Debtors'

continued operation and rehabilitation.    Further, the limited non-monetary relief sought in association with these payments provides invaluable comfort to parties doing business with the Debtors—many of whom are lenders that cannot be compelled to continue lending to the Debtors post-petition—and therefore is necessary and appropriate under the circumstances.

## II.    The Court Should Grant the Limited Stay Relief Requested Herein Pursuant to Section 362(d)(1) of the Bankruptcy Code.

74.    The Bankruptcy Code provides that the Court may grant stay relief "for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1).  The Debtors respectfully submit that it is in the best interests of their estates to grant the Debtors discretion to waive the automatic stay, pursuant to the terms set forth herein, in order to allow borrowers and tenants to raise claims and defenses in foreclosure and eviction proceedings, to allow Bankrupt Borrowers to prosecute their bankruptcy cases, and for Title Disputes to be resolved because requiring each of these parties to obtain stay relief would likely add an unnecessary degree of complexity, costs, and delay to both the underlying procedures as well as the administration of these chapter 11 cases.    The Debtors believe that the limited discretionary stay relief requested herein will allow for an efficient and fair process with respect to foreclosures, tenant evictions, Bankrupt Borrowers, and Title Disputes, and thereby preserve the interests of the Debtors' estates.

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

75.    Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, granting the relief requested herein is essential to the Debtors' ability to transition their operations into these chapter 11 cases and maintain the value of their estates post-petition.    Failure to receive such authorization and other relief during the first 21

days of these chapter 11 cases would severely disrupt the Debtors' ability to maintain their estates at this critical juncture.    Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## **RESERVATION OF RIGHTS**

76.    Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any party in interest's rights to dispute any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law, or (iv) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to dispute such claim subsequently.

## **WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)**

77.    To successfully implement the foregoing, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **NOTICE**

78.    The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Pre-petition Lenders; (d) the United States Attorney's Office for the

District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the Government National Mortgage Association; (h) the Federal National Mortgage Association; (i) the Federal Housing Administration; (j) the United States Department of Housing and Urban Development; (k) the attorneys general in the states where the Debtors conduct their business operations; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

79.    No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: December 1, 2022
       Wilmington, Delaware

Respectfully submitted,

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

   */s/ Jennifer R. Hoover*
Michael J. Barrie (DE No. 4684)
Jennifer R. Hoover (DE No. 5111)
Kevin M. Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
1313 North Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: mbarrie@beneschlaw.com
       jhoover@beneschlaw.com
       kcapuzzi@beneschlaw.com
       jgentile@beneschlaw.com

*-and-*

**SIDLEY AUSTIN LLP**

Stephen Hessler (admitted *pro hac vice*)
Thomas Califano (admitted *pro hac vice*)
Anthony Grossi (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email: shessler@sidley.com
       tom.califano@sidley.com
       agrossi@sidley.com

*Proposed Counsel to the Debtors*