## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVERSE MORTGAGE INVESTMENT TRUST INC, *et al.*,[1] | ) | Case No. 22-11225 (MFW) |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |
| | ) | |

## DECLARATION OF TANYA MEEROVICH, CHIEF RESTRUCTURING OFFICER IN SUPPORT OF CHAPTER 11 FILINGS AND FIRST DAY MOTIONS

I, Tanya Meerovich, hereby declare under penalty of perjury:

1.      I am a Senior Managing Director of FTI Consulting, Inc. ("FTI"), pre-petition consultants to Reverse Mortgage Investment Trust Inc. ("RMIT," together with the other above-captioned debtors in possession, the "Debtors," and, collectively with their non-Debtor subsidiaries, the "Company"). I was appointed as the Company's Chief Restructuring Officer on November 1, 2022. I am over 18 years of age and authorized to submit this declaration (this "First Day Declaration") on behalf of the Debtors.

2.      FTI is a publicly traded, global business advisory firm with more than 7,000 employees across 88 locations around the world. FTI is dedicated to helping organizations manage change, mitigate risk, and resolve disputes: financial, legal, operational, political and regulatory, reputational, and transactional. With more than 1,700 professionals in 64 offices across 17 countries, FTI's Corporate Finance & Restructuring segment is one of the leading restructuring

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Reverse Mortgage Investment Trust Inc. (3421); Reverse Mortgage Funding LLC (0209); RMIT Cash Management LLC (6241); RMIT Operating I LLC (1844); and RMIT Operating II LLC (2301). The location of the Debtors' service address for purposes of these chapter 11 cases is: 1455 Broad Street, 2nd Floor, Bloomfield, NJ 07003.

advisors in the world. FTI focuses on the strategic, operational, financial, transactional and capital needs of clients to deliver a wide range of services centered around three core offerings: Turnaround, Restructuring and Bankruptcy, Business Transformation and Transactions. FTI also couples industry experts with seasoned operators and restructuring professionals, to provide outside-the-box, yet practical solutions in complex situations. FTI's clients include corporations, boards of directors, investors, private equity sponsors, banks, lenders and other financing sources and creditor groups, as well as other parties-in-interest.

3.      I have more than fifteen years of experience leading complex transformations and advising on in- and out-of-court restructurings for companies across industries, with expertise in the financial services, real estate, nonprofit, insurance, healthcare, education, energy, manufacturing, infrastructure, print, entertainment and retail industries. I graduated from Roosevelt University with a Bachelor's degree in business management and finance. I am a Chartered Financial Analyst, a Certified Insolvency and Restructuring Advisor and a Certified Turnaround Professional. My recent engagements in the financial services industry include, among others: First Guaranty Mortgage Corporation, where I served as a Chief Restructuring Officer, AG Mortgage Investment Trust Inc, Impac Mortgage, MFA Financial, Ocwen Financial, Residential Capital, Reverse Mortgage Solutions, Credit-Based Asset Servicing and Securitization, Progrexion, JH Capital, Litton Loan Servicing, Ditech Corporation, Walter Investments and Stearns Lending. Prior to joining FTI, I was in the Financial Services Advisory group of RSM Cayman Islands, where I was involved in a number of high-profile and complex cross-border insolvency engagements in the financial services sector.

4.      Since my appointment as Chief Restructuring Officer, I have worked to familiarize myself with the Debtors' financial affairs and business operations. I am responsible for overseeing

the Debtors' preparation for these chapter 11 cases (these "Chapter 11 Cases").  I have further familiarized myself with the Debtors' day-to-day operations, organizational structure, and books and records by reviewing key financial documents and engaging in discussions with other members of the Debtors' management team, the Debtors' advisors, and the FTI professionals providing financial advisory services to the Debtors.

5.      Except as otherwise stated in this First Day Declaration, the statements set forth herein are based upon: (a) my personal knowledge or opinions based upon my experience; (b) information that I have received from the Debtors' advisors or employees and/or the FTI professionals working directly with me or under my supervision, direction, or control, and/or (c) my review of relevant documents and information concerning the Debtors' operations and financial affairs.  Any references to the Bankruptcy Code (as defined below), the chapter 11 process, and related legal matters herein reflect my understanding of such matters based on the explanations and advice provided to me by the Debtors' counsel.  If called upon, I could and would testify competently to the facts set forth in this First Day Declaration.

6.      I submit this First Day Declaration on behalf of the Debtors in support of:  (a) the Debtors' voluntary petitions for relief that they filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-152 (the "Bankruptcy Code"); and (b) the "first-day" pleadings filed concurrently herewith (collectively, the "First Day Pleadings").  The relief sought in the First Day Pleadings is intended to minimize the adverse effects of the commencement of these Chapter 11 Cases on the Debtors' operations.  I have reviewed the Debtors' petitions and the First Day Pleadings, and it is my belief that the relief sought therein is necessary to preserve and maximize the value of the Debtors' estates and serves the best interests of the Debtors' estates, creditors, and other parties in interest.

## Introduction and Overview[2]

### A.    Preliminary Statement.

7.    The Company is part of an important industry that serves the national policy of facilitating the aging of seniors in their homes.  Specifically, as an originator and servicer of reverse mortgages, the Company plays an integral role in the national economy by making loans available to older homeowners that allow them to convert the equity in their homes into cash.  Reverse mortgages serve many seniors who do not meet the income requirements or are unable to meet the monthly payment obligations of alternative financing options, such as cash-out refinance mortgages and home equity lines of credit.  These loans do not require borrowers to make monthly principal and/or interest payments.  All interest and fees accrue to the balance of the loan, which is typically paid after the homeowner moves out of the home or passes away.[3]  Borrowers may use the proceeds of their reverse mortgage loans to fund expenses such as maintenance, tax, utility, and other living expenses.

8.    The Company originates and services reverse mortgage loans, most of which are insured by the FHA.[4]  Approximately 93% of the total unpaid balance of the loans in the Company's portfolio are FHA-insured reverse mortgages (Home Equity Conversion Mortgage loans, or "HECM Loans"), which are typically pooled into Ginnie Mae[5] securitizations (Home

---

[2]    Capitalized terms used and not defined in this section have the meanings given to them elsewhere in this First Day Declaration.

[3]    Other events, such as default, may lead to a required repayment.

[4]    The Federal Housing Administration (the "FHA") is an agency within the U.S. Department of Housing and Urban Development ("HUD").

[5]    The Governmental National Mortgage Association ("Ginnie Mae") is a federal corporation within the FHA that guarantees timely payment of principal and interest payments for mortgage-backed securities made up exclusively of mortgages insured or guaranteed by the federal government.  The Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation ("Fannie Mae" and "Freddie Mac," respectively) are government-sponsored enterprises ("GSEs") chartered by Congress that buy and securitize mortgage loans originated by mortgage lenders.  Unlike Fannie Mae and Freddie Mac, Ginnie Mae does not purchase or securitize mortgages—

Equity Conversion Mortgage-Backed Securities, or "HMBS") issued by the Company.  As a servicer of HECM Loans, the Company pools the loans' subsequent draws and ongoing costs and fees (including interest, servicing fees, and mortgage insurance premiums) and issues additional HMBS ("Tail Securitizations") in order to generate revenue.  The Company also originates and services non-agency reverse mortgage loans ("Proprietary Reverse Mortgage Loans"), which are typically sold into private label securitizations.  The Company's primary profit drivers and liquidity generators were its originations business (largely through the gain-on-sale of HMBS and private label securitizations), the gain-on-sale of Tail Securitizations, and servicing fees.

9.      As the holder of the HECM Loans' mortgage servicing rights, the Company is obligated, per Ginnie Mae requirements, to purchase the participations[6] from their related securitization pools once the balance of a given HECM Loan equals or exceeds 98% of the Maximum Claim Amount.[7]  The Company finances such mandatory participation purchases ("Buyouts")[8] using "warehouse lending facilities" structured as repurchase ("repo") agreements and warehouse loans in order to obtain liquidity while it seeks to assign or liquidate the Buyout

---

it guarantees mortgage-backed securities issued by approved issuers (such as banks or credit unions) in accordance with the Ginnie Mae securitization guide (the "Ginnie Mae Guide").

[6]  As discussed in further detail below in section I.C.2., the borrower's initial draw, subsequent draws, and ongoing costs and fees are pooled into "participations."  One HECM Loan has many participations in various HMBS pools.

