**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVERSE MORTGAGE INVESTMENT | ) | Case No. 22-11225 (MFW) |
| TRUST INC., *et al.*,[1] | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

---

**AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR REVERSE**
**MORTGAGE INVESTMENT TRUST INC. AND ITS DEBTOR SUBSIDIARIES**

---

**SIDLEY AUSTIN LLP**
Stephen Hessler (admitted *pro hac vice*)
Thomas Califano (admitted *pro hac vice*)
Anthony Grossi (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email: shessler@sidley.com
      tom.califano@sidley.com
      agrossi@sidley.com

**BENESCH, FRIEDLANDER, COPLAN**
**& ARONOFF LLP**
Michael J. Barrie (DE No. 4684)
Jennifer R. Hoover (DE No. 5111)
John C. Gentile (DE No. 6159)
1313 North Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: mbarrie@beneschlaw.com
      jhoover@beneschlaw.com
      jgentile@beneschlaw.com

*Counsel to the Debtors*

Dated: March 22, 2023

---

[1] The Debtors in these jointly administered Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include: Reverse Mortgage Investment Trust Inc. (3421); Reverse Mortgage Funding LLC (0209); RMIT Cash Management LLC (6241); RMIT Operating I LLC (1844); and RMIT Operating II LLC (2301). The location of the Debtors' service address for purposes of these Chapter 11 Cases is: 1455 Broad Street, 2nd Floor, Bloomfield, NJ 07003.

# TABLE OF CONTENTS

I.      **DEFINED TERMS AND RULES OF INTERPRETATION** .........................................1

    **A.**      Defined Terms ................................................................................1

    **B.**      Rules of Interpretation .................................................................19

    **C.**      Computation of Time....................................................................20

    **D.**      Reference to Monetary Figures......................................................20

    **E.**      Reference to the Debtors or the Wind-Down Debtors.......................20

    **F.**      Controlling Document ..................................................................20

II.     **ADMINISTRATIVE CLAIMS, DIP SECURED CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS** ........................................................21

    **A.**      Administrative Claims ..................................................................21

    **B.**      DIP Secured Claims.....................................................................22

    **C.**      Professional Fee Claims................................................................22

        **1.**      Final Fee Applications and Payment of Professional Fee Claims ...........22

        **2.**      Professional Fee Reserve Amount .......................................23

        **3.**      Post-Confirmation Date Fees and Expenses ...........................23

    **D.**      Priority Tax Claims......................................................................23

III.    **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**...........24

    **A.**      Classification of Claims and Interests............................................24

    **B.**      Treatment of Claims and Interests .................................................25

        **1.**      Class 1 – Other Secured Claims..........................................25

        **2.**      Class 2 – Other Priority Claims...........................................26

        **3.**      Class 3 – BNGL Holdings Note Claims ................................26

        **4.**      Class 4 – Barclays Warehouse Repo Facility Claims..............27

        **5.**      Class 5 – CS Claims..........................................................28

        **6.**      Class 6 – Nomura Claims ...................................................28

        **7.**      Class 7 – TCB Prepetition Claims........................................30

        **8.**      Class 8 – TIAA Warehouse Repo Facility Claims .................31

        **9.**      Class 9 – General Unsecured Claims....................................33

        **10.**     Class 10 – Intercompany Claims .........................................33

        **11.**     Class 11 – Intercompany Interests .......................................33

        **12.**     Class 12 – RMIT Existing Equity Interests ..........................34

    **C.**      Limited Substantive Consolidation................................................35

    **D.**      Special Provision Governing Unimpaired Claims.............................35

    **E.**      Elimination of Vacant Classes......................................................35

    **F.**      Acceptance or Rejection of this Plan .............................................36

        **1.**      Presumed Acceptance of this Plan .......................................36

i

|  |  | 2. | Voting Classes ........................................................... | 36 |
|  |  | 3. | Deemed Rejection of this Plan ...................................... | 36 |
|  | G. | | Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ............................................... | 36 |
|  | H. | | Subordinated Claims and Interests ...................................... | 36 |
| **IV.** | | | **MEANS FOR IMPLEMENTATION OF THIS PLAN** ............... | **37** |
|  | A. | | General Settlement of Claims and Interests .......................... | 37 |
|  | B. | | Wind-Down Transactions ................................................. | 37 |
|  | C. | | RMF Reorganization Transaction ...................................... | 37 |
|  | D. | | Cancellation of Existing Agreements and Interests ................ | 38 |
|  | E. | | Section 1146 Exemption .................................................. | 39 |
|  | F. | | The Liquidation ........................................................... | 39 |
|  |  | 1. | Vesting of Assets in the Wind-Down Debtors .................. | 39 |
|  |  | 2. | Sources of Plan Distributions ....................................... | 39 |
|  |  | 3. | Wind-Down Debtors ................................................... | 40 |
|  |  | 4. | Plan Administrator ..................................................... | 40 |
|  |  | 5. | Plan Advisory Committee ............................................ | 41 |
|  |  | 6. | Option to Establish Liquidating Trust ............................ | 41 |
|  |  | 7. | Dissolution and Governing Bodies of the Debtors ............. | 42 |
|  |  | 8. | Release of Liens ....................................................... | 42 |
|  |  | 9. | Corporate Action ...................................................... | 43 |
|  |  | 10. | Effectuating Documents; Further Transactions ................ | 43 |
|  |  | 11. | Preservation of Causes of Action ................................. | 43 |
|  |  | 12. | Closing the Chapter 11 Cases ..................................... | 44 |
| **V.** | | | **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .... | **45** |
|  | A. | | Assumption and Rejection of Executory Contracts and Unexpired Leases .......... | 45 |
|  | B. | | Claims Based on Rejection of Executory Contracts or Unexpired Leases ........... | 45 |
|  | C. | | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ......... | 46 |
|  | D. | | Reservation of Rights .................................................... | 47 |
|  | E. | | Nonoccurrence of Effective Date ...................................... | 47 |
| **VI.** | | | **PROVISIONS GOVERNING DISTRIBUTIONS** .......................... | **47** |
|  | A. | | Timing and Calculation of Amounts to Be Distributed ......... | 47 |
|  | B. | | Disbursing Agent ........................................................ | 48 |
|  | C. | | Rights and Powers of Disbursing Agent ............................ | 48 |
|  |  | 1. | Powers of the Disbursing Agent ................................... | 48 |
|  |  | 2. | Expenses Incurred On or After the Effective Date ............ | 48 |
|  | D. | | Delivery of Distributions and Undeliverable or Unclaimed Distributions .......... | 48 |
|  |  | 1. | Record Date for Distribution ...................................... | 48 |

|  |  | **2.** | Delivery of Distributions in General | 48 |
|  |  | **3.** | Undeliverable Distributions and Unclaimed Property | 49 |
|  | **E.** | | Manner of Payment | 49 |
|  | **F.** | | Compliance with Tax Requirements | 49 |
|  | **G.** | | Allocations | 50 |
|  | **H.** | | No Postpetition Interest on Claims | 50 |
|  | **I.** | | Foreign Currency Exchange Rate | 50 |
|  | **J.** | | Setoffs and Recoupment | 50 |
|  | **K.** | | Claims Paid or Payable by Third Parties | 51 |
|  |  | **1.** | Claims Paid by Third Parties | 51 |
|  |  | **2.** | Claims Payable by Third Parties | 51 |
|  |  | **3.** | Applicability of Insurance Policies | 51 |

**VII.    THE PLAN ADMINISTRATOR** ........................................................ **52**

|  | **A.** | | The Plan Administrator | 52 |
|  |  | **1.** | Plan Administrator Rights and Powers | 52 |
|  |  | **2.** | Compensation and Expenses of the Plan Administrator | 53 |
|  | **B.** | | Wind Down | 53 |
|  | **C.** | | Exculpation, Indemnification, Insurance and Liability Limitation | 53 |
|  | **D.** | | Tax Returns | 54 |
|  | **E.** | | Dissolution of the Wind-Down Debtors | 54 |

**VIII.   PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS** .................................................................................. **54**

|  | **A.** | | Allowance of Claims | 54 |
|  | **B.** | | Claims Administration Responsibilities | 54 |
|  | **C.** | | Estimation of Claims | 55 |
|  | **D.** | | No Distributions Pending Allowance | 55 |
|  | **E.** | | Distributions After Allowance | 56 |
|  | **F.** | | Reduction of Claims | 56 |
|  | **G.** | | Adjustment to Claims or Interests Without Objection | 56 |
|  | **H.** | | Disallowance of Claims or Interests | 56 |
|  | **I.** | | Amendments to Claims | 57 |
|  | **J.** | | Disputed Claims Reserve | 57 |

**IX.    SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ...... **57**

|  | **A.** | | Compromise and Settlement of Claims, Interests, and Controversies | 57 |
|  | **B.** | | Discharge of Claims and Termination of Interests | 58 |
|  | **C.** | | Term of Injunctions or Stays | 58 |
|  | **D.** | | Release of Liens | 59 |
|  | **E.** | | Releases by the Debtors | 59 |
|  | **F.** | | Releases by the Releasing Parties | 60 |
|  | **G.** | | Exculpation | 61 |
|  | **H.** | | Injunction | 61 |

|       | I.    | Protections against Discriminatory Treatment | 62 |
|       | J.    | Document Retention | 62 |
|       | K.    | Reimbursement or Contribution | 62 |
| **X.** | | **CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THIS PLAN** | **62** |
|       | A.    | Conditions Precedent to the Effective Date | 62 |
|       | B.    | Effect of Failure of Conditions | 63 |
|       | C.    | Substantial Consummation | 63 |
| **XI.** | | **MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN** | **63** |
|       | A.    | Modification and Amendments | 63 |
|       | B.    | Effect of Confirmation on Modifications | 64 |
|       | C.    | Revocation or Withdrawal of Plan | 64 |
| **XII.** | | **RETENTION OF JURISDICTION** | **64** |
| **XIII.** | | **MISCELLANEOUS PROVISIONS** | **67** |
|       | A.    | Immediate Binding Effect | 67 |
|       | B.    | Additional Documents | 67 |
|       | C.    | Payment of Statutory Fees | 67 |
|       | D.    | Dissolution of the Creditors' Committee | 67 |
|       | E.    | Reservation of Rights | 68 |
|       | F.    | Successors and Assigns | 68 |
|       | G.    | Notices | 68 |
|       | H.    | Term of Injunctions or Stays | 69 |
|       | I.    | Entire Agreement | 69 |
|       | J.    | Exhibits and Annexes | 70 |
|       | K.    | Nonseverability of Plan Provisions | 70 |
|       | L.    | Votes Solicited in Good Faith | 70 |
|       | M.    | Governing Law | 70 |
|       | N.    | Waiver or Estoppel | 71 |

## INTRODUCTION

Reverse Mortgage Investment Trust Inc. and the above-captioned debtors and debtors in possession (each, a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>"), propose this joint chapter 11 plan of liquidation for the resolution of the outstanding claims against, and equity interests in, the Debtors. This is a joint Plan for all of the Debtors. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. Nothing in this Plan shall prejudice the rights of the Debtors or any other applicable parties with respect to the Disputed Issues (as defined in the Final DIP Order).

**All Holders of Claims, to the extent applicable, are encouraged to read this Plan in its entirety before voting to accept or reject this Plan.**

## I.     DEFINED TERMS AND RULES OF INTERPRETATION

### A.     Defined Terms

As used in this Plan, capitalized terms have the meanings set forth below.

"<u>9019 Settlement</u>" means the settlement described in the Settlement Term Sheet, dated February 14, 2023, by and among the Debtors, BNGL Holdings, the Committee, and, to a limited extent, BNGL Parent LLC and Starwood Capital Group Global II, LP, which was approved by order of the Court entered on February 23, 2023 [Docket No. 499].

"<u>Administrative Claim</u>" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims in the Chapter 11 Cases; (c) all fees and charges assessed against the Estates under 28 U.S.C. §1930; (d) Leadenhall Adequate Protection Claims, if any; (e) DIP Deficiency Claims, if any; and (f) any Claims that have been designated as "Administrative Claims" by order of the Bankruptcy Court, including the Final DIP Order.

"<u>Administrative Claims Bar Date</u>" means the applicable last date, at 4:00 p.m. Eastern time, set by the Bankruptcy Court for a Claimant to file a request for payment of any Administrative Claim which: (a) with respect to General Administrative Claims, (i) arising on or after the Petition Date, through and including January 31, 2023, shall be February 21, 2023 as set forth in the Bar Date Order, and (ii) arising after January 31, 2023, through and including the Effective Date, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

"<u>Administrative Expense Request Form</u>" means a request for payment of an Administrative Claim in the form attached to the Bar Date Order as Exhibit 2.

"<u>Affiliate</u>" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"<u>Allowed</u>" means, as to a Claim or an Interest, a Claim or Interest (or portion thereof), except as otherwise provided in the Plan: (a) a Claim that is evidenced by a Proof of Claim Filed

by the applicable Bar Date (or for which Claim under the Plan, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order; and *provided further* that Proofs of Claim need not be filed with respect to Interests. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. A Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent (i) entry of a Final Order allowing such late Filed Claim, or (ii) written consent of the Debtors, Wind-Down Debtors, or the Plan Administrator, as applicable, to the allowance of such Claim.

"Assumed Executory Contracts and Unexpired Leases Schedule" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors, if any, pursuant to this Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

"Avoidance Actions" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent and voidable transfer laws.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the Petition Date, together with all amendments, modifications, and replacements of the foregoing that are made retroactive to the Petition Date, as the same may exist on any relevant date to the extent applicable to the Chapter 11 Cases.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as may be amended from time to time.

"Bar Date" means the applicable date, as established in the Bar Date Order or by any other order of the Bankruptcy Court, by which respective Proofs of Claim must be Filed.

"Bar Date Order" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Setting a Bar Date for the Filing of Proofs of Claim by Governmental Units, (III) Setting a Bar Date for Allowance of Administrative Expense Claims, (IV) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (V) Approving the Form of and Manner for Filing Proofs of Claim, (VI) Approving Notice of Bar Dates, and (VII) Granting Related Relief* [Docket No. 293].

"Barclays" means Barclays Bank PLC.

"Barclays Warehouse Repo Facility" means the repurchase facility under that certain Amended and Restated Master Repurchase Agreement (as modified and amended from time to time), dated as of May 15, 2017, by and between RMF as seller and Barclays as purchaser and as agent.