[7]  The Maximum Claim Amount ("Maximum Claim Amount") is the maximum amount that the FHA's MMI Fund will reimburse mortgagees on their FHA insurance claims.  The Maximum Claim Amount for a given reverse mortgage loan is generally the lesser of appraised value of the underlying property or the HECM Loan limit for the area in which the home is located (which is tied to the Freddie Mac conforming loan limit).  The 2022 Maximum Claim Amount limit for HECM Loans is $970,800.  *See* U.S. DEP'T OF HOUSING AND URBAN DEVELOPMENT, *Mortgagee Letter 2021-29: 2022 Home Equity Conversion Mortgage (HECM) Limits*, https://www.hud.gov/sites/dfiles/OCHCO/documents/2021-29mlhsg.pdf;  *see also* U.S. DEP'T OF HOUSING AND URBAN DEVELOPMENT, *FHA Announces New Single Family Title II Forward and Home Equity Conversion Mortgage Loan Limits for 2022* (Dec. 1, 2021), https://www.hud.gov/press/press_releases_media_advisories/HUD_No_21_197.

[8]  The Company may also purchase a loan's participations upon the occurrence of another event that has caused the loan to become due-and-payable (such as when the borrower has passed away); however, such purchases are not mandatory.

loans.[9]   However, the precipitous rise of interest rates has led to both increases in Buyout obligations and increases in the cost of borrowing on the Company's warehouse facilities.

10.    The Company's warehouse facilities do not finance the entire amount of a Buyout: the warehouse lender funds a given portion of the Buyout (the "Advance Rate") and the remaining balance is financed with cash from the company's balance sheet ("Haircut Capital").  Interest rates on the Company's HECM Loans were largely set in lower interest rate environments, and increases in interest rates and credit spreads have lowered the market value of these assets.  The Company is required to complete Buyouts of HECM Loans at their par value, whereas lenders provide Advance Rates based on the loans' fair market value—meaning that as the fair market value of the loans has decreased, the Company's required Haircut Capital has increased.

11.    The greater cash required to fund the Company's Buyout obligations has negatively impacted the Company's liquidity position.  The obligation to hold Buyout loans on balance sheet until they are assigned or liquidated has resulted in significant negative carry[10] and impairment to the book value of the Company.  This is a challenge in the existing Ginnie Mae HECM program. The existing program does not currently provide mechanisms for servicers to access the necessary liquidity to support their Buyout obligations and instead makes servicers dependent on fluctuating capital market environments.

12.    Adverse trends in the reverse mortgage industry, principally caused by an increasing interest rate environment and the reduction of the Federal Reserve's holdings of mortgage-backed securities (totaling approximately $49 billion over the past 12 weeks), have negatively impacted the financing market for these loans and created a perfect storm that caused

---

[9]    During this time, the servicer must also fund all subsequent tax and insurance advances.

[10]    Negative carry occurs when revenue (interest received) from underlying loans is less than the cost (interest paid) to finance carrying such loans on a company's balance sheet.

the Company's business model to become unsustainable. In this environment, the Company experienced slowed loan origination volume (with HECM Loan origination volumes declining 66.1% year-over-year in September 2022) and reduced profitability on HMBS securitizations (including a 45.3% year-over-year decline for first participation HMBS gain-on-sale in September 2022).[11] This decline led the Company to recently pause all new originations. As loan origination volume and profitability have decreased, the Company has become more dependent on servicing revenue. However, rising interest rates and credit spreads also served to increase the Company's Buyout obligations, increase required Haircut Capital, and create negative carry to finance such obligations, impairing the value of the Company's servicing rights. All of the above reduced the Company's profitability and negatively impacted the Debtors' liquidity.

13. These trends have led to significant financial and operational stress for the Company—and ultimately led to the Company to obtaining a waiver from Ginnie Mae of its Ginnie Mae Liquidity Requirement in early October 2022 and later experiencing a series of events of default under the liquidity covenants of the Company's debt facilities by the end of the month. As a result of the Events of Default, each of the Prepetition Lenders has the ability to exercise remedies, including the option to liquidate or foreclose on (as applicable) the collateral securing the Company's obligations.

14. The Company has taken a number of measures to address its distress. The Company has: negotiated with its lenders—certain of whom could exercise remedies even after a chapter 11 filing—to provide the Company with breathing room to analyze strategic alternatives; endeavored to sell down its loan portfolios and entered into discussions with prospective buyers

---

[11] The Company's year to date gain-on-sale for first participation HMBS for the nine months ended September 30, 2022 was approximately $62.3 million as compared to $113.9 million for the 9 months ended September 30, 2021, representing a 45.3% decline from last year and a $51.5 million decline in revenue.

of its assets; spoken multiple times with Ginnie Mae and the FHA and informed them of both the industry's and the Company's distress; worked to obtain emergency funding to provide critical liquidity to facilitate the exploration of various strategic alternatives and fund the Company's Buyout obligations; and undertaken a general and administrative cost reduction strategy.

15.     Accordingly, on November 30, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware (the "Court") to facilitate an orderly transition of the assets and implement a wind-down plan to preserve value for all of the Company's stakeholders.  The Debtors are in active discussions with Leadenhall and the Debtors' equity sponsor to underwrite these Chapter 11 Cases with the potential support of Ginnie Mae.  Importantly, this process is underwritten by the Company's equity sponsor, which despite having lost its entire equity investment has committed significant capital on a pre-petition basis to work to find a comprehensive solution and deployed additional capital for the benefit of all stakeholders (and specifically to mitigate any harm to borrowers).  The Company will work swiftly in chapter 11 to monetize the Debtors' remaining assets, transition the Company's loan servicing portfolio, and distribute value to the Company's stakeholders.

**B.     Background to the Restructuring.**

16.     At the beginning of July 2022, the Company began experiencing losses and a decline in its liquidity position, primarily due to increases in interest rates and credit spreads.  In connection therewith, RMIT borrowed an additional $33.6 million from its one of its warehouse lenders, Leadenhall Capital Partners, LLP (Leadenhall Capital Partners, LLP, and certain of its managed funds and/or affiliates, "Leadenhall") with repayment due July 14, 2022, upsizing an existing debt facility.  Additionally, BNGL Holdings, L.L.C. ("Holdings")—the sponsor member of RMIT's parent company, BNGL Parent, L.L.C. (the "Parent") and an affiliate of Starwood Capital Group Global II, L.P. ("Starwood Capital")—delivered a $50 million secured loan to

RMIT pursuant to a demand note dated July 13, 2022 to pay down Leadenhall's upsized financing facility and add liquidity to the Company's balance sheet.  Despite the $50 million loan, due to the issues in the reverse mortgage financing market and structure of the HECM Loan servicing business described herein, by September 2022 the Company was facing mounting liquidity issues. On September 12, 2022, RMIT unwound its interest rate hedging activities in order to raise the cash necessary to meet certain liquidity requirements pursuant to its servicing agreement with Ginnie Mae and its debt facilities.  In the first week of October 2022, the Company requested and obtained from Ginnie Mae a waiver through year-end of its Ginnie Mae Liquidity Requirement; however, by the end of October 2022 the Company was unable to comply with the liquidity requirements in several of its debt facilities.

17.     On October 25, 2022, the Company retained restructuring counsel, Sidley Austin LLP, to explore strategic alternatives.  Shortly after the Events of Default, the Company, with the assistance of its advisors, engaged in discussions with its stakeholders regarding a potential standstill agreement pursuant to which each of the various parties would agree to refrain from exercising remedies while the Company and its advisors worked to address the situation and negotiate a comprehensive, long-term waiver.  Simultaneously, the Company actively engaged with its key regulatory stakeholders (Ginnie Mae and the FHA), who, through a series of conversations and meetings, indicated they understood the material headwinds the Company and its peers were experiencing and the challenges associated with continued servicing obligations.

18.     In early November, the Company continued to take actions to stabilize its business and evaluate its alternatives.  FTI was retained on November 1, 2022.  On November 2, 2022, Holdings agreed to provide liquidity support through November 11, 2022 in order to ensure that the Company complied with liquidity covenants in various of the Company's debt facilities that

require it to maintain $25 million in minimum liquidity. The Company also sought and received a temporary waiver from Ginnie Mae for its Buyout obligations for the month of November (through November 17). The Company also worked to obtain an agreement with the Prepetition Lenders to largely stand down from exercising remedies while the Company evaluated strategic alternatives.

19.    The Company satisfied its November 2022 Buyout obligations on November 17, 2022 after arranging for emergency financing support provided by Holdings and two of the Company's Prepetition Lenders. However, the Company's Prepetition Lenders continued to renegotiate financing rates historically provided to the Company and started exercising other remedies.