"Barclays Warehouse Repo Facility Claim" means any Claim arising under or relating to the Barclays Warehouse Repo Facility.

"BNGL Holdings" means BNGL Holdings, LLC.

"BNGL Holdings Note" means that certain Demand Promissory Note and Security Agreement, dated as of July 13, 2022, by and between RMIT and BNGL Holdings.

"BNGL Holdings Note Claim" means any Claim held by BNGL Holdings arising under or relating to the BNGL Holdings Note.

"BNGL Holdings Repo Facility Claim" means any Claim held by BNGL Holdings arising under or relating to that certain Master Repurchase Agreement dated November 17, 2022.

"BNGL Holdings Repo Facility Deficiency Claim" means any portion of a BNGL Holdings Repo Facility Claim that is not Secured.

"BNGL Holdings Repo Facility Secured Claim" means any portion of a BNGL Holdings Repo Facility Claim that is Secured.

"BNGL Holdings Waived Claims" means, collectively, any BNGL Holdings Note Claim, BNGL Holdings Repo Facility Deficiency Claim, and any DIP Claim held by BNGL Holdings as a DIP Lender.

"Business Day" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"Cash" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

"Cause of Action" or "Causes of Action" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claim under any state or foreign law, including, without limitation, any fraudulent transfer or similar claim.

"Chapter 11 Cases" means, when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

"Claim" means any claim, as defined in section 101(5) of the Bankruptcy Code.

"Claims Agent" means Kroll Restructuring Administration LLC, the noticing, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

"Claims Objection Deadline" means with respect to all Claims other than Professional Fee Claims, (a) 180 days after the Effective Date, or (b) such other date as may be fixed by an order of the Bankruptcy Court for objecting to Claims.

"Claims Register" means the official register of Claims maintained by the Claims Agent.

"Class" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

"CM/ECF" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

"Committee" means the official statutory committee of unsecured creditors appointed by the Office of the United States Trustee on December 13, 2022 pursuant to section 1102 of the Bankruptcy Code for the Chapter 11 Cases as set forth in the *Notice of Appointment of Creditors' Committee* [Docket No. 191].

"Conditions Precedent" has the meaning ascribed to such term in Section X.A of this Plan.

"Confirmation" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"<u>Confirmation Date</u>" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

"<u>Confirmation Hearing</u>" means the hearing(s) before the Bankruptcy Court under section 1129 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

"<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Debtors and reasonably acceptable to the Committee.

"<u>Consummation</u>" means the occurrence of the Effective Date.

"<u>Credit Suisse</u>" means Credit Suisse First Boston Mortgage Capital LLC, Credit Suisse Securities (USA) LLC, Credit Suisse AG, Cayman Islands Branch, and Alpine Securitization LTD (each in their respective capacities as administrative agent and/or buyers, as applicable under the CS Repos).

"<u>CS Claim</u>" means any Claim arising under, or relating or otherwise pertaining to the CS Repos, including, without limitation, the CS Unsecured Claim and any other Claims arising under the CS Stipulation.

"<u>CS Financed Loans</u>" means the "Financed Loans" as defined in the CS Stipulation.

"<u>CS Liquidation</u>" means the liquidation, assignment, disposition or other monetization of the CS Financed Loans and other collateral and property under, and in accordance with, the CS Repos.

"<u>CS Repos</u>" means the (a) the Master Repurchase Agreement between Credit Suisse AG, Cayman Islands Branch and Reverse Mortgage Funding LLC, dated January 15, 2021; (b) the Mater Repurchase Agreement between Credit Suisse Securities (USA) LLC and Reverse Mortgage Funding LLC, dated January 15, 2021; (c) the Master Repurchase Agreement between Credit Suisse AG, Cayman Islands Branch and RMIT Operating II LLC, dated March 1, 2022; (d) the Master Repurchase Agreement between Credit Securities (USA) LLC and RMIT Operating II LLC, dated March 1, 2022; (e) the Master Repurchase Agreement between Credit Suisse First Boston Mortgage Capital LLC (as administrative agent), Credit Suisse AG, Cayman Islands Branch, Alpine Securitization LTD (along with certain other buyers), and Reverse Mortgage Funding LLC, dated September 30, 2022 (together with any and all other contracts, agreements, guarantees, schedules, exhibits, confirmations exchanged, and other documents entered in connection therewith) and (f) any and all other contracts, agreements, guarantees, schedules, exhibits, confirmations exchanged, and other documents entered in connection with the foregoing (a) through (e).

"<u>CS Stipulation</u>" means the stipulation approved by and attached to the *Order Approving the Stipulation Granting Relief from the Automatic Stay, Authorizing the Transfer of Certain Assets, Authorizing Certain Advances, and Granting Related Relief* [Docket No. 498].

"CS Unsecured Claim" means the "Allowed Claim Amount" as defined in the CS Stipulation.

"Cure" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

"Debtor" and "Debtors" have the respective meanings set forth in the Introduction to this Plan.

"Description of the Transaction Steps" means the description of the steps to be carried out to effectuate the Wind-Down Transactions in accordance with this Plan as set forth in the Plan Supplement.

"DIP Claim" means any Claim held by the DIP Lenders arising under or relating to the DIP Loan Documents, including Leadenhall DIP Notes Superpriority Claims.  For the avoidance of doubt, all BNGL Holdings Waived Claims are waived pursuant to the 9019 Settlement, except to the extent noted therein.

"DIP Collateral" shall have the meaning assigned to such term in the Final DIP Order.

"DIP Deficiency Claim" means the portion of any DIP Claim that is not Secured, and which shall be treated pursuant to the Stipulation and Stipulation Order, the DIP Loan Documents, or the 9019 Settlement, as applicable.

"DIP Facilities" means each of the debtor-in-possession credit facilities entered into on the terms and conditions set forth in the DIP Loan Documents.

"DIP Funds" means Cash in an amount of $15 million advanced by BNGL Holdings to the Debtors after February 11, 2023, pursuant to the DIP Loan Documents and the 9019 Settlement. For the avoidance of doubt, the DIP Funds were advanced in addition to the $10 million in principal funded or to be funded pursuant to the First Interim DIP Order and the Second Interim DIP Order.

"DIP Lenders" means lenders from time to time party to the DIP Loan Documents.

"DIP Liens" shall have the meaning ascribed to such term in the Final DIP Order.

"DIP Loan Documents" means collectively, the Final DIP Order and the DIP Notes Documents and the DIP Tail Facility Documents, as may be amended, modified, restated or supplemented from time to time.

"DIP Notes Documents" means the DIP Notes Term Sheet, the Second Interim DIP Order, the Final DIP Order, and all other agreements, documents, and instruments related thereto.

"DIP Notes Term Sheet" means Exhibit A of the Second Interim DIP Order, or any term sheet approved by the Bankruptcy Court in the Final DIP Order or any future financing order to the extent such term sheet supersedes Exhibit A of the Second Interim DIP Order.

"<u>DIP Secured Claim</u>" means the portion of any DIP Claim that is Secured.

"<u>DIP Tail Facility Documents</u>" means, collectively, Tail Advance DIP Term Sheet, and all other agreements, documents, and instruments related thereto.

"<u>Disallowed</u>" means, as to a Claim or an Interest, a Claim or an Interest (or portion thereof) that has been disallowed, denied, dismissed, or overruled pursuant to this Plan or a Final Order of the Bankruptcy Court, or any other court of competent jurisdiction.

"<u>Disbursing Agent</u>" means the Plan Administrator, or such other Entity or Entities designated by the Debtors, the Wind-Down Debtors, or the Plan Administrator to make distributions to Holders of Allowed Claims pursuant to the terms of this Plan.

"<u>Disclosure Statement</u>" means the disclosure statement for this Plan, including all exhibits and schedules thereto.

"<u>Disputed</u>" means, with respect to any Claim, any Claim that is neither Allowed nor Disallowed.

"<u>Disputed Claim Amount</u>" means (a) if a liquidated amount is set forth in the Proof of Claim relating to a Disputed Claim, (i) the liquidated amount set forth in the Proof of Claim relating to a Disputed Claim; (ii) an amount agreed to by the Debtors, the Wind-Down Debtors, as applicable, and the Holder of such Disputed Claim; or (iii) if a request for estimation is Filed by any party, the amount at which such Claim is estimated by the Court; (b) if no liquidated amount is set forth in the Proof of Claim relating to a Disputed Claim, (i) an amount agreed to by the Debtors, the Wind-Down Debtors, as applicable, and the Holder of such Disputed Claim; or (ii) the amount estimated by the Court with respect to such Disputed Claim; or (c) if the Claim is a Disallowed Claim, zero.

"<u>Disputed Claims Reserve</u>" means an account, with appropriate subaccounts, to be established and administered by the Wind-Down Debtors for the payment of Disputed Claims that become Allowed Claims after the Effective Date; *provided* that the Disputed Claims Reserve may not be funded with (a) DIP Collateral (or the proceeds thereof) securing TCB's DIP Claims to the extent that TCB's DIP Claims are not yet paid in full in Cash or TCB otherwise agrees to other treatment, (b) Prepetition TCB Collateral (or the proceeds thereof), unless and until the Secured portion of the TCB Prepetition Claims has been satisfied in full in Cash or TCB otherwise agrees to other treatment, (c) the Restricted Cash Collateral or Restricted Cash Accounts, to the extent not already included in (a) or (b) above, or (d) funds in the Professional Fee Reserve.

"<u>Disputed Claims Reserve Amount</u>" means an amount equal to the aggregate Disputed Claim Amount that would be distributable to Holders of Disputed Claims in accordance with <u>Article II</u> and <u>Section III.B</u>, as applicable, if such Disputed Claims were Allowed Claims on the Effective Date from the Disputed Claims Reserve; *provided*, *however*, the Debtors shall not be required to retain any amount on account of contingent or unliquidated Claims; *provided further* that the Disputed Claims Reserve Amount shall not include any amount for Disputed Claims related to adversary proceeding no. 22-50473-MFW; *provided further* that the amount to be reserved on account of any Disputed Secured Claim held by Leadenhall, shall be funded (a) prior to any distributions of the Unencumbered Asset Proceeds and (b) only to the extent of any Cash

actually held by the Debtors or Wind-Down Debtors, as applicable, that constitutes Unencumbered Asset Proceeds.

"Disputed Issues" has the meaning set forth in the Final DIP Order.

"Distribution Date" means, except as otherwise set forth herein, the date or dates determined by the Debtors, if on the Effective Date, or the Wind-Down Debtors or the Plan Administrator, if after the Effective Date, as applicable, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, upon which the Debtors, Wind-Down Debtors, or the Plan Administrator, as applicable, deem it necessary for the Disbursing Agent to make distributions to Holders of Allowed Claims entitled to receive distributions under this Plan.

"Distribution Record Date" means the record date for purposes of making distributions under this Plan on account of Allowed Claims, which date shall be (a) the Confirmation Date or (b) such other date as designated in a Final Order of the Bankruptcy Court.

"D&O Liability Insurance Policy" means all insurance policies (including any "tail policy") of any of the Debtors for liability of any current or former directors, managers, officers, and members.

"Effective Date" means the date that is the day on which all Conditions Precedent have been satisfied or waived in accordance with this Plan and the Confirmation Order, and the Plan is declared effective.  The Debtors or Wind-Down Debtors shall file a Notice of Effective Date on the docket of these Chapter 11 Cases.

"Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"Estate" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

"Excluded RMF Assets and Liabilities" means all of the assets and liabilities of RMF that are not listed on the Reorganized RMF Schedule of Assets and Liabilities.

"Exculpated Parties" means collectively, and in each case, in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Debtors' and Wind-Down Debtors' current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, and management companies; (d) such Released Parties that are fiduciaries to the Debtors' Estates; (e) the Committee; (f) the Committee's Professionals; and (g) with respect to each of the foregoing, such Entity and its Related Parties.

"Executory Contract" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"Federal Judgment Rate" means the federal judgment rate in effect as of the Petition Date.

"File," "Filed," or "Filing" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, or, with respect to the filing of a Proof of Claim or an Administrative Expense Request Form, the Claims Agent.

"Final DIP Order" means that certain *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Authorizing Certain Debtors' Use of Cash Collateral; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Docket No. 500].

"Final Order" means as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided, however*, that the possibility of a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the local rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order.

"First Interim DIP Order" means the *Interim Order (I) Authorizing the Debtors to Obtain Post-Petition Financing; (II) Authorizing Certain Debtors' Use of Cash Collateral; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 115].

"General Administrative Claim" means an Administrative Claim other than a DIP Secured Claim, Professional Fee Claim, or Claim for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

"General Unsecured Claim" means a Leadenhall MSR Facility Claim (to the extent not Secured) and any other Claim that is not an Administrative Claim, a Professional Fee Claim, a Secured Tax Claim, a DIP Deficiency Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, a BNGL Holdings Note Claim, a Barclays Warehouse Repo Facility Claim, a CS Claim, a Nomura Claim, a TCB Prepetition Claim, a TIAA Warehouse Repo Facility Claim, a Leadenhall MSR Facility Claim (to the extent Secured), or an Intercompany Claim. For the avoidance of doubt, all BNGL Holdings Waived Claims are waived pursuant to the 9019 Settlement, except to the extent noted therein.

"GNMA" means the Government National Mortgage Association.

"GNMA Contract" means (a) 12 U.S.C. § 1721(g) and the implementing regulations governing the GNMA MBS Program, 24 C.F.R. Part 300, (b) applicable Guaranty Agreements and contractual agreements between GNMA and RMF, and (c) the GNMA Mortgage-Backed Securities Guide, Handbook 5500.3 Rev. 1, and other applicable guides.

"GNMA MSR" means RMF's rights (a) in the servicing of pooled mortgages under the GNMA Contract (including any income arising in connection therewith) and (b) to reimbursement of advances made in respect of pooled mortgages pursuant to the GNMA Contract.

"Governing Body" means, in each case in its capacity as such, the board of directors, board of managers, manager, general partner, investment committee, special committee, transaction committee, or such similar governing body of any of the Debtors or the Wind-Down Debtors, as applicable.

"Governmental Unit" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"GUC Reserve" means an account of the Wind-Down Debtors established on the Effective Date, holding Cash to be distributed to Holders of Allowed General Unsecured Claims at the discretion of the Plan Administrator.  The GUC Reserve will be funded as set forth in Section IV.F.2.