20.    The Debtors' management team and professionals worked diligently to explore all viable potential alternatives to maximize value, including a potential sale of all, or a subset thereof, of the Company's assets. After exploration of these alternatives, the Debtors and their advisors determined it was in the best interests of the estates to commence these Chapter 11 Cases to monetize its assets and execute an orderly wind down of the Company's reverse mortgage origination and servicing business. To preserve liquidity and in recognition of the limited personnel required to wind down the business, the Debtors made the very difficult decision to terminate a significant majority of its workforce shortly before commencing these cases.

**C.    The Proposed Restructuring.**

21.    To familiarize the Court with the Company, its business, and the circumstances leading to the commencement of these Chapter 11 Cases, the objectives of such cases, and the

relief the Debtors are seeking in the First Day Pleadings, this First Day Declaration is organized as follows:

- **Part I** provides a general overview of the Debtors' corporate history and operations, including the Debtors' prepetition capital structure;

- **Part II** describes the circumstances leading to these Chapter 11 Cases; and

- **Part III** summarizes the factual bases supporting the First Day Motions.

**Part I:**
**General Background**

**A.    General Background on the Company.**

    **1.  Overview of the Company's Business Operations.**

22.    Reverse Mortgage Funding LLC ("RMF") is a limited liability company formed in 2012 with the goal of helping older adults retire more freely by offering innovative, competitively-priced products to meet their financial needs.  RMF was initially formed in the state of New Jersey, though it became a Delaware limited liability company shortly thereafter on September 25, 2012.  RMF was acquired by RMIT on July 11, 2014, following which RMF became a wholly owned subsidiary of RMIT.  On December 23, 2020, RMIT was acquired by Parent.  RMIT is a wholly owned subsidiary of the Parent, which is in turn owned 97.05% by Holdings, with the remainder owned by certain current or former members of management and other current or former employees of the Company.

23.    The Company is a leading fully integrated finance company that focuses on the reverse mortgage industry, with a reverse mortgage servicing portfolio of approximately $25.57 billion as of October 31, 2022 (comprising approximately 130,335 loans).  Its principal business activities consist of originating and purchasing FHA-insured reverse mortgage loans—

HECM Loans[12]—for securitization through Ginnie Mae's HMBS participation securities program, originating and purchasing proprietary (non-agency) reverse mortgages, and securitizing such proprietary reverse mortgages in private label securitization vehicles. The Company is an approved Fannie Mae servicer, as well as an approved Ginnie Mae HMBS issuer and servicer, and as a result the Company may issue securities and service the underlying loans in accordance with Ginnie Mae requirements and regulations.

24.    Reverse mortgage loans are a popular financing option for senior citizens who have equity in their homes and would like to supplement their income. A reverse mortgage loan is a fully-secured non-recourse loan that enables homeowners to convert the equity in their home into cash in the form of a lump sum payment, a line of credit, a series of monthly advances, or a combination of the three methods.[13] Unlike a traditional "forward" residential mortgage loans in which homeowners borrow money against the value of their homes and make monthly payments over time ("Traditional Forward Mortgage Loans"), reverse mortgage loans do not have a fixed term, and are generally repaid in one payment. Reverse mortgage loans are generally repaid upon a maturity, refinancing, or liquidation event, most often after the death of the borrower, when the borrower no longer occupies the property as a principal residence, or when the borrower fails to meet other requirements of the loans, such as paying property taxes and insurance. Until repayment occurs, the loan balance of a reverse mortgage loan accrues at a fixed or floating rate of interest and, similar to a Traditional Forward Mortgage Loan, the borrower continues to own

---

[12]    The HECM program is codified at 12 U.S.C. § 1715z-20, and the relevant regulations are at 24 C.F.R. § 206.

[13]    *See generally* U.S. DEP'T OF HOUSING AND URBAN DEV., HOME EQUITY CONVERSION MORTGAGES HANDBOOK (4235.1); *see also* Libby Perl, *HUD's Reverse Mortgage Insurance Program: Home Equity Conversion Mortgages*, R44128, CONG. RES. SERV. 8 (2017).

and live in the home and remains responsible for maintaining the home in good repair, as well as paying real estate taxes and property insurance premiums for the life of the loan.

25.     The primary goal of the FHA's HECM Loan program is to provide older Americans with more affordable options to support their financial needs during their retirement years by converting equity in their homes to cash without having to make monthly principal and interest payments.  Typically, a HECM Loan is repaid by the borrower (or the borrower's estate) with the proceeds from the sale of the home.  If the proceeds from the sale of the home are insufficient to cover the balance of the HECM Loan (including the principal and accrued interest and fees), the lender files an insurance claim that is evaluated and adjudicated by the FHA's Mutual Mortgage Insurance Fund (the "MMI Fund").  After evaluating and adjudicating the lender's insurance claim, the MMI Fund reimburses the lender the difference between the sale price (or appraised value) and the loan balance, up to a Maximum Claim Amount,[14] with certain deductions for non-reimbursable foreclosure costs.

26.     A large portion of the reverse mortgages are insured through the HECM Loan program.  Some reverse mortgage loans are backed by private lenders and are not federally insured ("Proprietary Reverse Mortgage Loans").[15]     Proprietary Reverse Mortgage Loans are often underwritten to the same standards as HECM Loans originated through the FHA's HECM Loan program, except that they may permit lower age limits (less than 62 years of age, as is required for

---

[14]    As discussed above, the Maximum Claim Amount is the maximum amount that the FHA's MMI Fund will reimburse mortgagees on their FHA insurance claims.  The Maximum Claim Amount is generally the lesser of appraised value of the underlying property or the HECM Loan limit for the area in which the home is located (which is tied to the Freddie Mac conforming loan limit).

[15]    A third type of reverse mortgage loan, called a single-purpose reverse mortgage, is offered by state, local, and nonprofit agencies.

HECM Loans) and larger loan amounts.[16]  Since 2018, the Company has originated and serviced a Proprietary Reverse Mortgage Loan product, called Equity Elite, in addition to HECM Loans.

27.     The Company originates, acquires, services, invests in, and manages reverse mortgage loans and reverse mortgage-backed securities.  The Company's involvement with a reverse mortgage loan at multiple points in its life cycle beginning with origination gives the Company the ability to deliver a strong value proposition to borrowers, control asset quality, and earn income in multiple ways.  Through its integrated business model, the Company earns interest income, origination fees, and servicing fees from its portfolio of reverse mortgage assets.  The Company also earns revenue from the securitization and sale of its reverse mortgage assets.

28.     As of November 11, 2022, prior to the Petition Date, the Company had approximately 583 employees, of which 573 were full-time employees.  Approximately 153 of the Company's employees were licensed loan originators, reporting to five corporate centers and approximately 60 field offices across the United States.  The Company's five corporate centers include its headquarters located in Bloomfield, New Jersey, as well as offices in Melville, New York, Newburgh, New York, Gold River, California, and Portage, Michigan.

29.     Given the Company's situation, the Company made the difficult decision to reduce its operational workforce.  On November 29, 2022, approximately 472 employees were informed of their separation from the Company, and a subset were provided written notices pursuant to the Worker Adjustment and Retraining Notification (WARN) Act.

---

[16]   The 2022 Maximum Claim Amount limit for HECM Loans is $970,800.   *See* U.S. DEP'T OF HOUSING AND URBAN DEVELOPMENT, *Mortgagee Letter 2021-29: 2022 Home Equity Conversion Mortgage (HECM) Limits*, https://www.hud.gov/sites/dfiles/OCHCO/documents/2021-29mlhsg.pdf; *see also* U.S. DEP'T OF HOUSING AND URBAN DEVELOPMENT, *FHA Announces New Single Family Title II Forward and Home Equity Conversion Mortgage Loan Limits for 2022* (Dec. 1, 2021), https://www.hud.gov/press/press_releases_media_advisories/HUD_No_21_197.

## 2.   The Company's History and Organizational Structure.

30.     RMIT, a Maryland corporation, was formed in October 2013.  RMIT acquired RMF in July 2014 for $25 million and subsequently raised $47 million in a Regulation D offering in March 2015.  Since the Company's initial capital raises, the Company has grown into one of the largest participants in the reverse mortgage industry.  As part of the Company's growth strategy, the Company purchased mortgage servicing rights assets from several major reverse mortgage lenders, including, among others, Sun West Mortgage Company, Inc. (in 2015), James B. Nutter & Co. (through a series of transactions from 2017 to 2018), Live Well Financial, Inc. (through a series of transactions in 2018 and 2019) and American Advisors Group (AAG) (in 2021).  The Company is now the largest servicer of owned mortgage servicing rights in the reverse mortgage industry.