"Holder" means an Entity holding a Claim or Interest, as applicable.

"Impaired" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"Indemnification Provision" means each of the Debtors' indemnification provisions currently in place, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, or contracts, for the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, other professionals, and respective agents of, or acting on behalf of, the Debtors.

"Initial RMF Purchaser" means the Entity or Entities that first enter into the RMF Reorganization Transaction with the Debtors.

"Insurance Contracts" means all insurance policies that have been issued (or provide coverage) at any time to any of the Debtors (or any of their predecessors) and all agreements, documents, or instruments relating thereto.

"Insurer" means any company or other Entity that issued an Insurance Contract and includes any third-party administrator of or for any Insurance Contract, and any respective predecessors, successors, and/or Affiliates of any of these.

"Intercompany Claim" means any Claim against a Debtor held by another Debtor.

"Intercompany Interest" means an Interest in a Debtor held by another Debtor.

"Interest" means collectively, (a) any equity or ownership interest (including any such interest in a partnership, limited liability company, corporation, or other Entity), in any Debtor, (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor, and (c) any and all Claims that are otherwise determined by the Bankruptcy Court to be an equity interest, including any Claim or debt that is recharacterized as an equity interest.

"Judicial Code" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

"Leadenhall" means, collectively, Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC, and/or any of their managed funds or Affiliates.

"Leadenhall Adequate Protection Claims" means Leadenhall's Existing Note Providers Superpriority Adequate Protection Claims (as defined in the Second Interim DIP Order and the Final DIP Order) on account of diminution in the value of Leadenhall's collateral, if any, subject to adjudication of the Disputed Issues.

"Leadenhall Claims" means, collectively, Leadenhall MSR Facility Claim, Leadenhall DIP Notes Superpriority Claims, and Leadenhall Adequate Protection Claims.

"Leadenhall DIP Notes Superpriority Claims" means Leadenhall's DIP Notes Superpriority Claims on account of the funds Leadenhall advanced under the DIP Op Notes and the DIP Fee Notes as defined in and pursuant to the Second Interim DIP Order and the Final DIP Order.

"Leadenhall MSR Facility Agent" means Leadenhall Capital Partners LLP, as agent under the Leadenhall MSR Facility Loan and Security Agreement.

"Leadenhall MSR Facility Claim" means any Claim arising under, derived from, or based upon the Leadenhall MSR Facility Loan and Security Agreement.

"Leadenhall MSR Facility Lenders" means the lenders under the Leadenhall MSR Facility Loan and Security Agreement.

"Leadenhall MSR Facility Loan and Security Agreement" means that certain Amended and Restated Loan and Security Agreement (as modified and amended from time to time), dated as of October 17, 2018, by and among RMF, the Leadenhall MSR Facility Lenders, and the Leadenhall MSR Facility Agent.

"Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"NCFA" means Nomura Corporate Funding Americas, LLC.

"Nomura" means NCFA, NSI, and their respective Affiliates, predecessors, assignees, and any other Related Parties.

"Nomura Agreements" means, collectively, the (a) Nomura Securities Repo (Operating) Facility, (b) Nomura Securities Repo (RMF) Facility, (c) Nomura Warehouse Repo Facility, (d) the prepetition agreements listed in the Schedules as executory contracts, (e) the Nomura Stipulation, and (f) with respect to the agreements in (a)-(d), all guarantees (including the guarantees provided by RMIT), schedules, and exhibits to such agreements and all confirmations exchanged pursuant to transactions entered into in connection with any of the foregoing and all other related documents or agreements.

"Nomura Claim" means any Claim arising under or relating to the Nomura Agreements.

"Nomura Securities Repo (Operating) Facility" means the repurchase facility under that certain Master Repurchase Agreement (as may be modified, restated, supplemented or amended from time to time), dated as of May 26, 2015, by and between RMIT Operating II LLC as seller and NSI as buyer.

"Nomura Securities Repo (RMF) Facility" means repurchase facility under that certain Master Repurchase Agreement (as may be modified, restated, supplemented or amended from time to time), dated as of January 9, 2017, by and between RMF as seller and NSI as buyer.

"Nomura Stipulation" means the stipulation approved by the *Order Approving the Stipulation Granting Relief from the Automatic Stay, Authorizing the Transfer of Certain Assets, Authorizing Certain Advances, and Granting Related Relief* [Docket No. 397].

"Nomura Warehouse Repo Facility" means the repurchase facility under that certain Amended and Restated Master Repurchase Agreement (as may be modified, restated, supplemented or amended from time to time), dated as of June 4, 2019, by and among RMF, as seller, Wilmington Savings Fund Society, FSB, as trustee, Broad Street Funding Trust II and NCFA, as buyer.

"NSI" means Nomura Securities International, Inc.

"Other Priority Claim" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"Other Secured Claim" means any Secured Claim, including any Secured Tax Claim, BNGL Holdings Repo Facility Secured Claim, and the Leadenhall MSR Facility Claim (to the extent Secured), that is not a DIP Secured Claim, BNGL Holdings Note Claim, a Barclays Warehouse Repo Facility Claim, a CS Claim, a Nomura Claim, a TCB Prepetition Claim, or a TIAA Warehouse Repo Facility Claim.  For the avoidance of doubt, all BNGL Holdings Waived Claims are waived pursuant to the 9019 Settlement, except to the extent noted therein.

"Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"Petition Date" means November 30, 2022.

"Plan" means this plan, including the Plan Supplement and any other supplements and any exhibits and annexes hereto, as may be amended or modified from time to time consistent with the terms hereof.

"Plan Administrator" means the person selected by agreement between the Debtors and the Committee to administer the Plan Administrator Assets.  All costs, liabilities, and expenses reasonably incurred by the Plan Administrator, and any personnel employed by the Plan Administrator in the performance of the Plan Administrator's duties, shall be paid from the Plan Administrator Assets.

"Plan Administrator Assets" means, on the Effective Date, all assets of the Estates vested in the Wind-Down Debtors to be administered by the Plan Administrator, and, thereafter, all assets held from time to time by Wind-Down Debtors to be administered by the Plan Administrator.  For

the avoidance of doubt, the Plan Administrator Assets shall exclude (a) DIP Collateral (or the proceeds thereof) securing TCB's DIP Claims to the extent that TCB's DIP Claims are not yet paid in full in Cash or TCB otherwise agrees to other treatment, (b) Prepetition TCB Collateral (or the proceeds thereof), unless and until the Secured portion of the TCB Prepetition Claims has been satisfied in full in Cash or TCB otherwise agrees to other treatment, and (c) the Restricted Cash Collateral or Restricted Cash Accounts, to the extent not already included in (a) or (b) above.

"Plan Administrator Operating Reserve" means the reserve in the initial amount of $2 million or another amount agreed upon by the Debtors, the Committee, and BNGL Holdings pursuant to the 9019 Settlement, established on the Effective Date, and which, is the amount deemed necessary by the Plan Administrator to satisfy anticipated fees, costs, and expenses incurred or to be incurred by the Wind-Down Debtors and the Plan Administrator for operating, liquidating, and winding down the Wind-Down Debtors according to this Plan; *provided* that the Plan Administrator Operating Reserve shall exclude (a) DIP Collateral (or the proceeds thereof) securing TCB's DIP Claims to the extent that TCB's DIP Claims are not yet paid in full in Cash or TCB otherwise agrees to other treatment, (b) Prepetition TCB Collateral (or the proceeds thereof) unless and until the Secured portion of the TCB Prepetition Claims has been satisfied in full in Cash or TCB otherwise agrees to other treatment, and (c) the Restricted Cash Collateral or Restricted Cash Accounts, to the extent not already included in (a) or (b) above; *provided further* that, for the avoidance of doubt, the Plan Administrator Operating Reserve shall be administered on terms acceptable to BNGL Holdings, the Committee or the Plan Advisory Committee, and the Debtors or Wind-Down Debtors, as applicable (and otherwise in accordance with the Plan). The Plan Administrator Operating Reserve shall be funded from the Plan Reserve Account to the extent sufficient funds exist as of the Effective Date. To the extent the funds in the Plan Reserve Account are not sufficient to fund the Plan Administrator Operating Reserve as set forth herein, such Plan Administrator Operating Reserve shall be funded from the Wind-Down Account as such funds are collected. Any funds remaining in the Plan Administrator Operating Reserve at the time of entry of the final decree closing these Chapter 11 Cases shall revert to the Wind-Down Account to be distributed pursuant to the terms of the 9019 Settlement.

"Plan Advisory Committee" shall have the meaning as set forth in Section IV.F.5 of this Plan.

"Plan Reserve Account" means the account established pursuant to the 9019 Settlement and held by the Debtors or Wind-Down Debtors, as applicable, containing all Cash received by the Debtors from February 11, 2023 through the Plan Effective Date and all other proceeds of Estate assets except for (a) DIP Funds; (b) funds with respect to any of the Debtors' private label securitization accounts that pass through the Debtors' bank accounts; (c) any proceeds from reimbursed expenses or other pass-through funds, whether received prior to or after February 11, 2023, that the Debtors are required to provide to any third parties pursuant to any order of the Court or other agreement between the Debtors and such parties; (d) DIP Collateral (or the proceeds thereof) securing TCB's DIP Claims to the extent that TCB's DIP Claims are not yet paid in full in Cash or TCB otherwise agrees to other treatment, (e) Prepetition TCB Collateral (or the proceeds thereof), unless and until the Secured portion of the TCB Prepetition Claims has been satisfied in full in Cash or TCB otherwise agrees to other treatment, (f) the Restricted Cash Collateral or Restricted Cash Accounts, to the extent not already included in clauses (a) through (e) above, and (g) funds to be deposited into the Disputed Claims Reserve as set forth in this Plan.

13

Funds in the Plan Reserve Account shall be used to establish the Plan Administrator Operating Reserve and the Settlement Reserve.

"Plan Supplement" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules), to be Filed by the Debtors, to the extent reasonably practicable, no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, which may be filed, as applicable:  (a) the Schedule of Retained Causes of Action; (b)  the Description of the Transaction Steps; (c) the identity of the Plan Administrator and the compensation of the Plan Administrator; (d) the Plan Administrator Agreement; (e)  Assumed Executory Contracts and Unexpired Leases Schedule; (f) RMF Reorganization Transaction Documents and (g) any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date.

"Prepetition Liens" shall have the meaning assigned to such term in the Final DIP Order.

"Prepetition TCB Collateral" shall have the meaning assigned to such term in the Final DIP Order.

"Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"Pro Rata" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

"Professional" means an Entity: (a) retained pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"Professional Fee Claim" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

"Professional Fee Reserve" means an account established to administer Professional Fee Claims.

"Professional Fee Reserve Amount" shall have the meaning set forth in Section II.C.2 of this Plan.

"Proof of Claim" means (a) a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases or (b) a Claim agreed to pursuant to the CS Stipulation.

14

"Purchaser" means the Entity or Entities that consummates the RMF Reorganization Transaction with the Debtors.

"Reinstate," "Reinstated," or "Reinstatement" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

"Related Party" means, with respect to any Person or Entity, such Person's or Entity's current or former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, subsidiaries, Affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and the respective successors and assigns thereof.

"Released Party" means, each of, and in each case in its capacity as such: (a) the Debtors and each of the Debtors' Estates; (b) the Wind-Down Debtors and each of the Wind-Down Debtors' Estates and, if the RMF Reorganization Transaction is consummated, Reorganized RMF; (c) each DIP Lender; (d) TCB; (e) CS; (f) Nomura; (g) TIAA; (h) Barclays; (i) the Purchaser, but only if the RMF Restructuring Transaction is consummated; (j) the Committee and its members, each in their capacities as such; and (k) each Related Party of each Entity in clause (a) through clause (i); *provided* that Leadenhall shall not be a Released Party; *provided further* that, other than the Entities in clauses (a) and clause (b) and each of their Related Parties, a Released Party shall only be Released Party if it is also a Releasing Party.

"Releasing Party" means, each of, and in each case in its capacity as such: (a) each DIP Lender; (b) all Holders of Claims, Interests, or Causes of Action that elect to opt into the releases contained in Section IX.F of this Plan; (c) the Purchaser, but only if the RMF Restructuring Transaction is consummated; (d) the Committee and its members, each in their capacities as such; and (e) each Related Party of each Entity in clause (a) through clause (d).

"Reorganized RMF" means, on or after the Effective Date, if the RMF Reorganization Transaction is elected to be pursued as set forth in Section IV.C of this Plan, RMF or any successor or assign thereto, by merger, consolidation, or otherwise. For the avoidance of doubt, Reorganized RMF shall only possess those assets and liabilities identified on the Reorganized RMF Schedule of Assets and Liabilities and the assets and liabilities of Reorganized RMF shall not include the Excluded RMF Assets and Liabilities.

"Reorganized RMF Schedule of Assets and Liabilities" means the schedule of certain assets and liabilities of RMF, in each case, that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors. Such assets and liabilities shall, on the Effective Date, be the sole assets and liabilities of Reorganized RMF. For the avoidance of doubt, any assets or liabilities not expressly identified on the Reorganized RMF Schedule of Assets and Liabilities are Excluded RMF Assets and Liabilities.

15

"Restricted Cash Account" shall mean the bank accounts listed on Schedule 1 of the Tail Advance DIP Term Sheet.

"Restricted Cash Collateral" shall have the meaning assigned to such term in the Final DIP Order.

"Restructuring Document" this Plan, the Disclosure Statement, the Plan Supplement, and the various agreements and other documents formalizing or implementing this Plan and the transactions contemplated thereunder.

"RMF" means Reverse Mortgage Funding LLC.

"RMF Reorganization Transaction" means the sale of the Interests in Reorganized RMF pursuant to the RMF Reorganization Transaction Documents.

"RMF Reorganization Transaction Documents" means the Reorganized RMF Schedule of Assets and Liabilities, any stock purchase agreement or other purchase agreement agreed upon between the Debtors and the Purchaser, and any other documents agreed upon by such parties.

"RMF Reorganization Transaction Proceeds" has the meaning set forth in Section IV.C.

"RMIT" means Reverse Mortgage Investment Trust Inc.

"RMIT Existing Equity Interests" means all Interests in RMIT existing immediately prior to the Effective Date.

"RMIT Stock" means all common stock and preferred stock in RMIT.

"Schedule of Retained Causes of Action" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors.