31.     On December 23, 2020, RMIT was acquired from its existing financial institution investors by the Parent.  In the transaction, RMIT was acquired as a standalone entity and its entire management team stayed in place.  Officers, employees and former employees of the Company retained equity holdings in the Parent after the close of the transaction.

32.     The Company represents a significant portion of the reverse mortgage industry:  in the year to date through the third quarter of 2022, the Company had approximately 12% market share in reverse mortgage loan originations, and the Company issued approximately 41% of all Tail Securitizations.

33.     RMIT is a wholly owned subsidiary of the Parent (which, in turn, is owned 97.05% by Holdings, with the remainder owned by certain current or former members of management and other current or former employees of the Company).  RMIT owns 100% of the equity interests of the other Debtors in these Chapter 11 Cases.  The Company's origination and servicing activities

are executed within RMIT's RMF subsidiary.  RMF and RMIT's other Debtor subsidiaries, which do not conduct the Company's primary business activities, are Delaware limited liability companies.  RMIT Operating I LLC and RMIT Operating II LLC were both formed in February 2014 to transact in or hold securities and derivative instruments on behalf of themselves or their affiliates, and to engage in repurchase financing.  RMIT Cash Management LLC was formed in March 2014 for a purpose related to the Company's cash management, but currently the entity has little to no activity.

34.    Prior to November 7, 2022, RMIT's board of consisted of five members.  As discussed in further detail below, as the Company's financial situation worsened, the Debtors determined that it was advisable and in the best interests of the Company to appoint an independent and disinterested director to the board of RMIT and form a special committee to engage in the evaluation of potential claims or causes of action of the Debtors (the "Transaction Committee"). The independent director was appointed as a director of RMIT and a member of the newly-formed Transaction Committee by a resolution of the RMIT board on November 7, 2022.  Of RMIT's six board members, one is an officer of the Company and three are affiliated with Starwood Capital.

35.    A simplified organizational chart is provided below:



36.    A comprehensive organizational chart is attached hereto as **Exhibit A**.

**B.    The Debtors' Capital Structure.**

37.    As of the Petition Date, the Debtors have approximately $1.409 billion of funded indebtedness and $1.715 billion in total used and unused capacity, the majority of which is pursuant to twelve different facilities (the "Facilities"), entered into with Leadenhall, Credit Suisse Securities (USA) LLC and/or its affiliates ("Credit Suisse"), Nomura Securities International, Inc and/or its affiliates ("Nomura"), Barclays Bank PLC ("Barclays"), Texas Capital Bank, National Association and/or its affiliates ("TCB"), and TIAA, FSB ("TIAA Bank") (collectively, the "Prepetition Lenders").

38.    The Company's Facilities include the facilities evidenced by the following agreements:

- Loan and Security Agreement, by and between Texas Capital Bank, National Association and Reverse Mortgage Funding LLC, dated as of October 31, 2018, as amended (the "TCB Buyout Facility");

- Mortgage Warehouse Agreement between Texas Capital Bank, National Association and Reverse Mortgage Funding LLC, dated as of July 29, 2020, as amended (the "TCB Warehouse Facility");

- Loan and Security Agreement, by and between Texas Capital Bank, National Association and Reverse Mortgage Funding LLC, dated as of August 26, 2021, as amended (the "TCB Tail Facility");

- Amended and Restated Master Repurchase Agreement, by and between Barclays Bank PLC, Reverse Mortgage Funding LLC, Reverse Mortgage Investment Trust Inc., RMIT Operating I LLC, RMIT Operating II LLC and RMIT Cash Management LLC, dated as of May 15, 2017, as amended (the "Barclays Warehouse Facility");

- Master Repurchase Agreement, by and between TIAA, FSB, and Reverse Mortgage Funding LLC, dated as of September 15, 2017, as amended (the "TIAA Warehouse Facility");

- Amended and Restated Master Repurchase Agreement, by and between Nomura Corporate Funding Americas, LLC, Reverse Mortgage Funding LLC and Broad Street Funding Trust II, dated as of June 4, 2019 (the "Nomura Warehouse Facility");

- Master Repurchase Agreement, by and between Reverse Mortgage Funding LLC, Credit Suisse AG, acting through its Cayman Islands Branch, Alpine Securitization LTD and Credit Suisse First Boston Mortgage Capital LLC dated as of September 30, 2022 (the "CS Warehouse Facility", and collectively with the above facilities, the "Loan, Tail, and Buyout Warehouse Facilities");

- Master Repurchase Agreement, by and between Nomura Securities International, Inc. and Reverse Mortgage Funding LLC, dated as of January 9, 2017, as amended, as amended ("Nomura RMF Securities Repo (RMF)");

- Master Repurchase Agreement, by and between Nomura Securities International, Inc. and RMIT Operating II LLC, dated as of May 26, 2015 (the "Nomura Operating Securities Repo (RMIT Operating II)");

- Master Repurchase Agreement, by and between Credit Suisse Securities (USA) LLC and Reverse Mortgage Funding LLC, dated as of January 15, 2021, as amended ("CS Securities Repo (RMF)"); and

- Master Repurchase Agreement, by and between Credit Suisse Securities (USA) LLC and RMIT Operating II LLC, dated as of March 1, 2022, as amended ("CS Securities Repo (RMIT Operating II)," and, collectively with the Nomura RMF Securities Repo (RMF), Nomura Operating Securities Repo (RMIT Operating II), and CS Securities Repo (RMF), the "Securities Repo Facilities"); and

- Loan and Security Agreement, by and between Leadenhall Capital Partners LLP and certain of its managed funds and/or affiliates and Reverse Mortgage Funding LLC, dated October 17, 2018, as amended (the "<u>Leadenhall MSR Facility</u>").

39.     In addition, as of the Petition Date, the Debtors have outstanding note obligations consisting of $100 million in outstanding principal on an unsecured demand note dated October 18, 2021 between RMIT and the Parent ("<u>Parent Demand Note I</u>"), $50 million in outstanding principal on a secured demand note dated July 13, 2022 between RMIT and Holdings ("<u>Holdings Demand Note I</u>"), $1,500,151.53 in outstanding principal on an unsecured demand promissory note dated November 7, 2022 between RMF and Holdings ("<u>Holdings Demand Note II</u>"), and $1,390,000 in outstanding principal on an unsecured demand promissory note dated November 29, 2022 between RMF and Parent ("<u>Parent Demand Note II</u>").

40.     On November 17, 2022, the Company obtained several additional sources of financing in order to fund its November 2022 Buyout obligations.  The Company negotiated and obtained $10 million of financing on a secured basis from Leadenhall pursuant to an amendment to the loan and security agreement for the Leadenhall MSR Facility, $119,848,834 of financing from Nomura pursuant to an amendment to the master repurchase agreement for the Nomura RMF Securities Repo (RMF) facility, and $12 million of repo financing from Holdings pursuant to a Master Repurchase Agreement (the "<u>Holdings Repo Facility</u>").  Furthermore, TCB provided ongoing financing for originations, tails, and buyouts.  As of the Petition Date, the Company owes its respective lenders the entire amounts advanced on November 17, 2022.

41.    The following is an approximate overview of the Company's capital structure[17] as of the Petition Date:

| Debt | Maturity Date / Repurchase Date | Facility Limit ($) | Balance as of Petition Date ($) |
|---|---|---|---|
| **Loan, Tail, and Buyout Warehouse Facilities** | | | |
| CS Warehouse Facility | 9/29/2023 | $200,000,000 | $114,995,411 |
| TIAA Warehouse Facility | 8/15/2023 | 125,000,000 | 49,753,054 |
| TCB Warehouse Facility | 12/5/2022 | 202,000,000 | 161,863,623 |
| TCB Tail Facility | 12/9/2022 | 115,000,000 | 60,727,750 |
| TCB Buyout Facility | 12/9/2022 | 200,000,000 | 144,098,251 |
| Barclays Warehouse Facility | 6/30/2023 | 225,000,000 | 223,321,850 |
| Nomura Warehouse Facility | 3/10/2023 | 300,000,000 | 263,216,050 |
| **Leadenhall MSR Facility** | | | |
| Leadenhall MSR Facility | 10/12/2027 | 185,000,000 | 181,061,187 |
| **Securities Repo Facilities** | | | |
| CS Securities Repo (RMF) | 12/9/2022, 12/14/2022, 12/27/2022, 1/3/2023 | NA | 40,737,945 |
| CS Securities Repo (RMIT Operating II) | 11/29/2022 | NA | 3,331,261 |
| Nomura Operating Securities RMIT Operating II) | 11/29/2022 | NA | 809,000 |
| Nomura RMF Securities Repo (RMF) | 11/29/2022 | NA | 1,166,000 |
| **Parent and Holdings Facilities** | | | |
| Parent Demand Note I | On Demand | 100,000,000 | 100,000,000 |
| Holdings Demand Note I | On Demand | 50,000,000 | 50,000,000 |
| Holdings Demand Note II | On Demand | 25,100,000 | 1,500,152 |
| Parent Demand Note II | On Demand | 1,390,000 | 1,390,000 |
| Holdings Repo Facility | 12/16/2022 | 12,000,000 | 12,000,000 |
| **Total** | | **$1,740,490,000** | **$1,409,971,534** |

---

[17]    This capital structure chart does not include the Company's HMBS and private label securitizations.  As of October 31, 2022, the Company has approximately $21.371 billion of issued and outstanding HMBS participations and approximately $2.393 billion of issued and outstanding private label securitization notes.