"Schedules" means, with respect to each Debtor, the schedules of assets and liabilities and the statement of financial affairs filed by such Debtor with the Bankruptcy Court pursuant to sections 521 and 1106(a)(2) of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules and statement have been or may be amended or supplemented by such Debtor at any point prior to the Effective Date.

"Second Interim DIP Order" means the *Second Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Authorizing Certain Debtors' Use of Cash Collateral; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 170].

"Secured" means, when referring to a Claim, (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable,

which value shall be determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan, the CS Stipulation, or separate order of the Bankruptcy Court, as a Secured Claim.

"Secured Tax Claim" means any Secured Claim that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

"Securities Act" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa, or any similar federal, state, or local law.

"Security" means any security, as defined in section 2(a)(1) of the Securities Act.

"Settlement Reserve" means a reserve of an amount agreed upon by the Debtors, the Committee, BNGL Holdings, and the plaintiffs of Adversary Proceeding No. 22-50473-MFW for a settlement of such adversary proceeding pursuant to the 9019 Settlement; *provided* that the Settlement Reserve may not be funded with (a) DIP Collateral (or the proceeds thereof) securing TCB's DIP Claims to the extent that TCB's DIP Claims are not yet paid in full in Cash or TCB otherwise agrees to other treatment, or (b) Prepetition TCB Collateral (or the proceeds thereof), unless and until the Secured portion of the TCB Prepetition Claims has been satisfied in full in Cash or TCB otherwise agrees to other treatment, or (c) the Restricted Cash Collateral or Restricted Cash Accounts, to the extent not already included in (a) or (b) above.

"Stipulation" means the *Stipulation* attached as Exhibit A to the Stipulation Order.

"Stipulation Order" means the *Order (I) Authorizing Debtors to Enter into Stipulation to Transfer Servicing and Approving the Terms Thereof; (II) Authorizing Debtors to Take All Actions to Facilitate Transfer of Certain Servicing Rights and Obligations; (III) Approving Procedures for the Debtors' Potential Assumption and Assignment of Executory Contracts and Unexpired Leases; (IV) Modifying the Automatic Stay on a Limited Basis; and (V) Granting Related Relief*, Docket No. 217, entered on December 15, 2022.

"Tail Advance DIP Term Sheet" means Exhibit B to the Final DIP Order.

"TCB" means Texas Capital Bank, National Association.

"TCB Additional Collateral Account" shall have the meaning assigned to such term in the Final DIP Order.

"TCB Buyout Facility" means the secured loan facility under that certain Third Amended Loan and Security Agreement (as modified or amended from time to time), dated as of October 31, 2021, by and between RMF and TCB.

"TCB Prepetition Claims" means the Claims arising under or relating to the TCB Buyout Facility, TCB Tail Facility, and TCB Warehouse Facility, including any Claims for accrued and unpaid fees, costs and interests to the extent (a) provided for and owed under the underlying agreements and (b) Allowed pursuant to section 506(b) of the Bankruptcy Code.

"TCB Prepetition Facilities" means, collectively, the TCB Buyout Facility, the TCB Tail Facility, and the TCB Warehouse Facility.

"TCB Tail Facility" means the secured loan facility under that certain Fifth Amended and Restated Loan and Security Agreement (as modified and amended from time to time), dated as of August 26, 2021, by and between RMF, as borrower, and TCB.

"TCB Warehouse Facility" means the secured loan facility under that certain Mortgage Warehouse Agreement (as modified and amended from time to time), dated as of July 29, 2020, by and between RMF, as seller, and TCB.

"TIAA" means TIAA, FSB, formerly known as EverBank.

"TIAA Agreement" means that certain Master Repurchase Agreement, dated September 15, 2017 (as amended, restated, supplemented or otherwise modified from time to time), and together with all guarantees, schedules and exhibits thereto, Facility Documents (as defined therein) and confirmations exchanged pursuant to transactions entered into in connection therewith.

"TIAA Stipulation" means the stipulation approved by and attached to the *Order Approving the Stipulation Granting Relief from the Automatic Stay, Authorizing the Termination of Servicing Agreement with TIAA Bank and the Related Transfer of Certain Assets, and Granting Related Relief* [Docket No. 515].

"TIAA Warehouse Repo Facility" means those certain Purchased Mortgage Loans and Servicing Rights (as such terms are defined in the TIAA Agreement) and any property purchased by (or pledged to) under the TIAA Agreement, by and between RMF and TIAA.

"TIAA Warehouse Repo Facility Claim" means any Claim arising under or relating to the TIAA Warehouse Repo Facility.

"Transactions Committee" means the Transactions Committee of the Board of Directors of RMIT that was established to evaluate potential Claims or Causes of Action of the Debtors.

"Unencumbered Asset Proceeds" means (a) all Cash remaining in the Plan Reserve Account as of the Effective Date of the Plan *plus* (b) all Cash of the Estates remaining after payment of Administrative Claims, the Professional Fee Claims, the DIP Secured Claims other than any BNGL Holdings Waived Claims, the Priority Tax Claims, the Other Priority Claims, the Other Secured Claims, the Secured portion of the TCB Prepetition Claims, and any other Secured Claims (if any), *less* the Plan Administrator Operating Reserve, Professional Fee Reserve Amount, and Settlement Reserve. For the avoidance of doubt, Unencumbered Asset Proceeds shall exclude (a) DIP Collateral (or the proceeds thereof) securing TCB's DIP Claims to the extent that TCB's DIP Claims are not yet paid in full in Cash or TCB otherwise agrees to other treatment, (b) Prepetition TCB Collateral (or the proceeds thereof), unless and until the Secured portion of the TCB Prepetition Claims has been satisfied in full in Cash or TCB otherwise agrees to other treatment, and (c) the Restricted Cash Collateral or Restricted Cash Accounts, to the extent not already included in (a) or (b) above.

"<u>Unexpired Lease</u>" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"<u>Unimpaired</u>" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

"<u>Voting Deadline</u>" has the meaning set forth in the Disclosure Statement to be Filed by the Debtors.

"<u>Wind Down</u>" means the wind down and dissolution of the Debtors' Estates following the Effective Date as set forth in <u>Section VII.B</u> of this Plan.

"<u>Wind-Down Account</u>" means, an account of the Wind-Down Debtors established on or after the Effective Date, to be administered by the Plan Administrator in accordance with the terms of this Plan and the 9019 Settlement. Beginning on the Effective Date, the Wind-Down Account will collect: (a) all Plan Administrator Assets, (b) all Cash and cash receipts of the Estates of the Wind-Down Debtors as of the Effective Date to the extent not included as Plan Administrator Assets, and (c) the revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action or Avoidance Actions not settled, released, discharged, enjoined, or exculpated under this Plan or otherwise on or prior to the Effective Date. For the avoidance of doubt, the Wind-Down Account shall exclude (a) DIP Collateral (or the proceeds thereof) securing TCB's DIP Claims to the extent that TCB's DIP Claims are not yet paid in full in Cash or TCB otherwise agrees to other treatment, (b) Prepetition TCB Collateral (or the proceeds thereof), unless and until the Secured portion of the TCB Prepetition Claims has been satisfied in full in Cash or TCB otherwise agrees to other treatment, and (c) the Restricted Cash Collateral or Restricted Cash Accounts, to the extent not already included in (a) or (b) above.

"<u>Wind-Down Debtors</u>" means, on or after the Effective Date, any Debtor or any successor or assign thereto, by merger, consolidation, or otherwise, including any liquidating trust that may be established pursuant to <u>Section IV.F.6</u> of this Plan; *provided, however*, that Reorganized RMF shall not be a Wind-Down Debtor.

"<u>Wind-Down Transactions</u>" means the transactions described in <u>Section IV.B</u> of this Plan.

## B.    Rules of Interpretation

For purposes of this Plan, unless otherwise provided herein: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (2) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document, schedule, exhibit, or annex, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, exhibit, or annex, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (6) all references in this Plan to Articles and Sections are references to Articles and Sections of this Plan, respectively, as the same may be amended,

waived or modified from time to time in accordance with the terms hereof; (7) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular Article, Section, paragraph, or clause contained in this Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) any immaterial effectuating provisions may be interpreted by the Debtors in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (13) captions and headings to Articles or Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (14) any reference to an Entity's "subsidiaries" means its direct and indirect subsidiaries; and (15) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Wind-Down Debtors shall mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

### C. Computation of Time

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply. In the event that any payment, distribution, act or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then such payment, distribution, act or deadline shall be deemed to occur on the next succeeding Business Day, but if so made, performed or completed by such next succeeding Business Day, shall be deemed to have been completed or to have occurred as of the required date. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

### D. Reference to Monetary Figures

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

### E. Reference to the Debtors or the Wind-Down Debtors

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Wind-Down Debtors shall mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

### F. Controlling Document

Except as set forth in this Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in this Plan (or

any exhibits, annexes, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of this Plan, this Plan shall govern and control.  In the event of an inconsistency between the Confirmation Order and this Plan, the Confirmation Order shall control.  For the avoidance of doubt, notwithstanding the foregoing, nothing herein shall modify, amend or alter the Nomura Stipulation, the CS Stipulation, or the TIAA Stipulation, which all shall continue in full force and effect and remain binding on the Debtors and their Estates and any and all successors thereto, including, without limitation, the Wind-Down Debtors and Plan Administrator.

## II.    ADMINISTRATIVE CLAIMS, DIP SECURED CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Secured Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of this Plan. This Plan incorporates the Stipulation, the Stipulation Order, and the Final DIP Order, unless otherwise stated, as if fully set forth herein and subject to adjudication of the Disputed Issues, as applicable.

### A.    Administrative Claims

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors, the Wind-Down Debtors; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Holders of General Administrative Claims that are required to File and serve a request for payment of such General Administrative Claims by the Administrative Claims Bar Date (pursuant to the Bar Date Order) that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such General Administrative Claims against the Debtors or the Wind-Down Debtors, or their respective property and such General Administrative Claims shall be deemed forever discharged and released as of the Effective Date.  Any requests for payment of General Administrative Claims that are not properly Filed and served by the Administrative Claims Bar Date shall not appear on the Claims Register and shall

be disallowed automatically without the need for further action by the Debtors, the Wind-Down Debtors, the Plan Administrator, or further order of the Bankruptcy Court.

### B.      DIP Secured Claims

Any portion of the DIP Secured Claims that remains outstanding shall be Allowed and paid by the Effective Date as set forth herein or in the 9019 Settlement to the extent not inconsistent with the terms of this Plan, subject to adjudication of the Disputed Issues, as applicable.

On the Effective Date, except to the extent that a Holder of an Allowed DIP Secured Claims agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Secured Claims, each Holder thereof shall receive payment in full in Cash of such Holder's Allowed DIP Secured Claims.  Consistent with the Final DIP Order, TCB's Allowed DIP Secured Claims shall, in the first instance, be satisfied from the proceeds of the DIP Collateral other than the TCB Additional Collateral Account, and the proceeds of the TCB Additional Collateral Account shall only be used by the Debtors to satisfy TCB's Allowed DIP Secured Claims to the extent the other DIP Collateral securing TCB's Allowed DIP Secured Claims has otherwise been exhausted.

Pursuant to the 9019 Settlement, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, all Allowed DIP Secured Claims held by BNGL Holdings, BNGL Holdings shall receive, in one or more distributions (1) on the Effective Date or as soon as practicable thereafter, fifty percent of the Unencumbered Asset Proceeds; (2) on the later of the Effective Date or final adjudication of all Professional Fee Claims, after payment of all Allowed Professional Fee Claims, any remaining Professional Fee Reserve Amount; and (3) after the final decree is entered closing these Chapter 11 Cases, fifty percent of the Wind-Down Account, with such Cash to be distributed after such final decree is entered and after payment in full all operating expenses of the Wind-Down Debtors and Plan Administrator.

### C.      Professional Fee Claims

#### 1.      Final Fee Applications and Payment of Professional Fee Claims

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  Once approved by the Bankruptcy Court, the Allowed Professional Fee Claims shall be paid promptly by the Disbursing Agent in Cash.  To the extent the funds held on account of the Professional Fee Reserve Amount are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, and the full unpaid amount of such Allowed Administrative Claim shall be paid promptly in Cash.  To the extent the funds held on account of the Professional Fee Reserve Amount are in excess of the aggregate amount of Allowed Professional Fee Claims, such excess amount shall be paid to BNGL Holdings on account of its DIP Secured Claim as set forth in <u>Section II.B</u>.

### 2.    Professional Fee Reserve Amount

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than two Business Days before the Confirmation Date; *provided, however,* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  The Debtors shall reserve such estimated amount (the "Professional Fee Reserve Amount") until payment in full of all Allowed Professional Fee Claims.  If the Professional Fee Reserve Amount is insufficient to fund the full Allowed amounts of Professional Fee Claims, the remaining unpaid Allowed Professional Fee Claims shall be paid by the Wind-Down Debtors as Allowed Administrative Claims.  For the avoidance of doubt and consistent with the Final DIP Order, the Professional Fee Reserve shall exclude (a) DIP Collateral (or the proceeds thereof) securing TCB's DIP Claims to the extent that TCB's DIP Claims are not yet paid in full in Cash or TCB otherwise agrees to other treatment, (b) Prepetition TCB Collateral (or the proceeds thereof), unless and until the Secured portion of the TCB Prepetition Claims has been satisfied in full in Cash or TCB otherwise agrees to other treatment, and (c) the Restricted Cash Collateral or Restricted Cash Accounts, to the extent not already included in (a) or (b) above.  For the avoidance of doubt, the Professional Fee Reserve cannot be used to pay any Secured, Priority, or Administrative Claims until all Professional Fee Claims are satisfied or otherwise reserved for.

### 3.    Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtors or the Wind-Down Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtors or Plan Administrator may employ and pay any Professional in accordance with the terms of the Plan Administrator Agreement without any further notice to or action, order, or approval of the Bankruptcy Court.

### D.    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

III.     **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.     **Classification of Claims and Interests**

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a) of the Bankruptcy Code. This Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class for purposes of distribution only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code and as described in <u>Article II</u> of this Plan, the Debtors have not classified Administrative Claims, DIP Secured Claims, Professional Fee Claims, and Priority Tax Claims.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below. The Plan shall apply as a joint Plan for all of the Debtors, and the classification of Claims and Interests set forth herein shall apply jointly to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in <u>Section III.E</u> of this Plan.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | BNGL Holdings Note Claims | Impaired | Entitled to Vote[2] |
| Class 4 | Barclays Warehouse Repo Facility Claims | Impaired | Entitled to Vote |
| Class 5 | CS Claims | Impaired | Entitled to Vote[3] |

---

[2]    Under the 9019 Settlement, BNGL Holdings agreed to affirmatively support this Plan and to vote in favor of this Plan.