42.    The Facilities generally fall into three categories described below.

43.    ***Loan, Tail, and Buyout Warehouse Facilities.***  As is customary in the mortgage industry, the Company borrows funds from warehouse lenders to finance its day-to-day obligations.  The Company uses these credit facilities to fund the origination and purchase of reverse mortgage loans and other aspects of the Company's operations, including funding the "tails" (payment obligations arising on HECM Loans arising after the origination thereof) and funding the Company's Buyouts.[18]  Each of these facilities has an adjustable interest rate that fluctuates based on changes in market interest rates.  Further, a portion of the Debtors' obligations to each applicable Prepetition Lender is full recourse, i.e., the lenders' right to recovery is not limited solely to its collateral.  The Loan, Tail, and Buyout Warehouse Facilities include the TCB Buyout Facility, the TCB Warehouse Facility, the TCB Tail Facility, the Barclays Warehouse Facility, the TIAA Warehouse Facility, the Nomura Warehouse Facility, and the CS Warehouse Facility.

44.    The agreements with Prepetition Lenders for the Loan, Tail, and Buyout Warehouse Facilities are structured either as repurchase facilities or as secured loan facilities.

45.    Pursuant to the terms of the repo facilities—namely, the Barclays Warehouse Facility, the TIAA Warehouse Facility, the Nomura Warehouse Facility, and the CS Warehouse Facility—the Debtors sell their reverse mortgage loans to repo counterparties and typically repurchase such loans from the related warehouse lender using the proceeds from the sales of such

---

[18]    The Company's Buyout obligations are described further in section II.B, *infra*.

loans to secondary market participants, the liquidation of such loans, the recoveries of Buyouts from the FHA, or the securitization of such loans.[19]

46.     Under the terms of the TCB Tail Facility and TCB Buyout Facility, Texas Capital Bank advances funds to the Debtors that are secured by the Company's reverse mortgage loans and related collateral.  Lastly, under the terms of the TCB Warehouse Facility, Texas Capital Bank historically purchases 100% participations in the Company's reverse mortgage loans.

47.     As of the Petition Date, the Debtors estimate that they collectively owe the Prepetition Lenders approximately $1.02 billion (potentially excluding accrued and unpaid interest) under the Loan, Tail, and Buyout Warehouse Facilities.

48.     ***Leadenhall MSR Facility.***  The Leadenhall MSR Facility funds the Company's reverse mortgage loan servicing business unit.  Through this facility, the Company draws against the market value of its mortgage servicing rights assets.  The Leadenhall facility has a $185 million capacity.  As of the Petition Date, the Debtors estimate that they collectively owe approximately $181.0 million under the Leadenhall MSR Facility.

49.     ***Securities Repo Facilities***.  The Company has entered into two repo facilities each with Credit Suisse and Nomura.  The purpose of the Securities Repo Facilities is to allow the Company to obtain additional liquidity by leveraging the portion of its interest in reverse mortgage loans that it is required to hold due to certain credit risk retention requirements created by the Dodd-Frank Wall Street Reform and Consumer Protection Act and its related regulations (the "Credit Risk Retention Rules") and/or other securities retained by the Company in securitization transactions sponsored by the Company.

---

[19]    The Debtors historically obtained advances that are 89-98% of the full principal balance of such reverse mortgage loans from the related repo counterparty, except recently which some Advance Rates have been at or below 85%. The amount by which the collateral exceeds the funds lent is the margin or "haircut."

50.     Pursuant to the Credit Risk Retention Rules, "securitizers" of asset-backed securities generally must retain at least five percent of the credit risk of the assets securitized.[20] The Company is subject to the Credit Risk Retention Rules with respect to its issuance of most of its private label securitizations.  Accordingly, the Company is required to hold at least five percent of the "ABS interests" in the private label securitizations that it issues (the "Risk Retention Bonds").  Although the Company is required to hold the Risk Retention Bonds, it is permitted by the Credit Risk Retention Rules to pledge such bonds as collateral for its other "full recourse" obligations.  As is common for entities subject to the Credit Risk Retention Rules, the Company has entered into repo facilities related to its Risk Retention Bonds, wherein the Company sells the Risk Retention Bonds to repo counterparties at a haircut and subsequently repurchases the Risk Retention Bonds.  Entering into the Securities Repo Facilities enables the Company to maximize the value of its reverse mortgage assets and obtain additional liquidity to fund its operations. .

**C.     The Company's Operations.**

51.     The Company's business operations can be divided into the following units: (i) reverse mortgage originations, which can be further broken down into HECM Loan originations and Equity Elite loan originations, (ii) reverse mortgage securitization, and (iii) reverse mortgage servicing.  These business units are described in further detail below.

---

[20]    *See* 15 U.S.C. §§ 78o-11(a), (c); 12 C.F.R. §§ 43, 244, 373, 123; 17 C.F.R. § 246; 24 C.F.R. § 267.

52.    A detailed schematic describing the Company's business operations is provided

below:



**1. Origination of Reverse Mortgage Loans.**

53.    The Company is one of the largest originators of reverse mortgage loans in the

United States, with approximately 12% market share in reverse mortgage loan originations in the

year to date through the third quarter of 2022.

54.    Through Debtor RMF, the Company is licensed to originate and/or acquire HECM

Loans in 50 States, Puerto Rico, and the District of Columbia.  The Company originates HECM

Loans through its retail and wholesale operations, and it also acquires HECM Loans recently closed by other lenders through additional channels.

55.     In 2018, the Company diversified its originations business to include an expansion into Proprietary Reverse Mortgage Loan products.   Through the launch of the Company's proprietary Equity Elite loans, the Company offered a financing solution to meet the needs of borrowers whose preferences fit outside of the FHA's lending requirements, for example, because they do not meet the age requirements or would like to borrow in excess of the Maximum Claim Amount limits.   The Equity Elite loan product appeals to cost-sensitive borrowers, because borrowers do not need to pay an upfront mortgage insurance premium or an ongoing mortgage insurance premium as are required for HECM Loans.   Equity Elite loans also are available to borrowers starting at age 55[21]—in contrast to age 62 for HECM Loans—and they have a higher maximum loan balance.   The Equity Elite loan product is originated through retail and wholesale operations and has been offered in 28 states and the District of Columbia.

56.     In addition to its Equity Elite loan product, the Company acquires additional Proprietary Reverse Mortgage Loans originated by other lenders.

57.     From October 2021 through September 2022, the Company originated or acquired 6,606 HECM Loans with a total unpaid balance of $1.592 billion and 2,203 Proprietary Reverse Mortgage Loans with a total unpaid balance of $1.024 billion.

58.     Once the Company originates a reverse mortgage loan, the Company uses the loan as collateral for its warehouse financing until it later sells or participates the loan in a securitization transaction.   Through the securitization transaction, the Company converts the future cash flows associated with the eventual repayment of the loan balance into cash available to the Company in

---

[21]    Higher minimum age requirements apply in some states.

the near term.  The originated loans also provide value to the Company because the Company acquires the rights to service the underlying loans ("Mortgage Servicing Rights" or "MSR") and retains such rights when it securitizes the loans.  The Company's securitization and servicing activities are discussed in further detail below in sections I.C.2 and I.C.3, respectively.

### 2. The Company's Securitization Activities.

59.    When reverse mortgage loan borrowers take an initial draw of their loans, the Company securitizes the initial loan amount and upfront fees by pooling those amounts (referred to as "participations") with participations in other reverse mortgage loans and financing the pools in the secondary market as mortgage-backed securities.  The Company also securitizes into separate "tail securitizations" the ongoing monthly servicing fees, annual mortgage insurance premiums, accrued interest, and subsequent draws on the loan by the mortgage borrower.  The company pools HECM Loans and tails into HMBS securitizations for which Ginnie Mae has guaranteed payment of principal and interest payments.