[3]    Subject to the terms of, and without limiting, impairing or otherwise modifying Credit Suisse's rights under the CS Stipulation, Credit Suisse has agreed to support the Plan and to vote in favor of the Plan, to the extent the Plan complies with the terms of the CS Stipulation.

| Class 6 | Nomura Claims | Impaired | Entitled to Vote[4] |
| Class 7 | TCB Prepetition Claims | Impaired | Entitled to Vote |
| Class 8 | TIAA Warehouse Repo Facility Claims | Impaired | Entitled to Vote |
| Class 9 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 10 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 12 | RMIT Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

### B.    Treatment of Claims and Interests

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Wind-Down Debtors or the Plan Administrator, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

### 1.    Class 1 – Other Secured Claims

(a)    *Classification*:  Class 1 consists of all Other Secured Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors:

(i)    payment in full in Cash of its Allowed Other Secured Claim;

---

[4]  Subject to the terms of, and without limiting, impairing or otherwise modifying Nomura's rights under the Nomura Stipulation, Nomura has agreed to support the Plan and to vote in favor of the Plan, to the extent the Plan complies with the terms of the Nomura Stipulation.

(ii)      delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;[5] or

(iii)      such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code agreed upon by the Debtors and the Holder of the Other Secured Claim.

(c)      *Voting*: Class 1 is Unimpaired under this Plan. Holders of Claims in Class 1 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

**2.      Class 2 – Other Priority Claims**

(a)      *Classification*: Class 2 consists of all Other Priority Claims.

(b)      *Treatment*: On the Effective Date or as soon as practicable thereafter, except to the extent that a Holder of an Allowed Other Priority Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each Holder of an Allowed Other Priority Claim shall receive payment, at the option of the Debtors:

(i)      payment in full in Cash; or

(ii)      such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)      *Voting*: Class 2 is Unimpaired under this Plan. Holders of Claims in Class 2 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

**3.      Class 3 – BNGL Holdings Note Claims**

(a)      *Classification*: Class 3 consists of all BNGL Holdings Note Claims.

(b)      *Treatment*: Pursuant to the 9019 Settlement, each Holder of an Allowed BNGL Holdings Note Claims has waived recoveries of all such Claims and shall not receive any payment or other recovery on

---

[5] For the avoidance of doubt, the BNGL Holdings Repo Facility Secured Claim as an Other Secured Claim, shall receive delivery of the collateral securing such claim, in satisfaction in full of such Other Secured Claim.

its BNGL Holdings Note Claims except as otherwise provided in the 9019 Settlement.

(c)    *Voting*: Class 3 is Impaired under this Plan. Holders of Claims in Class 3 are entitled to vote. Pursuant to the 9019 Settlement, BNGL Holdings agreed to affirmatively support this Plan.

**4.**     **Class 4 – Barclays Warehouse Repo Facility Claims**

(a)    *Classification*: Class 4 consists of all Barclays Warehouse Repo Facility Claims.

(b)    *Treatment*:

    (i)    To the extent that an Allowed Barclays Warehouse Repo Facility Claim is Secured, except to the extent that a Holder of a Barclays Warehouse Repo Facility Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each Holder of an Allowed Barclays Warehouse Repo Facility Claim shall receive, solely to the extent that such Claim is Secured, at the option of the Debtors:

        (1) payment in full in Cash of the Secured portion of its Allowed Barclays Warehouse Repo Facility Claim;

        (2) delivery of collateral securing any Secured portion of such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or

        (3) such other treatment that renders its Allowed Barclays Warehouse Repo Facility Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code agreed upon by the Debtors and the Holder of the Barclays Warehouse Repo Facility Claim.

    (ii)    To the extent that an Allowed Barclays Warehouse Repo Facility Claim is not Secured, each Holder of an Allowed Barclays Warehouse Repo Facility Claim shall receive, in full and final satisfaction of such Claims, up to the Allowed amount of such Barclays Warehouse Repo Facility Claim that is not Secured, its Pro Rata share of the GUC Reserve.

(c)    *Voting*: Class 4 is Impaired under this Plan. Holders of Claims in Class 4 are entitled to vote to accept or reject this Plan.

5.     **Class 5 – CS Claims**

(a)     *Classification*:  Class 5 consists of all CS Claims.

(b)     *Treatment*:

(i)     To the extent that a CS Claim is secured by collateral or property pursuant to and in connection with the CS Repos, except to the extent that a Holder of a CS Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each Holder of a CS Claim shall receive, solely to the extent that such Claim is secured by collateral or property pursuant to and in connection with the CS Repos:

(1)     payment in Cash from the proceeds of the CS Liquidation to the extent of the CS Liquidation;

(2)     delivery of collateral, including risk retention bonds, securing any Secured portion of such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or

(3)     such other treatment that renders its Allowed CS Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code agreed upon by the Debtors and the Holder of the CS Claim.

(ii)     On account of the CS Unsecured Claim, each Holder of a CS Unsecured Claim shall receive, in full and final satisfaction of such Claims, up to the Allowed amount of such CS Unsecured Claim that is not Secured, its Pro Rata share of the GUC Reserve, subject to the CS Stipulation.

(c)     *Voting*:  Class 5 is Impaired under this Plan.  Holders of Claims in Class 5 are entitled to vote to accept or reject this Plan.  Subject to the terms of, and without limiting, impairing or otherwise modifying Credit Suisse's rights under the CS Stipulation, Credit Suisse has agreed to support the Plan and to vote in favor of the Plan, to the extent the Plan complies with the terms of the CS Stipulation.

6.     **Class 6 – Nomura Claims**

(a)     *Classification*:  Class 6 consists of all Nomura Claims.

(b)    *Allowance:*  The Nomura Claims shall be Allowed in an aggregate amount of not less than $[262,844,904.07],[6] *plus* all accrued and unpaid interest (including additional interest at the default rate), fees, costs, expenses, and all other amounts, in each case payable, indemnifiable or reimbursable under the applicable Nomura Agreement and all such amounts that continue to be incurred and are accruing on a postpetition basis under or in connection with the Nomura Agreements.  The Allowed Nomura Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable, contractual, or otherwise), counterclaim, defense, disallowance, objection, or any challenges under applicable law or regulation.

(c)    *Treatment*:

      (i)    To the extent that an Allowed Nomura Claim is Secured, except to the extent that a Holder of a Nomura Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each Holder of an Allowed Nomura Claim shall receive, solely to the extent that such Claim is Secured, at the option of the Debtors:

            (1) payment in full in Cash of the Secured portion of its Allowed Nomura Claim;

            (2) delivery of collateral (or the proceeds of such collateral) securing any Secured portion of such Claim and payment of any interest, fees, costs, charges and other expenses payable under the Nomura Agreements or as required under section 506(b) of the Bankruptcy Code; or

            (3) such other treatment that renders its Allowed Nomura Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code and agreed upon by the Debtors and the Holder of the Nomura Claim.

---

[6]   This amount reflects the asserted aggregate principal amount of the Nomura Claims as of January 31, 2023, and does not include all accrued and unpaid interest (including additional interest at the default rate), fees, costs, expenses, and all other amounts, payable, indemnifiable or reimbursable under the applicable Nomura Agreement and all such amounts that are continuing to be incurred and are accruing under or in connection with the Nomura Agreements on a postpetition basis.  This number remains subject to ongoing review by Nomura, the Debtors, and the Committee, and remains subject to change and final agreement between Nomura and the Debtors prior to Confirmation

(ii)   To the extent that an Allowed Nomura Claim is not Secured, each Holder of an Allowed Nomura Claim shall receive, in full and final satisfaction of such Claims, up to the Allowed amount of such Nomura Claim that is not Secured, its Pro Rata share of the GUC Reserve.

(d)   *Voting*: Class 6 is Impaired under this Plan.  Holders of Claims in Class 6 are entitled to vote to accept or reject this Plan.  Subject to the terms of, and without limiting, impairing or otherwise modifying Nomura's rights under the Nomura Stipulation, Nomura has agreed to support the Plan and to vote in favor of the Plan, to the extent the Plan complies with the terms of the Nomura Stipulation.

**7.     Class 7 – TCB Prepetition Claims**

(a)   *Classification*:  Class 7 consists of all TCB Prepetition Claims.

(b)   *Allowance*:  On the Effective Date, the TCB Prepetition Claims shall be Allowed in an aggregate amount of not less than $387,11,600.02,[7] representing the aggregate principal amount outstanding under the TCB Prepetition Facilities, (i) plus any accrued and unpaid interest, and all accrued and unpaid fees and other expenses payable under the TCB Prepetition Facilities and (ii) less any amounts actually recovered by TCB on account of monetization of Prepetition TCB Collateral.[8]

Notwithstanding the foregoing, if the Debtors or Plan Administrator, as applicable, and TCB are unable to reach an agreement as to the Allowed Amount, such amount shall be determined by the Court.

(c)   *Treatment*:

(i)   To the extent that an Allowed TCB Prepetition Claim is Secured, except to the extent that a Holder of a TCB Prepetition Claim against any of the Debtors has agreed to less favorable treatment of such Claim, on the Effective Date or as soon as reasonably practicable thereafter (or such other

---

[7]   This amount reflects the asserted amount on TCB's Proof of Claim.

[8]   If TCB is still in the process of monetizing the Prepetition TCB Collateral as of the Effective Date pursuant to authority granted to TCB under the Final DIP Order, but such liquidation, sale or other event has not yet been consummated, any anticipated proceeds from such liquidation of the Prepetition TCB Collateral that has not been realized by the Effective Date shall not reduce the Allowed Amount of the TCB Prepetition Claims; *provided* that if such value is realized on the Prepetition TCB Collateral after the Effective Date, upon consummation, TCB shall apply the proceeds of any such liquidation transaction of the Prepetition TCB Collateral to satisfy the TCB Prepetition Claims, and upon satisfaction in full, in cash, of the TCB Prepetition Claims, TCB shall return any excess proceeds as soon as reasonably practicable to the Reorganized Debtor or Plan Administrator, as applicable.

timing agreed with TCB), each Holder of an Allowed TCB Prepetition Claim shall receive, solely to the extent that such Claim is Secured, at the option of the Debtors:

(1) payment in full in Cash of the Secured portion of its Allowed TCB Prepetition Claim;

(2) delivery of Prepetition TCB Collateral, or the proceeds of such collateral when liquidated, securing any Secured portion of such Claim and payment of any accrued and unpaid interest, fees, and other expenses payable under the TCB Prepetition Facility required under section 506(b) of the Bankruptcy Code; or

(3) such other treatment that renders its Allowed TCB Prepetition Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code agreed upon by the Debtors and the Holder of the TCB Prepetition Claim.[9]

(ii) To the extent that an Allowed TCB Prepetition Claim is not Secured, each Holder of an Allowed TCB Prepetition Claim shall receive, in full and final satisfaction of such Claims, up to the Allowed amount of such TCB Prepetition Claim that is not Secured, its Pro Rata share of the GUC Reserve.

(d) *Voting*: Class 7 is Impaired under this Plan. Holders of Claims in Class 7 are entitled to vote to accept or reject this Plan.

**8.    Class 8 – TIAA Warehouse Repo Facility Claims**

(a) *Classification*:    Class 8 consists of all TIAA Warehouse Repo Facility Claims.

(b) *Allowance:* The TIAA Claims shall be Allowed in an aggregate amount of not less than $[34,965,802.44],[10] *plus* all (x) accrued and

---

[9]  Subject to <u>Section II.B.</u> of this Plan, the proceeds of the TCB Additional Collateral Account shall be released to TCB on the Effective Date of the Plan in partial satisfaction of the Secured portion of the Allowed TCB Prepetition Claims.

[10]  This amount reflects the asserted amount on TIAA's Proof of Claim. This number remains subject to ongoing review by TIAA, the Debtors, and the Committee, and remains subject to change and final agreement between TIAA and the Debtors prior to Confirmation.

unpaid interest (including additional interest at the default rate), (y) fees, costs, expenses, and (z) all other amounts, in each case of (x), (y), and (z), accrued, incurred, indemnifiable, or reimbursable under the terms of the TIAA Agreement.

The Allowed TIAA Warehouse Repo Facility Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable, contractual, or otherwise), counterclaim, defense, disallowance, objection, or any challenges under applicable law or regulation.

(c)     *Treatment*:

(i)      To the extent that a TIAA Warehouse Repo Facility Claim is secured by collateral or property pursuant to and in connection with the TIAA Warehouse Repo Facility, except to the extent that a Holder of a TIAA Warehouse Repo Facility Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each Holder of a TIAA Warehouse Repo Facility Claim shall receive, solely to the extent that such Claim is secured by collateral or property pursuant to and in connection with the TIAA Warehouse Repo Facility, at the option of the Debtors:

(1) payment in full in Cash of the Secured portion of its Allowed TIAA Warehouse Repo Facility Claim;

(2) delivery or return of collateral (or the proceeds or realization of or from such collateral) securing any Secured portion of such Claim and payment of any interest, fees, costs, charges, and other expenses payable under the TIAA Agreement or as required under section 506(b) of the Bankruptcy Code; or

(3) such other treatment that renders its Allowed TIAA Warehouse Repo Facility Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code and agreed upon by the Debtors and the Holder of the TIAA Warehouse Repo Facility Claim.

(ii)     On account of any unsecured TIAA Warehouse Repo Facility Claims (if any), each Holder of any unsecured TIAA Warehouse Repo Facility Claims shall receive, in full and

final satisfaction of such Claims, up to the Allowed amount of such unsecured Claim, its Pro Rata share of the GUC Reserve.

(d)    *Voting*:  Class 8 is Impaired under this Plan.  Holders of Claims in Class 8 are entitled to vote to accept or reject this Plan.

**9.    Class 9 – General Unsecured Claims**

(a)    *Classification*:  Class 9 consists of all General Unsecured Claims.

(b)    *Treatment*:  Each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such General Unsecured Claim, up to the Allowed amount of such General Unsecured Claim, its Pro Rata share of the GUC Reserve.