60.    The below graphics further describe the Company's securitization activities:





61.     In addition, the Company from time to time issues short-duration private label securitization notes that are not guaranteed by Ginnie Mae for the purpose of financing Buyout loans that are assignable to the FHA.  Such securitizations create liquidity from Active Buyout[22] loans without requiring the Company to assign the loans to the FHA.  The Company also issues other securitizations that are not guaranteed by Ginnie Mae, including private label securitizations of Buyout HECM loans that are not assignable to the FHA and securitizations of its Proprietary Reverse Mortgage Loans.  Unlike HMBS securitizations, securitizations of Buyout loans and the Company's Proprietary Reverse Mortgage Loan securitizations involve whole loans, not participations.

62.     By executing these securitizations, the Company is able to generate cash and income on a regular basis from a mortgage asset that does not receive monthly borrower principal and interest payments like a Traditional Forward Mortgage Loan.  The Company uses this cash, in turn, to fund additional loan originations and other operations of its business.

---

[22]    As described in further detail in section II.B. below, an "active buyout" is a Buyout of a performing loan.

63.     As of October 31, 2022, the Company has approximately $21.371 billion of issued and outstanding HMBS participations and approximately $2.393 billion of issued and outstanding private label securitization notes.

### 3.  Servicing.

64.     The Company holds the Mortgage Servicing Rights and acts as the servicer for the reverse mortgage loans held in its portfolio.   As a servicer, the Company is responsible for servicing activities including fulfilling Buyout obligations, mailing monthly statements, answering borrowers' phone calls, and foreclosing on delinquent borrowers.

65.     The Company has contracted with a subservicer, Compulink Corp., d/b/a Celink ("Celink"), to assist with the servicing of its reverse mortgages.   The Company maintains an internal servicing oversight team, with employees in Michigan (within driving distance of Celink's office) and at its Bloomfield, New Jersey location.   RMF's Servicing Oversight department reviews Celink servicing activities on a daily, weekly and monthly basis, depending on the function and frequency of reporting.   The Servicing Oversight department is split into five core teams with unique monitoring functions based on the different stages of the life cycle of a reverse mortgage loan: Active, Default and Due & Payable, Foreclosure, REO,[23] and HUD Claims.   The Active Loan Oversight team's functions include new loan boarding and transfers, audits of payment plan changes, adjustable-rate mortgage adjustments, draw requests, customer inquiries and complaints and HUD assignments.   The Default and Due & Payable team's oversight functions include monitoring loans in default for death, non-occupancy, and tax or insurance defaults, and working with Celink on possible mitigation activities.   The Foreclosure team monitors critical HUD timelines related to the foreclosure process.   The REO oversight team monitors the

---

[23] REO or "real estate owned" properties are lender-owned properties that failed to sell during the foreclosure process.

Company's REO properties through the listing, contract, and sale of such properties to ensure that the Company incurs minimal losses. Lastly, the HUD Claims oversight team monitors the FHA claims process and audits initial and supplemental claims filed by Celink to ensure all applicable funds are claimed.

66.     The Company is heavily focused on servicing HECM Loans, which comprise 96% of its MSR portfolio. Pursuant to the requirements of Ginnie Mae's HMBS program, the Company must ensure that it services all of the HECM Loans underlying the HMBS that it issues in compliance with FHA and Ginnie Mae servicing requirements. If the Company fails to comply with the these servicing requirements, it could face possible termination of its servicing rights without compensation.

67.     The Company's servicing activities generate revenue through fees, which can only be accessed through the issuance of Tail Securitizations during the life of the loan. When the Mortgage Servicing Rights cashflows are discounted to present value, they represent an asset on the Company's balance sheet. It is difficult to determine with certainty the valuation of the Company's MSR assets, and, as discussed below in section II, the value of such assets has changed significantly in recent months.

68.     The Company is the largest servicer of owned Mortgage Servicing Rights in the reverse mortgage industry. As of October 31, 2022, RMF managed reverse mortgage loans with an unpaid principal balance of approximately $25.57 billion.

69.     The Company generally retains its Mortgage Servicing Rights when it securitizes its reverse mortgage loans. Notably, any impending or actual insolvency of the Company is an event of default under the guaranty agreement that the Company has entered into with Ginnie Mae. On the occurrence or development of any event of default, unless arrangements are mutually

agreed upon by and between Ginnie Mae and the Company and placed in written contractual form duly executed by Ginnie Mae, Ginnie Mae may, by letter directed to the Company, automatically effect and complete the extinguishment of any rights of the Company under the Ginnie Mae Guide.

70.    Additionally, voluntarily filing for bankruptcy is an event of default referred to as an "servicer termination event" under the terms of the sale and servicing agreements related to the Company's private label securitizations.  Under the terms of the sale and servicing agreements related to each of the private label securitizations, upon RMF's filing for bankruptcy, certain "controlling noteholders" have the right to replace the RMF as servicer on the reverse mortgage loans underlying the securitizations.

**Part II:**
**Circumstances Leading to the Commencement of the Chapter 11 Cases**

**A.    Trends in the Mortgage Industry.**

71.    Continued concerns about the availability and cost of credit, the United States mortgage and real estate markets, energy costs, geopolitical issues (including the potential for increased tensions between the United States and Russia resulting from the current situation involving Russia's invasion of Ukraine), and the COVID-19 pandemic, among other things, have all contributed to increased volatility within the reverse mortgage industry.  This volatility occurred during a period of historically low inflation and interest rates.

72.    The current environment, such as rapid interest rate increases and the sale of agency mortgage-backed securities from the Federal Reserve's balance sheet, has brought continued volatility and challenges in markets affecting the reverse mortgage industry.

73.    Traditional Forward Mortgage Loan interest rates have increased significantly over the course of 2022.  The below chart published by Freddie Mac shows a drastic increase in average

30-year fixed mortgage interest rates to 6.95% in November 2022, the highest average rate since 2008.[24]



74.    This has resulted in widened Tail Securitization spreads and lowered Tail Securitization execution prices.    The below chart details the Company's declining Tail Securitization execution prices from January 2020 to October 2022:



---

[24]    *See Primary Mortgage Market Survey*, FREDDIE MAC (Nov. 3, 2022), https://www.freddiemac.com/pmms.

75.     As a result of this decline in execution prices, the Company projects it will generate approximately $41.4 million less in revenue on HMBS tail securitizations over the next 12 months than it would have achieved at its trailing 36-month average HMBS tail execution price.

76.     Additionally, widening first participation HMBS spreads and lowering first participation HMBS execution pricing since May 2021 has drastically reduced the premiums that the Company receives on its loan origination securitizations.

77.     The below chart details this pricing trend from January 2020 to October 2022:



78.     These adverse market conditions have led to significant financial and operational challenges for the mortgage lending industry, including the Company.  Lower interest rates in 2020 and 2021 were a catalyst for higher prepayment speeds for mortgage borrowers, which reduced the future cash flow and securitization revenue from the Company's Mortgage Servicing Rights

asset.  Subsequent rises in interest rates have slowed the pace of prepayments,[25] thereby causing another set of issues for the Company.  The slowdown in prepayments has resulted in an increase in the Company's Buyout obligations, which have become more difficult to finance due to rising interest rates.

79.     For the twelve months ending September 30, 2022, the Debtors generated a $28.8 million after-tax net loss.  The Company's origination volume has significantly decreased, from 767 total loans originated or otherwise acquired in the month of October 2021 to 589 in September 2022.   In dollar amounts, the total unpaid balance of the Company's September 2022 loan originations and acquisitions was $156.6 million in September 2022 as compared to $230.1 million in October 2021—a decline of 31.9%.  This decrease was especially severe among HECM Loans, where origination volumes declined 66.1% from a total unpaid balance of $151.3 million October 2021 to $51.2 million in September 2022.  The decrease in origination volume was not limited to the Company, as new originations across the industry were down 30.2% (from $2.4 billion to $1.7 billion) over this time span.

**B.      Strain Caused by the Company's Buyout Obligations.**

80.     In accordance with the Ginnie Mae Guide and the Company's servicing agreement with Ginnie Mae, the Company (similar to other issuers of HMBS) has certain Buyout obligations, whereby it must purchase all participations related to a given HECM Loan when the outstanding principal balance of the HECM Loan equals or exceeds 98% of the Maximum Claim Amount.  Buyout obligations may relate to HECM Loans that are in active status (an "<u>Active Buyout</u>" or

---

[25]   The changes in the Company's reverse mortgage loan repayment rates can be summarized based on the conditional prepayment rate (CPR) associated with the Company's loans.  The CPR for the Company's loans from 2015 through 2020 ranged from approximately 0.7% to 13.7%.  The CPR for 2021 through September 2022 increased to a range from 10.6% to 24.2%.  The CPR for October 2022 was 10.4%.