(c)    *Voting*:  Class 9 is Impaired under this Plan.  Holders of Claims in Class 9 are entitled to vote to accept or reject this Plan.[11]

**10.    Class 10 – Intercompany Claims**

(a)    *Classification*:  Class 10 consists of all Intercompany Claims.

(b)    *Treatment*:   On the Effective Date, each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will be canceled and released pursuant to Section III.C.

(c)    *Voting*:  Pursuant to sections 1126(f) and 1126(g) of the Bankruptcy Code, Holders of Intercompany Claims against the Debtors are not entitled to vote to accept or reject this Plan.

**11.    Class 11 – Intercompany Interests**

(a)    *Classification*:  Class 11 consists of all Intercompany Interests.

(b)    *Treatment*:   On the Effective Date, each Allowed Intercompany Interest shall be Reinstated for administrative convenience or

---

[11] As further described in the Debtors' *Motion to Enforce the Order (I) Authorizing Debtors to Enter Into Stipulation to Transfer Servicing and Approving the Terms Thereof; (II) Authorizing Debtors to Take All Actions to Facilitate Transfer of Certain Servicing Rights and Obligations; (III) Approving Procedures for the Debtors' Potential Assumption and Assignment of Executory Contracts and Unexpired Leases; (IV) Modifying the Automatic Stay on a Limited Basis; and (V) Granting Related Relief* [Docket No. 318], the Debtors assert that, pursuant to Paragraph 8 of the Stipulation, Leadenhall agreed to affirmatively support this Plan and to vote in favor of this Plan.  For the avoidance of doubt, the Debtors are not attempting to deprive Leadenhall of its right to vote on the Plan, but reserve their rights to pursue enforcement of the Stipulation.

canceled and released without any distribution on account of such interests at the option of the Debtors.

(c)   *Voting*:  Pursuant to sections 1126(f) and 1126(g) of the Bankruptcy Code, Holders of Intercompany Interests in the Debtors are not entitled to vote to accept or reject this Plan.

## 12.   **Class 12 – RMIT Existing Equity Interests**

(a)   *Classification*:  Class 12 consists of all RMIT Existing Equity Interests.  For the avoidance of doubt, Class 12 does not include Intercompany Interests.

(b)   *Treatment*:  Except to the extent that a Holder of RMIT Existing Equity Interests agrees to less favorable treatment, in full and final satisfaction and release of, and in exchange for RMIT Existing Equity Interests, each such holder thereof shall receive the following treatment:

(i)   On the Effective Date, all RMIT Existing Equity Interests shall be cancelled and one common share of RMIT Stock (the "Single Share") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of RMIT Stock consistent with their former relative priority and economic entitlements and the Single Share shall be recorded in the books and records maintained by the Plan Administrator;

(ii)   Each former Holder of RMIT Stock (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such RMIT Stock; *provided* that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and this Plan, each former holder of RMIT Stock may receive its share of any remaining assets of RMIT consistent with such holder's rights of payment existing immediately prior to the Petition Date unless otherwise determined by the Plan Administrator, on the date that RMIT's Chapter 11 Case is closed in accordance with this Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates; and

(iii)   the continuing rights of former Holders of RMIT Stock (including through their interest in Single Share or otherwise) shall be nontransferable except (A) by operation

34

of law or (B) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent.

(c)     *Voting*: Class 12 is Impaired under this Plan.  Holders of Interests in Class 12 are conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

## C.     Limited Substantive Consolidation

This Plan provides for the limited substantive consolidation of all of the Debtors' Estates, but solely for the purposes of the Plan, including making any distributions to Holders of Claims and Interests.  The Debtors propose limited substantive consolidation to avoid the inefficiency of proposing Entity-specific Claims for which there would be no material impact on distributions.  Such limited substantive consolidation protects the prepetition expectation of creditors and provides substantial cost savings to all creditors, without any prejudice to the rights of recovery that creditors would otherwise receive in a nonconsolidated scenario.  Accordingly, none of the creditors will be prejudiced by such substantive consolidation.

On the Effective Date, (a) all assets and liabilities of the Debtors will, solely for distribution purposes, be treated as if they were merged, (b) each Claim against the Debtors will be deemed a single Claim against and a single obligation of the Debtors, (c) any Claims filed or to be filed in the Chapter 11 Cases will be deemed single Claims against all of the Debtors, (d) all guarantees of any Debtor of the payment, performance, or collection of obligations of another Debtor shall be eliminated and canceled, (e) all transfers, disbursements, and distributions on account of Claims made by or on behalf of any of the Debtors' Estates hereunder will be deemed to be made by or on behalf of all of the Debtors' Estates, and (f) any obligation of the Debtors as to Claims or Interests will be deemed to be one obligation of each of the Debtors.  Holders of Allowed Claims and Interests entitled to distributions under the Plan shall be entitled to their share of assets available for distribution without regard to which Debtor was originally liable for such Claim.  Such limited substantive consolidation shall not (other than for purposes related to this Plan) affect the legal and corporate structures of the Debtors.

## D.     Special Provision Governing Unimpaired Claims

Except as otherwise provided in this Plan, nothing under this Plan shall affect the Debtors' or the Wind-Down Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.  Unless otherwise Allowed, Claims that are Unimpaired may remain Disputed Claims under the Plan.

## E.     Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from this Plan for purposes of voting

to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**F.     Acceptance or Rejection of this Plan**

**1.     Presumed Acceptance of this Plan**

Claims in Classes 1, 2, and 10 (to the extent Unimpaired) and Interests in Class 11 (to the extent Unimpaired) are Unimpaired under this Plan.  The Holders of such Claims and Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.

**2.     Voting Classes**

Claims in Classes 3, 4, 5, 6, 7, 8, and 9 are Impaired under this Plan and the Holders of such Claims are entitled to vote to accept or reject this Plan.  If such a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject this Plan, such Class shall be deemed to have accepted this Plan.

**3.     Deemed Rejection of this Plan**

Claims in Class 10 and Interests in Class 11 (to the extent Impaired), and 12 are Impaired and Holders of such Claims and Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.

**G.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by one or more of the Classes entitled to vote pursuant to Section III.B of this Plan.  The Debtors reserve the right to modify this Plan in accordance with Article XI of this Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**H.     Subordinated Claims and Interests**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests (as applicable) and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Wind-Down Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest (as applicable) in accordance with any contractual, legal, or equitable subordination relating thereto.

IV.        **MEANS FOR IMPLEMENTATION OF THIS PLAN**

A.        **General Settlement of Claims and Interests**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

B.        **Wind-Down Transactions**

Before, on, and after the Effective Date, the Debtors or the Wind-Down Debtors, as applicable, shall enter into any transaction and shall take any actions as may be necessary or appropriate to effectuate the transactions contemplated by this Plan.

The actions to implement the Wind-Down Transactions may include, but are not limited to: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of this Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with this Plan.  Notwithstanding the foregoing, nothing in this Section IV.B will alter the rights of any Holder of a Secured Claim.

C.        **RMF Reorganization Transaction**

Prior to the Confirmation Date, the Debtors may elect to pursue the RMF Reorganization Transaction, with such election to be provided in a notice filed on the docket of the above-captioned Chapter 11 Case.  Unless and until the Debtors elect not to pursue the RMF Reorganization Transaction, the Debtors shall file a stipulation on the docket with the terms of the RMF Reorganization Transaction with the Initial RMF Purchaser, however the identity of such Initial RMF Purchaser need not be disclosed at such time.  The Plan Supplement shall include the RMF Reorganization Transaction Documents, including the proposed purchase agreement and the Reorganized RMF Schedule of Assets and Liabilities, in the Plan Supplement.  Prior to the

Confirmation Date, the Debtors shall analyze and consider all reasonable competing offers and terms for the RMF Reorganization Transaction.  Any objections to the RMF Reorganization Transaction shall be adjudicated by the Court at the Confirmation Hearing.

Before, on, and after the Effective Date, the Debtors, Wind-Down Debtors, and Reorganized RMF, as applicable, shall be authorized, without the need for any approval, to enter into any transaction and shall take any action as may be necessary or appropriate to effectuate the RMF Reorganization Transaction including, without limitation, the provision of a break-up fee and/or expense reimbursement for the Initial RMF Purchaser if, prior to the Effective Date, the RMF Reorganization Transaction is consummated with an Entity other than the Initial RMF Purchaser.  The Purchaser shall be authorized and entitled to purchase the Interests of Reorganized RMF, and the assets and liabilities held by Reorganized RMF, free and clear of all Causes of Action associated therewith (except as expressly provided in the RMF Reorganization Transaction Documents) that arose on or before the Effective Date.  The Excluded RMF Assets and Liabilities may be transferred into a liquidating trust pursuant to Section IV.F.6 of this Plan or another Entity as determined by the Debtors or the Wind-Down Debtors.  For the avoidance of doubt, implementation of the RMF Reorganization Transaction shall have no effect on the DIP Liens and Prepetition Liens which shall remain enforceable consistent with the terms of this Plan and the Final DIP Order against the DIP Collateral and Prepetition Collateral retained by Reorganized RMF.  If the RMF Reorganization Transaction results in the monetization of any DIP Collateral or Prepetition Collateral (the "RMF Reorganization Transaction Proceeds"), such RMF Reorganization Transaction Proceeds shall also be encumbered by the DIP Liens and Prepetition Liens, as applicable, subject to the lien and claim priorities set forth in the Final DIP Order.

The actions to implement the RMF Reorganization Transactions may include, but are not limited to: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of this Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the RMF Reorganization Transaction.

D.    **Cancellation of Existing Agreements and Interests**

On the Effective Date, except with respect to the extent otherwise provided in the Description of the Transaction Steps, this Plan, or the Confirmation Order, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, released, and of no force or effect.  Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities,

and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan.

E.      **Section 1146 Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor or to any other Person) of property under this Plan, if applicable, or pursuant to: (1) the issuance, reinstatement, distribution, transfer, or exchange of any debt, or other Interest in the Debtors or the Wind-Down Debtors; (2) the Wind-Down Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

F.      **The Liquidation**

1.      **Vesting of Assets in the Wind-Down Debtors**

Except as otherwise provided in this Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in this Plan or the Plan Supplement, on the Effective Date, the assets of the Debtors shall vest in the Wind-Down Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided for in this Plan, the Debtors and the Wind-Down Debtors may operate their business and use, acquire, or dispose of property, and compromise or settle any Claims, Interests, Avoidance Actions, or Causes of Action.

2.      **Sources of Plan Distributions**

The Wind-Down Debtors will fund distributions under this Plan with (a) Cash in the Plan Reserve Account, (b) Cash in the Wind-Down Account, and any other revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action, including those not settled,

released, discharged, enjoined, or exculpated under this Plan or otherwise on or prior to the Effective Date. Proceeds of all assets except for (a) DIP Funds; (b) funds with respect to any of the Debtors' private label securitization accounts that pass through the Debtors' bank accounts; (c) any proceeds from reimbursed expenses or other pass-through funds, whether received prior to or after February 11, 2023, that the Debtors are required to provide to any third parties pursuant to any order of the Court or other agreement between the Debtors and such parties shall be held in the Plan Reserve Account until distribution according to the terms of this Plan and the Confirmation Order; and (d) the Restricted Cash Collateral and Restricted Cash Accounts, to the extent not already included in clauses (a) through (c) above.

The GUC Reserve will be funded (a) on the Effective Date, with fifty percent of the Unencumbered Asset Proceeds and, (b) after the final decree is entered closing these Chapter 11 Cases, or at any earlier date, at the discretion of the Wind-Down Debtor or Plan Administrator, fifty percent of the Wind-Down Account.

Notwithstanding anything to the contrary in this Plan, (a) on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under this Plan on or prior to the Effective Date shall vest in the Wind-Down Debtors and shall be subject to administration by the Plan Administrator; and (b) the Plan Reserve Account may not be funded with (i) DIP Collateral (or the proceeds thereof) securing TCB's DIP Claims to the extent that TCB's DIP Claims are not yet paid in full in Cash or TCB otherwise agrees to other treatment, (ii) Prepetition TCB Collateral (or the proceeds thereof), unless and until the Secured portion of the TCB Prepetition Claims has been satisfied in full in Cash or TCB otherwise agrees to other treatment; or (iii) the Restricted Cash Collateral or Restricted Cash Accounts, to the extent not already included in (i) or (ii) above.

### 3.    Wind-Down Debtors

On and after the Effective Date, the Wind-Down Debtors shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible, including, but not limited to, surrendering licenses and collecting on remaining assets, (b) resolving Disputed Claims, (c) making distributions on account of Allowed Claims as provided hereunder, (d) funding distributions, (e) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (f) filing appropriate tax returns, and (g) administering this Plan in an efficacious manner. The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

### 4.    Plan Administrator

On and after the Effective Date, the Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, officers, or

other Governing Body, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by this Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers, officers, directors, sale director, or Governing Body of the Wind-Down Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors, and shall succeed to the powers of the Wind-Down Debtors' managers, directors, officers, and other Governing Bodies. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors. The foregoing shall not limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer, including pursuant to any transition services agreement or other agreement entered into on or after the Effective Date. Following the Effective Date, the Plan Administrator (or liquidating trustee if a liquidating trust is established) is given full power of attorney and had the authority to execute and/or endorse documentation on behalf of the Debtors in furtherance of the Plan and the Debtors' liquidation, including but not limited to, the filing of final tax returns and the dissolution of the Debtors.

### 5.  Plan Advisory Committee

On the Effective Date, a committee comprised of one or more members as determined by the Committee, the Debtors, and BNGL Holdings (the "Plan Advisory Committee") shall be established. Any members of the Committee who are not members of the Plan Advisory Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from their service as members of the Committee consistent with Section XIII.D of this Plan. The Plan Advisory Committee shall have duties and responsibilities as set forth herein and in the Plan Administrator Agreement which shall be included in the Plan Supplement. Such duties and responsibilities include oversight of the Plan Administrator and the Wind-Down Debtor following the Effective Date.

Following all distributions and other payments made in accordance with the Plan and all outstanding Disputed Claims resolved, the Plan Advisory Committee shall be dissolved, and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from their service as members of the Plan Advisory Committee. The Plan Administrator shall consult with the Plan Advisory Committee on an as-needed basis in connection with the status of the Estates and wind-down process. Nothing set forth herein shall prohibit or limit the Plan Administrator's ability to consult with creditor representatives who are not members of the Plan Advisory Committee.