"ABO") or HECM Loans that have become due-and-payable, most commonly because the borrower has passed away (a "Non-Active Buyout" or "NABO").[26]

81.     Under the current design of Ginnie Mae's HMBS program, services must advance the funds necessary to satisfy the Buyout obligations that accrue each month.  In periods of macroeconomic stress, access to credit for a company in the Debtors' position may become more challenging; however, the obligation to fund these buyouts does not change, creating an environment where servicer either must have access to (i) substantial committed warehouse financing capacity, or (ii) significant cash on balance sheet.  If the Company does not comply with its Buyout obligations, it could face the possible termination of its servicing rights.

82.     The Company's Buyout obligations for November 2022 were approximately $144 million, and the Company expects that its December 2022 Buyout obligations are estimated to be approximately $161 million.  Based on the recent projections of the Company's management, these Buyout obligations are forecasted to increase over time and average $189 million per month over the next 24 months.  Furthermore, the Company forecasts that it will incur approximately $2.1 billion in Buyout obligations over the next twelve months, and a total of approximately $13.8 billion in Buyout obligations over the next seven years.  According to the Company's projections, the Company does not have sufficient capacity in its warehouse facilities to fund the increases in its Buyout obligations over the next twelve months or the liquidity to address the obligations.

83.     Furthermore, the interest rates and debenture rates on these assets were determined at the time of loan origination (unlike in the Traditional Forward Mortgage industry, where it is

---

[26]    Other reasons a HECM Loan may become due-and-payable include, *inter alia*, that the borrower has failed to pay property insurance or taxes, or no longer lives in the home.

set at the time of default), and the HMBS program requires servicers to buy the loans at par value. As rates have increased, services face both (i) decreased fair market value of their assets, which results in lower Advance Rates from warehouse lenders and increased Haircut Capital, thereby depleting liquidity; and (ii) negative carry in financing the Buyouts, which ultimately erodes the Company's book value[27] as every dollar that is funded for a Buyout has a negative return on equity.

84.    The below graph depicts the Company's forecasted Buyout obligations:



85.    The Company generally can expect to be repaid the amounts advanced to purchase participations to fulfill its Buyout obligations; however, increases in interest rates on the Company's sources of financing have led to negative carry, wherein the Company incurs significant losses while it seeks to assign or liquidate the Buyout loans.  At the same time, the

---

[27]    The erosion of the Company's book value also makes it difficult for the Company to maintain its net worth covenants pursuant to Ginnie Mae's requirements and the Company's debt facilities.

average length of time for which the Company must wait for repayment of its Buyouts has increased.

86.     The method by which the Company is repaid and the timing for such repayment depends on whether the Buyout is an Active Buyout or a Non-Active Buyout.  After an Active Buyout, the Company may assign the loan to the FHA.  When loans are assigned to the FHA, the FHA's MMI Fund purchases the loan at par and the Company receives reimbursement of the advancement of funds to liquidate the participation from HMBS pools.[28]  Although the FHA will pay out its claim at the par balance of the loan, this payment does not compensate the issuer for the cost of financing its Buyout obligations.

87.     If the Buyout is a Non-Active Buyout, the Company must liquidate the loan[29] and seek reimbursement from the FHA to the extent the liquidation proceeds do not satisfy the total obligations owed under the loan.  Before the Company can liquidate the loan, it must engage in certain mitigation procedures to help the borrower try to become current, and only after such procedures are unsuccessful can the Company foreclose on the loans.

---

[28]    The transfer of the loan to the FHA is a dual transfer:  both the ownership of the loan and the servicing of the loan are transferred to the FHA.  The FHA, through its contract subservicer, assumes all responsibilities in servicing the loan and, in turn, receives the servicing fees that previously accrued to the Company.

[29]    Buyouts of non-active HECM Loans cannot be assigned to the FHA, despite the fact that active and non-active HECM Loans carry an identical amount of FHA insurance.  Due to the current design of the Ginnie Mae's HMBS program, HMBS issuers are placed in substantially different financial positions based on whether a HECM Loan has an active or non-active status at the time of the buyout—even though the HECM Loan itself remains FHA-insured regardless of its status.

88.    The below graphic compares Active Buyouts to Non-Active Buyouts:

| Active Buyout ("ABO") | Non-Active Buyout ("NABO") |
|---|---|
| **Trigger Event:**<br>• Unpaid balance of borrower's reverse mortgage has crossed 98% of the Maximum Claim Amount; and<br>• Loan is performing.<br><br>**Liquidation Process:**<br>• Borrower pays back loan, typically through selling the home or refinancing the reverse mortgage.<br>• FHA Event:  Loans are assigned to FHA and payment for full balance is received when the loan balance. reaches 98% of the Maximum Claim Amount.<br>• Timeline: 2-3 months. | **Trigger Event:**<br>• Unpaid balance of borrower's reverse mortgage has crossed 98% of the Maximum Claim Amount;  and<br>• Borrower has deceased, has not occupied property for 12 consecutive months, has not completed repairs prescribed at time of origination, or has not made tax and insurance payments.<br>**Liquidation Process:**<br>• Servicer takes possession of the house and sells it.<br>• FHA Event:  Servicer files claims for any shortfall in balance up to the maximum claim amount.<br>• Timeline: Average of 12-18 months; can take up to 4 years. |

89.    In the case of Active Buyouts, it typically takes between two to three months for the Company to be repaid; however, in recent months the FHA assignment and repayment process has been elongated.  The process for obtaining repayment of Non-Active Buyouts is longer than Active Buyouts.  The Company must either attempt to sell the Buyout loan—either as a whole loan or in a private label securitization transaction—or engage in a lengthy foreclosure process to liquidate the loan and subsequently file an insurance claim with the FHA for up to the Maximum Claim Amount to recover the remaining debt.  Typically, it takes 12-18 months for the Company to obtain repayments of Non-Active Buyouts, but in some cases it can take two to four years for the Company to be repaid.  Over time, this delay leads to substantial increases in the amount of Non-Active Buyout Loans that remain on the Company's balance sheet and must be financed through warehouse facilities, as the pace at which it must repurchase loans exceeds the rate at which it is repaid.

90.    The Company finances its obligations using several of its Loan, Tail, and Buyout Warehouse Facilities.  However, the floating interest rates on these facilities have increased to the

point where the Company incurs substantial losses while it awaits repayment of the funds it has advanced to undertake the Buyouts.  An analysis of the Debtors' Non-Active Buyouts financed using warehouse facilities in early November 2022 revealed that 23% of the HECM Loans had fixed rates of 5.01%, and 77% of the HECM Loans were adjustable-rate, with a 5.42% average rate.  In comparison, the rates the Company was required to pay on its warehouse facilities ranged from 6.05% to 7.15%.  Based on industry-recognized projections of future SOFR rates,[30] the Company expects that the cost to finance carrying these loans on its balance sheet will continue to be greater than the revenue (interest received) from the underlying loans in the coming months.

91.     Although the Company's Buyout obligations are intended to be repaid in full by the FHA, the Company must cover the losses it incurs from paying the higher interest rates on its Buyouts than it will ultimately recover when it is reimbursed from the coupon rate on the loans. These losses impair the company's book value and make it uneconomical for private capital to fund these obligations.

### C.     The Events of Default.

92.     The challenges stemming from the Company's Buyout obligations, in combination with adverse market conditions for the mortgage lending industry and market volatility, have led the Debtors to experience significant operating losses and cash flow challenges.  Due to these and other factors, the Company has defaulted on several of its Facilities.

93.     Pursuant to the Ginnie Mae Guide,[31] Ginnie Mae requires HMBS issuers to maintain certain liquidity levels determined based on their net worth (the "Ginnie Mae Liquidity Requirement").  Under the terms of most of the Company's Facilities,

---

[30]   *See Term SOFR, USD LIBOR, and Treasury Forward Curves*, CHATHAM FINANCIAL (Nov. 29, 2022), https://www.chathamfinancial.com/technology/us-forward-curves.

[31]   *See* GINNIE MAE, GINNIE MAE MBS GUIDE Ch. 3, Part 8, Section C(2), https://www.ginniemae.gov/issuers/program_guidelines/MBSGuideLib/Chapter_03.pdf.