### 6.  Option to Establish Liquidating Trust

The Debtors reserve the right in their sole discretion, either before or after the Confirmation Date, to make nonmaterial mechanical changes to the Plan to provide for the establishment of a liquidating trust. Such liquidating trust would hold and wind down the Wind-Down Debtors, should the Debtors or Wind-Down Debtors determine, in their sole discretion, that a liquidating trust would more efficiently wind down the Estates. Additionally, if the Debtors elect to pursue the RMF Reorganization Transaction as set forth in Section IV.C of this Plan, the Debtors reserve the right to establish a liquidating trust to hold and wind down the Excluded RMF Assets and

Liabilities and/or Reorganized RMF. For the avoidance of doubt, implementation of the RMF Reorganization Transaction shall have no effect on the DIP Liens and Prepetition Liens which shall remain enforceable consistent with the terms of this Plan and the Final DIP Order against the DIP Collateral and Prepetition Collateral retained by Reorganized RMF or any liquidating trust established pursuant to this Section IV.F.6.

If a liquidating trust is established, the liquidating trust shall in no event be dissolved later than five (5) years from the creation of the Liquidating Trust unless the Plan Administrator determines that a fixed period extension (approved by the Bankruptcy Court within six (6) months of the beginning of the extension period) is necessary to facilitate or complete the liquidation of the assets of the liquidating trust.

### 7.    Dissolution and Governing Bodies of the Debtors

As of the Effective Date, the current board shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, members, or Governing Bodies, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, managers, or Governing Body, as applicable, of the Debtors, or the members of any Debtor. Subject in all respects to the terms of this Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, manager, and Governing Body, as applicable, of the Debtors and the Wind-Down Debtors with respect to their affairs. Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall: (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of Manager or any of its Affiliates.

### 8.    Release of Liens

Except as otherwise expressly provided herein or in the Confirmation Order, on the Effective Date, all Liens on any property of any Debtors or the Wind-Down Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors or the Wind-Down Debtors shall be automatically discharged and

released.  For the avoidance of doubt, (a) pursuant to and consistent with the CS Stipulation, nothing herein shall modify or release any lien of Credit Suisse on the property or collateral provided pursuant to, and in connection with, the CS Repos, (b) nothing herein shall modify or release any lien held by Nomura on the property or collateral (and proceeds thereof) provided pursuant to, and in connection with, the Nomura Agreements, (c) nothing herein shall modify or release any lien held by TIAA on the property or collateral under or in connection with the TIAA Warehouse Repo Facility, (d) nothing herein shall modify or release any lien held by TCB, and (e) nothing herein shall modify or release any lien asserted by Leadenhall, so long as such lien is valid.

### 9.    Corporate Action

Upon the Effective Date, all actions contemplated under this Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects.  All matters provided for in this Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtors, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with this Plan or the corporate structure of the Debtors or Wind-Down Debtors, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the equity holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors.  Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under this Plan (or necessary or desirable to effect the transactions contemplated under this Plan) in the name of and on behalf of the Wind-Down Debtors.  The authorizations and approvals contemplated by this Section IV.F shall be effective notwithstanding any requirements under non-bankruptcy law.

### 10.    Effectuating Documents; Further Transactions

Prior to the Effective Date, the Debtors are, and on and after the Effective Date, the Wind-Down Debtors, the Plan Administrator, and the officers and members thereof are, authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of this Plan such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to this Plan.

### 11.    Preservation of Causes of Action

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors shall convey to the Plan Administrator all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, which shall vest in the Plan Administrator pursuant to the terms of this Plan.  The Plan Administrator may enforce all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action, including but not limited to the Causes of Action included in the Schedule of Retained Causes of Action and any and all payments made within the

43

90-day period prior to the Petition Date as referenced by the Debtors in the Schedules, whether arising before or after the Petition Date, and the Plan Administrator's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Plan Administrator may, in its reasonable business judgment, pursue such Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Causes of Action to the extent the Plan Administrator deems appropriate, including on a contingency fee basis. **No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Causes of Action against it. The Debtors and the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in this Plan.** Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Final Order, the Plan Administrator expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to, or action, order, or approval of, the Bankruptcy Court.

### 12.    Closing the Chapter 11 Cases

The Wind-Down Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases; *provided* that, as of the Effective Date, the Wind-Down Debtors may submit separate orders to the Bankruptcy Court closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly, provided further that matters concerning Claims may be heard and adjudicated in one of the Debtors' Chapter 11 Cases that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed. Nothing in this Plan shall authorize the closing of any case effective as of a date that precedes the date any such order is entered. Any request for such relief shall be made on motion served on the U.S. Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing. Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Wind-Down Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with this Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## V.        TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.        Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, in the Plan Supplement, or in the Confirmation Order, each Executory Contract and Unexpired Lease that is not assumed or assigned or identified on the Assumed Executory Contracts and Unexpired Leases Schedule shall be deemed automatically rejected as of the Effective Date.

Such automatic assumption or rejection, as applicable, shall be effective without the need for any further notice to or action, order, or approval of the Bankruptcy Court, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than any Executory Contracts and Unexpired Leases that: (a) have been previously assumed, assumed and assigned, or rejected pursuant to a Bankruptcy Court order; (b) are the subject of a motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect to the proposed assumption, assumption and assignment, or rejection of such Executory Contract or Unexpired Lease) that is pending on the Effective Date; (c) are a contract, release, or other agreement or document entered into in connection with the Plan, or otherwise assumed under the Plan; or (d) is a D&O Liability Insurance Policy.  The assumption or rejection of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.  The Confirmation Order will constitute an order of the Bankruptcy Court approving, subject to and upon the occurrence of the Effective Date, the above-described assumptions and assumptions and assignments, or rejections, as applicable.  Any Filed motions to assume, assume and assign, or reject any Executory Contracts or Unexpired Leases (or Filed objection with respect to the proposed assumption and assignment of such contract) that is pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order but may be withdrawn, settled, or otherwise prosecuted by the Wind-Down Debtors or the Plan Administrator, with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

### B.        Claims Based on Rejection of Executory Contracts or Unexpired Leases

All Proofs of Claim with respect to any Claims arising from the rejection of the Executory Contracts or Unexpired Leases which are rejected pursuant to this Plan or the Confirmation Order (and which are not subject to any separate Court order authorizing the rejection of such Executory Contracts or Unexpired Leases), if any, must be Filed with the Bankruptcy Court within 30 days

45

after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Wind-Down Debtors, the Estates, or their property without the need for any objection by the Wind-Down Debtors, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary. Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapters 11 Cases on account of such Claim.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with <u>Section III.B</u> of this Plan.

### C.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each Assumed Executory Contract or Unexpired Lease pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Wind-Down Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

Any objection by a lease or contract counterparty to proposed assumption of an Executory Contract or Unexpired Lease or the related cure amount (including as set forth in the Assumed Executory Contracts and Unexpired Leases Schedule) must be Filed, served, and actually received by the Debtors at least three days prior to the Confirmation Hearing. The Debtors or Wind-Down Debtors, as applicable, may settle any Cure disputes without any further notice to or action, order, or approval of the Bankruptcy Court. If an objection to a proposed assumption or related Cure is not withdrawn or resolved, the Cure shall be paid promptly in full following (a) an agreement between the Debtors or Wind-Down Debtors, as applicable, and the objecting counterparty to the Executory Contract or Unexpired Lease or (b) the entry of a Final Order resolving the dispute and approving the assumption pursuant to a hearing not more than 30 days after the Confirmation Date or such other date set by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such assumption or proposed cure amount. For the avoidance of doubt, to the extent an Executory Contract or Unexpired Lease proposed to be assumed is not listed as having a related cure cost, any counterparty to such Executory Contract or Unexpired Lease that

fails to object timely to the proposed assumption will be deemed to have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults under such Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise and full payment of any applicable Cure pursuant to this Section V.C shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Section V.C, shall be deemed Disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

### D.      Reservation of Rights

Nothing contained in this Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Wind-Down Debtors, as applicable, have any liability thereunder.

### E.      Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## VI.      PROVISIONS GOVERNING DISTRIBUTIONS

### A.      Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the initial Distribution Date (or if a Claim is not an Allowed Claim or Allowed Interest on the initial Distribution Date, on the next Distribution Date after such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), or as soon as is reasonably practicable thereafter, each Holder of an Allowed Claim or Allowed Interests (as applicable) shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VIII of this Plan. Except as otherwise provided in this Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.    **Disbursing Agent**

All distributions under this Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Wind-Down Debtors.

C.    **Rights and Powers of Disbursing Agent**

1.    **Powers of the Disbursing Agent**

The Disbursing Agent shall be empowered to, at the consent and direction of the Plan Administrator: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.    **Expenses Incurred On or After the Effective Date**

Except as otherwise ordered by the Bankruptcy Court, to the extent the Disbursing Agent is an Entity other than the Wind-Down Debtors, the amount of any reasonable fees and expenses incurred by such Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by such Disbursing Agent shall be paid in Cash by the Wind-Down Debtors. For the avoidance of doubt, such expenses shall not be funded with (a) DIP Collateral (or the proceeds thereof) securing TCB's DIP Claims to the extent that TCB's DIP Claims are not yet paid in full in Cash or TCB otherwise agrees to other treatment, (b) Prepetition TCB Collateral (or the proceeds thereof), unless and until the Secured portion of the TCB Prepetition Claims has been satisfied in full in Cash or TCB otherwise agrees to other treatment, or (c) the Restricted Cash Collateral, to the extent not already included in (a) or (b) above.

D.    **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

1.    **Record Date for Distribution**

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.    **Delivery of Distributions in General**

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims, except as otherwise provided in this Article VI, or Interests shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent: (a) to the signatory set forth on any of

48

the Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Wind-Down Debtors have not received a written notice of a change of address; or (d) to any counsel that has appeared in the Chapter 11 Cases on such Holder's behalf.  Subject to this <u>Article VI</u>, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Disbursing Agent, the Wind-Down Debtors, or the Plan Administrator, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

### 3.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date or the respective Distribution Date, as applicable.  After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and, subject to further court order, the Claim of any Holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.  Any unclaimed Distributions shall be transferred to the Wind-Down Account or donated to charity as deemed appropriate by the Plan Administrator in consultation with the Plan Advisory Committee.

### E.      Manner of Payment

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

### F.      Compliance with Tax Requirements

In connection with this Plan, to the extent applicable, the Debtors, the Wind-Down Debtors, the Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and the Wind-Down Debtors reserve the right

to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Any party entitled to receive any property as an issuance or distribution hereunder shall, upon request, deliver to the Plan Administrator or Wind-Down Debtors an IRS Form W-9 or, if the payee is a foreign entity, an applicable IRS Form W-8. If such request is made by the Plan Administrator, the Disbursing Agent withholds a distribution to the payee until the payee complied with the request, and the payee fails to comply before the date that is 120 days after the request is made, the amount of such distribution shall irrevocably revert to the Wind-Down Account and any Claim or Interest in respect of such distribution shall be discharged and forever barred from assertion against the Debtors or Wind-Down Debtors.

### G.    Allocations

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

### H.    No Postpetition Interest on Claims

Unless otherwise specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

### I.    Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal*, National Edition, on the Effective Date.

### J.    Setoffs and Recoupment

Except as expressly provided in this Plan or Confirmation Order, each Wind-Down Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Wind-Down Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Wind-Down Debtor(s) and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, *however*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Wind-Down Debtor or its successor of any and all claims, rights, and Causes

of Action that such a Wind-Down Debtor, or its successor may possess against the applicable Holder. Except as expressly provided in this Plan or Confirmation Order, in no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Wind-Down Debtors as applicable, unless such Holder has completed such recoupment with the Debtors' prior consent or Court authority and in accordance with this Plan on or before the Effective Date or such Holder has, in a timely filed Proof of Claim, stated that it asserts, has, or intends to preserve any right of recoupment.

K.      **Claims Paid or Payable by Third Parties**

1.      **Claims Paid by Third Parties**

The Debtors or the Wind-Down Debtors as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Wind-Down Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Wind-Down Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Wind-Down Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Wind-Down Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.      **Claims Payable by Third Parties**

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Contracts until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Contract. To the extent that one or more of the Debtors' Insurers agrees to pay in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      **Applicability of Insurance Policies**

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

## VII.      THE PLAN ADMINISTRATOR

### A.      The Plan Administrator

The powers of the Plan Administrator shall, as more fully set forth in the Plan Administrator Agreement, include, but not be limited to, any and all powers and authority to implement this Plan and wind down the business and affairs of the Debtors and the Wind-Down Debtors, including: (1) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtor; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under this Plan; (3) making distributions as contemplated under this Plan; (4) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating this Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind Down on and after the Effective Date; (7) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (8) representing the interests of the Wind-Down Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to this Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of this Plan.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator appointed by the Plan Advisory Committee or as approved by the Court.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor (as set forth in the Plan Administrator Agreement) and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors shall be terminated.

### 1.      Plan Administrator Rights and Powers

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan, and as otherwise provided in the Confirmation Order.  The Plan Administrator shall be the exclusive trustee of the assets of the Wind-Down Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  For the avoidance of doubt, such professionals may include the Professionals retained in these Chapter 11 Cases.  The reasonable fees and expenses of such professionals shall be paid by from the Plan Administrator Operating Reserve in accordance with the provisions of the Plan Administrator Agreement.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business from the Plan Administrator Operating Reserve in accordance

with the provisions of the Plan Administrator Agreement and shall not be subject to the approval of the Bankruptcy Court.

## 2. Compensation and Expenses of the Plan Administrator

The Plan Administrator's post Effective Date compensation will be set forth in the Plan Supplement.  Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes imposed on the Wind-Down Debtors) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid as provided in the Plan Administrator Agreement without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Plan Administrator Assets, as applicable, if such amounts relate to any actions taken hereunder.

## B. Wind Down

On and after the Effective Date, the Plan Administrator will be authorized and directed to implement this Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall: (1) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (2) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of this Plan.  Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders, board of directors or managers, or Governing Body of any Debtor.  From and after the Effective Date, except with respect to the Wind-Down Debtors as set forth herein, the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have canceled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.  Notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

## C. Exculpation, Indemnification, Insurance and Liability Limitation

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, in all respects by the Wind-Down Debtors.  The Plan Administrator may obtain, at the expense of the Wind-Down Debtors and with funds from the Plan Administrator Assets, commercially reasonable liability or

other appropriate insurance with respect to the obligations of the Wind-Down Debtors, including appropriate directors' and officers' insurance with respect to the Wind Down.

Notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

### D.    Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors reflecting all tax consequences relating to the activities of the Wind-Down Debtors as attributable to and for the account of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

### E.    Dissolution of the Wind-Down Debtors

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under this Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the filing of any documents with the secretary of state for the state in which the Wind-Down Debtor is formed or any other jurisdiction.  The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable state(s).

## VIII.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

### A.    Allowance of Claims

After the Effective Date, each of the Wind-Down Debtors or the Plan Administrator, as applicable, shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

### B.    Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Plan Administrator shall have the sole authority to File and prosecute objections to Claims, and the Plan

Administrator, as applicable, shall have the sole authority to: (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  On and after the Effective Date, the Plan Administrator will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise.

### C.    Estimation of Claims

Before, on, or after the Effective Date, the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors, Wind-Down Debtors, or the Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### D.    No Distributions Pending Allowance

Notwithstanding any provision in the Plan to the contrary, no distributions, partial or otherwise, shall be made with respect to a Disputed Claim until such Claim becomes an Allowed Claim. Subject to the provisions of the Plan, after a Disputed Claim becomes an Allowed Claim, the Holder of such an Allowed Claim will receive all distributions to which such Holder is then entitled under the Plan on the next scheduled Distribution Date or as the Wind-Down Debtors, otherwise determine in their reasonable discretion.  No post-Effective Date interest shall be paid on distributions under this section of the Plan.  If the Holder of a Claim incorporates more than one Claim in a Proof of Claim then: (i) such Claims will be considered one Claim for purposes of this Plan; and (ii) no such Claim will be bifurcated into an Allowed portion and a Disputed portion.

E.       **Distributions After Allowance**

As soon as reasonably practicable after the date that an order or judgment of the Bankruptcy Court allowing all or part of any General Unsecured Claim that is a Disputed Claim becomes a Final Order, the Wind-Down Debtor shall distribute to the Holder of such Claim the distribution (if any) that would have been made to such Holder had such Allowed General Unsecured Claim been Allowed when distributions were made.  After a Disputed Claim becomes an Allowed General Unsecured Claim or is otherwise resolved, any excess Cash or other property that was reserved on account of such Disputed Claim, if any, shall become property of the Wind-Down Debtors, for the benefit of Allowed General Unsecured Claims.

F.       **Reduction of Claims**

Notwithstanding the contents of the Bankruptcy Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtors prior to the Effective Date, including pursuant to orders of the Bankruptcy Court.  To the extent such payments are not reflected in the Bankruptcy Schedules, such Bankruptcy Schedules will be deemed amended and reduced to reflect that such payments were made. Nothing in this Plan shall preclude the Wind-Down Debtors from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Effective Date.

G.       **Adjustment to Claims or Interests Without Objection**

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Wind-Down Debtors without such Wind-Down Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

H.       **Disallowance of Claims or Interests**

All Claims and Interests of any Entity from which property is sought by the Debtors or the Wind-Down Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Wind-Down Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Wind-Down Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

All Proofs of Claim Filed on account of an indemnification obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to, or action, order, or approval of, the Bankruptcy Court.

Except as otherwise provided herein or as agreed to by the Wind-Down Debtors or the Plan Administrator, as applicable, any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.

**I.    Amendments to Claims**

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court, the Wind-Down Debtors, or the Plan Administrator, as applicable, and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court to the maximum extent provided by applicable law.

**J.    Disputed Claims Reserve**

On the Effective Date, the Wind-Down Debtors shall establish and administer the Disputed Claims Reserve.  Except for Secured Claims, the Disputed Claims Reserve relating to Disputed Claims of a specific priority shall be funded on the Distribution Date on which Allowed Claims of the same priority are paid.  For the avoidance of doubt, Claims of junior priority shall not be paid prior to the payment of and/or reservation for Claims with higher priority.  The Disputed Claims Reserve relating to any Disputed Secured Claim shall be funded (a) prior to any distributions of the Unencumbered Asset Proceeds and (b) only to the extent of any Cash actually held by the Debtors or Wind-Down Debtors, as applicable, that constitutes Unencumbered Asset Proceeds.

Each Holder of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall receive the treatment set forth in Article II and Section III.B of this Plan, as applicable.  On each Distribution Date, all assets in the Disputed Claims Reserve on account of a Disputed Claim that has become Disallowed in whole or in part shall be redistributed among Holders of Claims according to Article II and Section III.B of this Plan, as applicable.

For the avoidance of doubt, the Disputed Claims Reserve excludes (a) DIP Collateral (or the proceeds thereof) securing TCB's DIP Claims to the extent that TCB's DIP Claims are not yet paid in full in Cash or TCB otherwise agrees to other treatment, (b) the Professional Fee Reserve Funds, (c) Prepetition TCB Collateral (or the proceeds thereof), unless and until the Secured portion of the TCB Prepetition Claims has been satisfied in full in Cash or TCB otherwise agrees to other treatment, or (d) the Restricted Cash Collateral or Restricted Cash Accounts, to the extent not already included in (a) or (c) above.

**IX.    SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

**A.    Compromise and Settlement of Claims, Interests, and Controversies**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim

or Interest may have, or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Wind-Down Debtors or the Plan Administrator, as applicable, may compromise and settle any Claims and Causes of Action against other Entities.

For the avoidance of doubt, nothing herein shall affect the scope or validity of the release provisions of the 9019 Settlement, and such release provisions shall remain valid pursuant to the terms of any order approving the 9019 Settlement.

## B.      Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Wind-Down Debtors), Interests, and Causes of Action against any Debtor of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Causes of Action accrued before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. Unless expressly provided in the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

## C.      Term of Injunctions or Stays

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

D.      **Release of Liens**

Except as otherwise provided in this Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with **Section III.B.1** of this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Wind-Down Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Wind-Down Debtors, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

E.      **Releases by the Debtors**

Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Wind-Down Debtors, the Plan Administrator, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action owned by the Debtors, directly or derivatively, by, through, for, or because of the foregoing Entities on behalf of the Debtors, from any and all derivative Claims and Causes of Action asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Wind-Down Debtors, the Plan Administrator, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions, the Nomura Agreements, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the DIP Loan Documents, this Plan (including, for the avoidance of doubt, the Plan Supplement), or any Wind-Down Transaction, RMF Reorganization Transaction, contract, instrument, release, or other agreement or document

(including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by this Plan or the reliance by any Released Party on this Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the DIP Loan Documents, or this Plan, the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of a transfer of the GNMA MSR, the pursuit of the 9019 Settlement, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under this Plan, the Confirmation Order, any Wind-Down Transactions, RMF Reorganization Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or any Claim or obligation arising under this Plan.  Notwithstanding anything to the contrary herein, no Entity is released from its obligations or claims the Debtors may have with respect to the payment or return of any Repo Facility Equity Value (as defined in the Final DIP Order) to the Debtors' Estates.

F.    Releases by the Releasing Parties

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions, the Nomura Agreements, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the DIP Loan Documents, this Plan (including, for the avoidance of doubt, the Plan Supplement), or any Wind-Down Transaction, RMF Reorganization Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by this Plan or the reliance by any Released Party on this Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Disclosure Statement, this Plan, the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of a transfer of the GNMA MSR, the pursuit of the 9019 Settlement, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property

60

**under this Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release or act to modify (a) any post-Effective Date obligations of any party or Entity under this Plan, (b) the Confirmation Order, (c) any Wind-Down Transaction, (d) the RMF Reorganization Transaction, or (e) any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or any Claim or obligation arising under this Plan.**

G.     **Exculpation**

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of a transfer of the GNMA MSR, the pursuit of the 9019 Settlement, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon closing of the Chapter 11 Cases or the Effective Date shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

H.     **Injunction**

**Except as otherwise expressly provided in this Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or**

**with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date or has timely Filed a Proof of Claim with an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to this Plan.**

### I.    Protections against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Wind-Down Debtors, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Wind-Down Debtors, or another Entity with whom the Wind-Down Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### J.    Document Retention

On and after the Effective Date, the Wind-Down Debtors, may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Wind-Down Debtors.

### K.    Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## X.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THIS PLAN

### A.    Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date of this Plan that the following conditions ("Conditions Precedent") shall have been satisfied or waived:

> (a)    the Bankruptcy Court shall have entered the Confirmation Order;

(b)     the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are determined by the Debtors to be necessary to implement and effectuate this Plan and that are required by law, regulation, or order;

(c)     the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with this Plan;

(d)     all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts estimated to be sufficient to pay such fees and expenses after the Effective Date have been reserved pending approval by the Bankruptcy Court;

(e)     the Wind-Down Debtors, shall have procured or become insured under policies acceptable to the Debtors; and

(f)     the Debtors shall have otherwise substantially consummated the applicable Wind-Down Transactions, and all transactions contemplated herein, in each case, capable of being consummated prior to the Effective Date in a manner consistent in all respects with this Plan.

### B.     Effect of Failure of Conditions

If Consummation does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors, or Claims against, or Interests in, the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

### C.     Substantial Consummation

"Substantial Consummation" of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## XI.     MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN

### A.     Modification and Amendments

Except as otherwise specifically provided in this Plan, the Debtors reserve the right to modify this Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in this Plan and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its

respective rights to revoke or withdraw, or, to alter, amend, or modify this Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify this Plan, or remedy any defect or omission, or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of this Plan.

### B.      Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### C.      Revocation or Withdrawal of Plan

The Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent plans of liquidation or reorganization.  If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## XII.      RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(a)      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

(b)      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

(c)      resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor

may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Wind-Down Debtors, amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of this Plan, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

(d)     ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of this Plan;

(e)     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

(f)     adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(g)     enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with this Plan or the Disclosure Statement;

(h)     enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(i)     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

(j)     issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of this Plan;

(k)     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article IX of this Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

(l)     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to <u>Section VI.K</u> of this Plan;

(m)     enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(n)     determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan, the Plan Supplement, or the Disclosure Statement;

(o)     enter an order concluding or closing the Chapter 11 Cases;

(p)     adjudicate any and all disputes arising from or relating to distributions under this Plan;

(q)     consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(r)     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

(s)     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

(t)     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(u)     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in this Plan, including under <u>Article IX</u> of this Plan, regardless of whether such termination occurred prior to or after the Effective Date;

(v)     enforce all orders previously entered by the Bankruptcy Court; and

(w)     hear any other matter not inconsistent with the Bankruptcy Code and other applicable law governing the Bankruptcy Court's jurisdiction.

## XIII.   MISCELLANEOUS PROVISIONS

### A.   Immediate Binding Effect

Subject to Section X.A of this Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors or the Wind-Down Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

### B.   Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan.  The Debtors, the Wind-Down Debtors, and all Holders of Claims or Interests receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

### C.   Payment of Statutory Fees

All fees payable pursuant to section 1930(a) of the Judicial Code, and any interest accruing thereon pursuant to 31 U.S.C. § 3717, shall be paid by each of the Wind-Down Debtors (or the Disbursing Agent on behalf of each of the Wind-Down Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.  Any such fees and applicable interest payable on the Effective Date shall be paid in full from the Unencumbered Asset Proceeds.  Any such fees and applicable interest payable after the Effective Date shall be paid from the Plan Administrator Operating Reserve.  For the avoidance of doubt, such fees and applicable interest shall not be paid from (a) DIP Collateral (or the proceeds thereof) securing TCB's DIP Claims to the extent that TCB's DIP Claims are not yet paid in full in Cash or TCB otherwise agrees to other treatment, (b) Prepetition TCB Collateral (or the proceeds thereof), unless and until the Secured portion of the TCB Prepetition Claims has been satisfied in full in Cash or TCB otherwise agrees to other treatment, or (c) the Restricted Cash Collateral or Restricted Cash Accounts, to the extent not already included in (a) or (b) above.

### D.   Dissolution of the Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of (a) prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals, (b) prosecuting and defending any appeal of the Confirmation

Order, and (c) to the extent any litigation was commenced by the Committee, prosecuting and defending the Committee's position in such litigation. The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date except as set forth herein.

### E.    Reservation of Rights

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

### F.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### G.    Notices

All notices, requests, and demands to or upon the Debtors or the Creditors' Committee to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Creditors' Committee |
|---|---|
| **Reverse Mortgage Investment Trust**<br>1455 Broad Street<br>2nd Floor, Bloomfield, NJ 07003<br>Attn: Richard Jensen<br><br>With a copy to:<br><br>**Sidley Austin LLP**<br>787 Seventh Avenue<br>New York, New York 10019<br>Attn: Anthony Grossi and Patrick Venter<br><br>*- and -*<br><br>**Benesch, Friedlander, Coplan & Aronoff LLP**<br>1313 North Market Street, Suite 1201<br>Wilmington, DE 19801<br>Attn: Michael J. Barrie, Jennifer R. Hoover, and John C. Gentile | **Thompson Coburn Hahn & Hessen LLP**<br>488 Madison Avenue<br>New York, NY 10022<br>Attn: Mark S. Indelicato, Mark T. Power, and Joseph Orbach<br><br>*- and -*<br><br>**Blank Rome**<br>1201 Market Street, Suite 800<br>Wilmington, DE 19801<br>Attn: Regina Stango Kelbon and Josef W. Mintz |

After the Effective Date, the Wind-Down Debtors shall have the authority to send a notice to parties in interest providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such party must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Wind-Down Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

### H. Term of Injunctions or Stays

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### I. Entire Agreement

Except as otherwise indicated, this Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

J.      **Exhibits and Annexes**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.ra.kroll.com/RMIT or the Bankruptcy Court's website at http://www.deb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of this Plan shall control.

K.      **Nonseverability of Plan Provisions**

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the Debtors' or the Wind-Down Debtors' consent, as applicable; and (3) non-severable and mutually dependent.

L.      **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under this Plan and any previous plan, and, therefore, neither any of such parties or individuals, or the Wind-Down Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan and any previous plan.

M.      **Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in

those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided*, *however*, that corporate governance matters relating to the Debtors, the Wind-Down Debtors, not incorporated in Delaware shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

**N.      Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

*[Remainder of page intentionally left blank.]*

Dated this 22nd day of March, 2023

_/s/ Tanya Meerovich_
Tanya Meerovich
Chief Restructuring Officer
_Reverse Mortgage Investment Trust Inc._