RMF must satisfy minimum liquidity covenants requiring RMF to maintain a designated minimum level of liquidity (with the highest requirement being $25 million, as provided in the CS Warehouse Facility, the TCB Warehouse Facility, and the TCB Tail Facility) and/or to satisfy the Company's Ginnie Mae Liquidity Requirement (the "Minimum Liquidity Tests").  Upon the failure of the Minimum Liquidity Tests, the applicable Prepetition Lender has the right to foreclose on the pledged collateral (or liquidate the assets that Company transferred to such lender as part of a repo transaction).

94.    In the first week of October 2022, the Company's Ginnie Mae Liquidity Requirement was $45.1 million.  Due to projected liquidity shortfalls, the Company requested and obtained a temporary waiver[32] from Ginnie Mae of the Company's Ginnie Mae Liquidity Requirement so as to avoid the failure of the Minimum Liquidity Tests in the Facilities.

95.    However, on October 27, 2022, the Company fell out of compliance with the Minimum Liquidity Tests for the CS Warehouse Facility, the TCB Warehouse Facility, and the TCB Tail Facility, each which required the Company to maintain at least $25 million of liquidity. These defaults triggered cross-default provisions in several of the Company's other Facilities.

96.    The Company has also defaulted on margin calls in connection with the CS Securities Repo (RMF) Facility, the Barclays Warehouse Facility, and the Nomura Warehouse Facility.  The Company may have also experienced additional financial covenant and other defaults (such defaults, in combination with the other events of default, the "Events of Default").

97.    As a result of the Events of Default, each counterparty has the ability to exercise remedies and, accordingly, each has the option to liquidate or foreclose on (as applicable) the collateral securing the Company's obligations.

---

[32]    The waiver is set to expire on January 1, 2023.

D.    **Subsequent Events.**

98.    In light of the Events of Default, the Company, with the assistance of its advisors, engaged with the Prepetition Lenders.  On October 27, 2022, the Company requested that all Prepetition Lenders agree to a standstill agreement pursuant to which each would temporarily forbear from exercising remedies while the Company and its advisors work to address the situation and negotiate a comprehensive waiver.  The Company's efforts to obtain a standstill had varying degrees of success with respect to the Prepetition Lenders.  The Company was unable to obtain the requested standstill from all Prepetition Lenders.

99.    On October 31, 2022, the Company communicated with Ginnie Mae with respect to its existing challenges.  Ginnie Mae's representatives noted, among other things, the industry-wide difficulties.

100.    On November 1, 2022, I was appointed Chief Restructuring Officer.   On November 2, 2022, Holdings committed to deliver a demand note to the Company, pursuant to which the Company may borrow up to $25,100,000 for the purpose of maintaining the Company's liquidity at a minimum of $25 million at all times until November 11, 2022.  The provision of such funding was conditioned upon the absence of the exercise of remedies by any Prepetition Lender. Over the next several days, the Debtors and their advisors continued to engage with the Prepetition Lenders and to field near-constant requests for information from the Prepetition Lenders.  By November 7, 2022, all of the Prepetition Lenders verbally agreed to a standstill until November 11, 2022, though none would sign a written agreement to that effect.

101.    The Company is required to pay its Buyout obligations on the second day of each month.   The Company's Buyout obligations on November 2, 2022 were approximately $144 million.  On November 2, 2022, the Company informed Ginnie Mae that it was unable to satisfy its Buyout obligations for the month of November and Ginnie Mae agreed to temporarily

waive the Company's Buyout obligations until November 15, 2022.[33]  On November 7, 2022, Ginnie Mae granted a written temporary waiver of the Company's Buyout obligations that was set to expire on November 17, 2022.  On November 8, 2022, the Company held a meeting with Ginnie Mae to provide a further update on the Company's financial position.  The Company and Ginnie Mae also exchanged written correspondence on November 25, 2022 and November 26, 2022, respectively.  At this time, Ginnie Mae has not taken action to revoke the Company's servicing rights.  Additionally, Ginnie Mae has reserved all rights it has against the Company, but it has expressed a willingness to work with the Company in the coming weeks.

102.    The Debtors determined that it was advisable and in the best interests of the Company to appoint an independent and disinterested director to the board of RMIT.   On November 7, 2022, RMIT's board appointed an independent director and established the Transaction Committee, comprised solely of the independent director, for the purpose of engaging in the evaluation of potential claims or causes of action held by the Company.  The Transaction Committee is vested with the authority to, among other things:

- review, negotiate, evaluate, propose, approve and/or enter into settlement terms and conditions in response to, arising from, in connection with or related to the claims or causes of action of the Company;
- direct the prosecution of the claims or causes of action of the Company; and
- exercise certain rights, authority, and powers in connection with any matters pertaining to any claims or causes of action of the Company in which a conflict of interest exists or is reasonably likely to exist between the Company and any related party.

103.    Despite the Company's efforts to obtain an extension of the standstill beyond November 11, 2022, the Prepetition Lenders would not agree to an extension of the standstill.  On November 11, 2022, the standstill expired.

---

[33]    This waiver was extended to November 17, 2022 in Ginnie Mae's subsequent written confirmation of the waiver.

104.    As described in section I.B. above, the Company satisfied its November 2022 Buyout obligations on November 17, 2022 after arranging for emergency financing provided by Holdings, Nomura, and Leadenhall pursuant to the Holdings Repo Facility and amendments to the Leadenhall MSR facility and the Nomura RMF Securities Repo (RMF) facility.    Thereafter, the Debtors' Prepetition Lenders began to exercise remedies and renegotiate financing rates for funding that the lenders historically provided to the Company and started exercising other remedies.

105.    On November 21, 2022, the Company halted its mortgage origination activities. On November 29, 2022, the Debtors made the very difficult decision to terminate a significant majority of its workforce.    Shortly thereafter, on November 29, 2022, the Debtors' Board of Directors unanimously authorized this chapter 11 filing.

106.    To fund and support the Company's operations during the chapter the chapter 11 process, the Company is in the process of securing debtor-in-possession (DIP) financing from critical financial stakeholders.    The contemplated DIP financing would provide the Debtors with near-term liquidity to operate and cover administrative expenses as it pursues restructuring options.

### Part III:
### First Day Motions

107.    Contemporaneously herewith, the Debtors have filed the following motions (the "First Day Motions")[34] in these Chapter 11 Cases seeking orders granting various forms of relief intended to allow the Debtors to transition smoothly into chapter 11, while continuing to operate their business without disruption.    The First Day Motions include:

- *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief;*

---

[34]    Capitalized terms used but not otherwise defined below shall have the meanings ascribed to them in the respective First Day Motions.

- *Debtors' Application for Retention and Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Determining Adequate Assurance of Payment for Future Utility Services, and (III) Establishing Procedures for Determining Adequate Assurance of Payment;*

- *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Prepare a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) Authorizing the Debtors to File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (III) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (IV) Approving the Form and Manner of Notifying Creditors of Commencement, (V) Approving the Form and Manner of Notice to Borrowers, and (VI) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (a) Pay Prepetition Employee Compensation, Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay their Obligations under Prepetition Insurance Policies, (B) Continue to Pay Certain Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, (D) Maintain their Surety Bond Program, and (E) Enter into New Financing Agreements in the Ordinary Course of Business; and (II) Granting Related Relief;*

- *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Administrative Expense Status to Post-Petition Intercompany Balances, and (III) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Continue Honoring Reverse Issuer and Servicing Obligations and (II) Sell Certain Newly Originated Loans, (B) Modifying the Automatic Stay on a Limited Basis To Facilitate the Debtors' Ongoing Obligations, and (C) Granting Related Relief;* and

- *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, (I) Authorizing the Debtors to Obtain Post-Petition Financing, (II) Authorizing the Debtors' Use of Cash Collateral, (III) Granting Adequate Protection, and (IV) Granting Related Relief.*

108.    The First Day Motions seek authority for, among other things, the Debtors to use cash collateral, honor employee wages and benefits obligations, and ensure the continuation of the Debtors' cash management systems.  I believe that the relief requested in the First Day Motions is necessary to give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' Prepetition Lenders.

109.    Several of these First Day Motions request authority to pay certain prepetition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 20 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate an irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

110.    I am familiar with the content and substance of the First Day Motions.  I believe approval of the relief sought in each of the motions is critical to allowing the Debtors to transition smoothly into chapter 11, while continuing their business without disruption.

111.    I have consulted with the Debtors' advisors regarding and understand each of the First Day Motions and the relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: December 1, 2022          /s/ Tanya Meerovich
New York, NY                     Tanya Meerovich
                                 Senior Managing Director
                                 FTI Consulting