### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| REVERSE MORTGAGE INVESTMENT TRUST INC., *et al.*, [1] | Case No. 22-11225 (MFW) |
| | (Jointly Administered) |
| Wind-Down Debtors. | **Hearing Date: February 22, 2024 at 2:00 p.m. (ET)**<br>**Obj. Deadline: January 26, 2024 at 4:00 p.m. (ET)** |

### PLAN ADMINISTRATOR'S MOTION FOR ENTRY OF AN ORDER CONVERTING CHAPTER 11 CASES TO CASES UNDER CHAPTER 7 AND GRANTING RELATED RELIEF

Amanda Swift, appointed as the plan administrator (the "Plan Administrator") of the above captioned debtors (the "Debtors") pursuant to the *Third Amended Joint Chapter 11 Plan of Liquidation for Reverse Mortgage Investment Trust Inc. and Its Debtor Subsidiaries* [Docket No. 713] (as amended and supplemented, the "Plan")[2] and the *Findings of Fact, Conclusions of Law, and Order (I) Approving the Adequacy of the Disclosure Statement and (II) Confirming the Third Amended Joint Chapter 11 Plan of Liquidation for Reverse Mortgage Investment Trust Inc. and its Debtor Subsidiaries* [Docket No. 724] (the "Confirmation Order"), hereby submits this motion (this "Motion"), pursuant to section 1112 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 1017(f) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2002-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for the entry of an order,

---

[1]     The remaining debtor entities in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: Reverse Mortgage Investment Trust Inc. (3421) and Reverse Mortgage Funding LLC (0209).  The chapter 11 cases of RMIT Cash Management LLC (6241); RMIT Operating I LLC (1844); and RMIT Operating II LLC (2301) were closed as of May 25, 2023 [Docket No. 781].  The location of the remaining Wind-Down Debtors' service address for purposes of these chapter 11 cases is: 1455 Broad Street, 2nd Floor, Bloomfield, NJ 07003.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan.

substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), converting each of the Debtors' Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code, effective as of five (5) calendar days from the entry of the proposed order approving the Destruction Motion[3], provided, such Destruction Motion is not denied by this Court or otherwise withdrawn by the Plan Administrator, but no later than ten (10) days from entry of the Proposed Order (the "Conversion Effective Date") and granting related relief. In support of this Motion, the Plan Administrator respectfully states as follows:

## PRELIMINARY STATEMENT

The primary purpose behind the Debtors' Chapter 11 Cases was to ensure the uninterrupted access to capital for its reverse mortgages borrowers, while at the same time exploring options for the orderly winddown or other transition of the Debtors' operations. As more fully discussed below, the Debtors negotiated, among other things, a DIP Loan with TCB to ensure draws on the reverse mortgages could be satisfied. That DIP Loan, as well as a companion DIP facility to provide for operating expenses, was approved by this Court on February 23, 2023. However, prior to such approval, on December 20, 2022, GNMA declared an event of default under the GNMA Documents and ceased the Debtors' mortgage servicing rights. This left the Debtors with no alternative but to negotiate a liquidating plan to resolve the Debtors' Estates.

Thereafter, on the eve of confirmation of the Debtors' Plan, GNMA asserted a senior right to the TCB DIP Collateral represented by the Tail Advances. The Debtors were then left with Chapter 11 Cases in which it was not certain whether the DIP Lenders would be repaid in full pursuant to a Chapter 11 plan. Although the Debtors' Plan was then confirmed in the hopes that

---

[3]    The Destruction Motion, as defined in ¶ 20 herein, is being filed contemporaneously with this Motion.

the dispute between TCB and GNMA with regards to the Tail Advances would be resolved, unfortunately, as of the date hereof, no resolution has been reached.

The Plan Administrator has done everything in her power to provide for the orderly winddown of the Debtors' Estates despite the unresolved TCB Dispute with GNMA. However, the Debtors' Estates have now ran out of money necessitating the relief requested in this motion to preserve what little value may remain in the Debtors' Estates. The Plan Administrator has had extensive discussions with the both TCB and BNGL, another DIP lender, to request that additional funding to permit the Plan Administrator to reserve amounts for payment to all known administrative expense and priority claims as well as to provide a small reserve for a Chapter 7 trustee. As of the date herein, the Plan Administrator was able to achieve such objective and is at this point requesting the Court convert these Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code.

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules, the Plan Administrator consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief requested herein are section 1112 of the Bankruptcy Code, Bankruptcy Rule 1017(f), and Local Rule 2002-1.

## **BACKGROUND**

**A.    General Background**

3.       On November 30, 2022 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

4.       On February 2, 2023, the Bankruptcy Court entered the Final DIP Order, approving the Debtors' Original DIP Motion, as modified, on a final basis.  Among other things, the Final DIP Order provided for the approval of (i) up to $25,499,999.99 advanced to the Debtors pursuant to the DIP Notes, (ii) not less than $30,733,668 advanced to the Debtors by Texas Capital Bank ("TCB") under the DIP Tail Facility, and (iii) up to $8 million in incremental advances under certain additional notes provided to the Debtors by BNGL Holdings, LLC ("BNGL").

5.       On April 28, 2023, the Plan was confirmed pursuant to the Confirmation Order. The Plan went effective and the Plan Administrator was appointed on April 30, 2023 (the "Effective Date").  *See* ECF No. 731.

6.       Pursuant to Section II of the Plan, holders of all allowed Administrative Claims, DIP Secured Claims, and Priority Tax Claims were to be paid in full in satisfaction of each respective claim.  Further, pursuant to Section III of the Plan, holders of allowed General Unsecured Claims were to receive their individual Pro Rata share of the reserve established on the Effective Date holding cash to be distributed to holders of allowed General Unsecured Claims (the "GUC Reserve").  As discussed in Section IV.E.2 of the Plan, the GUC Reserve was to be funded with, among other things, unencumbered portions of cash balances remaining in the Debtors' accounts plus cash remaining after payment of Administrative Claims, Professional Fee Claims, DIP Secured Claims, and Priority Tax Claims, Other Priority Claims, and Other Secured Claims

- 4 -

(collectively, the "Senior Claims"), as well as other revenues and proceeds of assets of the Debtors. On the Effective Date, the Debtors anticipated a distribution to holders of General Unsecured Creditors.

**B.    TCB Dispute**

7.    Prior to the Petition Date, the Debtors and TCB entered into the TCB Tail Facility, and the Debtors' obligations thereunder were collateralized by unsecuritized funded amounts (such amounts, the "Tail Advances") and the proceeds of the securitization of such Tail Advances. The Tail Advances relate to securitized home equity conversion mortgage loans ("HECM Loans"). The Tail Advances included, but were not limited to, draw disbursements, and mortgage insurance premiums, fees, or charges.

8.    Pursuant to the Second Interim DIP Order, TCB financed post-petition Tail Advances (the "DIP Tail Advances"), and in exchange was granted first priority liens (the "DIP Liens") on a variety of the Debtors' collateral, which included, among other things, the proceeds of the DIP Tail Advances (collectively, the "TCB DIP Collateral").

9.    After such funding was advanced to the Debtors, the Government National Mortgage Association ("GNMA") initiated a seizure of the Debtors' mortgage servicing rights ("MSRs").  GNMA contended that such seizure also extinguished TCB's rights to the DIP Liens on the DIP Tail Advances, and further asserted that its seizure of the Debtors' MSRs meant that TCB had no rights to any proceeds from the collateral securing TCB's loans.

10.    TCB, on the other hand, contended that GNMA's seizure of the Debtors' MSRs did not extend to TCB's rights to the DIP Tail Advances because the DIP Liens were properly

perfected and consented to by GNMA, and GNMA does not have the power, statutorily or otherwise, to extinguish TCB's property interest in the DIP Tail Advances without compensation.[4]

11.    In anticipation of the TCB Dispute, the *Amended Disclosure Statement for the Joint Chapter 11 Plan of Liquidation for Reverse Mortgage Investment Trust Inc. and its Debtor Subsidiaries* [ECF No. 577] (the "Disclosure Statement"), filed on March 22, 2023, provided in Section X.A.6 that "[i]n the event that TCB is unable to receive recovery in full in Cash with respect to the DIP Tail Advances from the DIP Collateral securing such DIP Tail Advances, or agree to alternative treatment with respect to the satisfaction of its DIP Claims, the Debtors bear a material risk that the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code."

12.    In further anticipation of the TCB Dispute, pursuant to ¶ 128 of the Confirmation Order, if TCB was unable to recover from GNMA the amount necessary to satisfy the DIP Tail Advances within 120 days after the Effective Date, subject to a further 30-day extension (the "TCB Plan Distribution Date"), TCB was permitted to seek the release of the TCB DIP Collateral, including proceedings of unencumbered assets, to partially satisfy TCB's DIP Claims.  The Confirmation Order went on to state that upon payment in full of TCB's DIP Claims, TCB shall have no further Claim to the TCB Collateral and any remaining funds would be returned to the Debtors' estate.

13.    On or about October 4, 2023, TCB commenced an action against GNMA in the District Court for the Northern District of Texas in an attempt to recover the TCB DIP Collateral held by GNMA (Case No. 2:23-cv-00156); unless the TCB Dispute is resolved in TCB's favor,

---

[4]    A more complete discussion of the dispute between TCB and GNMA (the "TCB Dispute") is set forth in the Motion by Texas Capital Bank for Entry of an Order to Release TCB's DIP Collateral [ECF No. 874] (the "TCB Motion").

however, all proceeds of the Debtors' estates designated as the unencumbered collateral are currently earmarked for TCB as TCB has a first priority lien on all of the Debtors' assets. In addition, the likelihood of any distribution to a number of holders of Senior Claims, as well as holders of General Unsecured Claims in these cases is highly improbable.

14.    The Plan Administrator has had extensive discussions with both TCB and BNGL seeking a reserve to ensure that there are sufficient funds to pay all known Senior Claims as well as to provide any Chapter 7 trustee appointed with funds to monitor the TCB Dispute, and if resolved in a manner that is beneficial to the Debtors' Estates, resolve the general unsecured claims and make appropriate distributions. As of the date herein, the Plan Administrator has reached an agreement with both TCB and BNGL to reserve funds for known Senior Claims and for a Chapter 7 trustee.

15.    The Plan Administrator hopes that by converting this case, instead of seeking dismissal or simply resigning, that the estate will be able to preserve value of any potential recovery from the TCB Dispute or other litigation for the benefit of all unsecured creditors. Absent conversion and the installation of a chapter 7 trustee, this value could be significantly eroded, if not entirely eliminated.

16.    Upon the expiration of the Plan Distribution Date on September 27, 2023, TCB filed the TCB Motion seeking release of the TCB DIP Collateral, which was entered by the Court on November 7, 2023. The TCB DIP Collateral was transferred to TCB on November 10, 2023 in partial satisfaction of $4,336,697.89 of TCB's $28,689,673.73 claim (the "TCB Transfer").

17.    In accordance with the terms of this Order, if the TCB Dispute is resolved in TCB's favor, any recovery in excess of its DIP Claims will be remitted to the Plan Administrator or its successor.

18.     As of the date herein, the TCB Dispute remains unresolved.   Thus, there are nominal funds in the Debtors' estates that remain after the transfer of the TCB DIP Collateral to TCB and such funds are inadequate to fund ongoing administrative expense obligations necessary to liquidate and recover proceeds for distribution.   Moreover, any proceeds would be recovered will be directed to TCB ahead of any other holders of allowed claims.   The Plan Administrator has no ability to continue pursuing recovery of the assets in the Debtors' estates for either TCB or all older holders of allowed claims because of its lack of resources.

19.     Pursuant to the *Stipulation Resolving TCB Claims* (the "<u>TCB Stipulation</u>") filed contemporaneously with this Motion, TCB and the Plan Administrator agree to several terms to resolve outstanding claims between TCB and the Plan Administrator, as well as memorialize TCB's agreement to provide additional funding for the Plan Administrator in order to satisfy known priority and administrative expense claims and to reserve amounts for a Chapter 7 trustee.

20.     In additionally, the *Motion For Order Authorizing The Abandonment And Destruction Of Certain Records Pursuant To Bankruptcy Code Sections 105, 363 And 554* (the "<u>Destruction Motion</u>") is also being filed contemporaneously with this Motion, requesting authority from this Court to destroy and/or abandon certain documents that are no longer necessary for the Plan Administrator to carry out her duties.

## RELIEF REQUESTED

21.     By this Motion, the Plan Administrator requests entry of the Proposed Order, pursuant to section 1112 of the Bankruptcy Code and Bankruptcy Rule 1017(f), converting the Debtors' Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, effective as of the Conversion Date and granting related relief.

**BASIS FOR RELIEF**

22.     Section 1112(b)  of the Bankruptcy Code provides that "on request of a party in interest, and after notice and a hearing, a court shall convert a case under [Chapter 11] to a case under [C]hapter 7 or dismiss a case under [Chapter 11], whichever is in the best interests of the creditors and estate, for cause . . . ." 11 U.S.C. § 1112(b)(1).  Bankruptcy courts are given wide discretion to convert Chapter 11 Cases to Chapter 7 cases for cause.  *In re Greenfield Drive Storage Park*, 207 B.R. 913, 916 (9th Cir. B.A.P. 1997).  Pursuant to the Bankruptcy Code, cause for the purposes of conversion includes, but is not limited to, material default by the debtor with respect to a confirmed plan.  11 U.S.C. § 1112(b)(4)(N).  However, in determining cause for conversion, courts also look to other compelling circumstances in each individual case.  *See C-TC 9th Ave, P'ship v. Norton Co. (In re C-TC 9th Ave P'ship)*, 113 F.3d 1304, 1311 (2d Cir. 1997) (citing H.R. No. 95-595, 95th Cong., 1st Sess. At 4056, U.S.C.C.A.N., pp. 5787, 6363-64) ("The list [contained in section 1112(b)] is not exhaustive.  The Court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases."); *In re Seaview Estates, Inc.*, 213 B.R. 427, 432 (Bankr. E.D.N.Y. 1997) (stating that section 1112(b) was meant to provide court with means to convert cases based on the facts peculiar to each case as the examples of cause were not meant to be exhaustive).

23.     "Material default" is not defined in the Bankruptcy Code.  However, courts have found that material default exists upon a failure or inability to comply with obligations required under a confirmed Chapter 11 plan, including failing or being unable to make required payments.  *In re AMC Mortg. Co., Inc.*, 213 F.3d 917, 921 (6th Cir. 2000) ("failure to make a payment required under the plan is a material default and is cause for dismissal"); s*ee also In re Baroni*, 36 F.4th 958, 968 (9th Cir. 2022) (finding material default where debtor defaulted on her obligations related

to a secured claim); *Seaview*, 213 B.R. at 431 (citing to cases where chapter 11 cases were converted based on debtor's inability to pay fees award to examiners and where debtor discontinued payment under the plan); *Matter of Iberis Intern., Inc.*, 72 B.R. 624, 627 (Bankr. W.D. Wis. 1986) ("[A] Debtor's inability to fulfill the requirements of the confirmed plan is adequate grounds for this court to convert this case to a chapter 7 proceeding . . . ."). Even when a debtor began complying with obligations required under a Chapter 11 plan, such as making payments to creditors for an extended period of time prior to a default, failing to make all required payments can be a material default. *Baroni*, 36 F.4th at 967; *see id*. (citing case where material default was found where debtors paid some but not all creditors and where the court rejected debtors' arguments that they had 'substantially complied with the terms of the plan').

24.     Further, where unsecured creditors had an expectation to be paid based on the plan and disclosure statement provided by a debtor, a material default occurs when there are no remaining assets sufficient to pay creditors pursuant to such plan. *Seaview*, 213 B.R. at 431-33 (noting that neither the debtor's plan nor disclosure statement stated that unsecured creditors would not receive a distribution and stating that the court "would not have approved a plan whereby unsecured creditors faced the prospect of receiving no payment whatsoever in return for their agreement to release third parties from their guaranties").

25.     Here, despite best efforts of the Plan Administrator and through no fault of her own, it is highly improbable that the Plan Administrator will be able to fulfill all obligations required under the Plan.  Although the Plan Administrator began making distributions pursuant to the Plan to holders of allowed Senior Claims, including TCB, in accordance with her duties and responsibilities as required by the Plan, as a result of the TCB Dispute and the TCB Transfer, absent an infusion of additional funds, the estate does not have sufficient funds remaining to pay

all holders of allowed Senior Claims in full satisfaction of each such claim as required by the Plan. Moreover, TCB's DIP Claim was not satisfied in full upon the TCB Transfer and at this time, it is not clear whether such claim will be satisfied in full, without a resolution of the TCB Dispute in TCB's favor.

26.     Additionally, holders of allowed General Unsecured Claims had an expectation that they would receive some amount of distribution pursuant to the Plan and the Disclosure Statement that were filed by the Debtors.  However, similarly, based on the TCB Dispute, it is improbable that unless and until the TCB Dispute is resolved, TCB's DIP Claim is fully satisfied, and all Senior Claims are satisfied, that holders of General Unsecured Claims will receive a distribution because the estate simply does not have enough funds.

27.     As a result, it is evident that a material default can be found here where the Plan Administrator, through no fault of her own, is unable to comply with the terms of the Plan related to distributions on allowed claims.

28.     Courts have also found that the loss or the termination of means to fund a confirmed Chapter 11 plan also constitutes a material default.  *See Greenfield*, 207 B.R. at 917 (holding the entire purpose of the Chapter 11 plan could no longer be achieved, and thus material default found, when the debtor's property that was meant to generate revenue to fund the plan was foreclosed upon and thus the debtor's ability to fund the plan was terminated); *Seaview*, 213 B.R. at 430 (finding material default where debtor had no assets remaining in its possession from which it could fund the plan).

29.     Upon the entry of TCB's Motion, and the subsequent turnover of the TCB DIP Collateral to TCB, nominal funds remained in the Debtors' estates for the Plan Administrator's use to effectuate the terms of the Plan.  Pursuant to such transfer, the Plan Administrator no longer

has the means to fund any additional payments under the Plan. In addition, given the cost to compensate the former RMIT employees, fund the Plan Administrator and other professionals, it is not cost effective to pursue any remaining claims.

30.     Until and unless such TCB DIP Collateral is returned to the estate upon successful resolution of the TCB Dispute as contemplated by the Confirmation Order, the Plan Administrator no longer has  the means to effectuate or fund the Plan.  Based on the foregoing, cause pursuant to section 1112(b) of the Bankruptcy Code exists to convert the Chapter 11 Cases to chapter 7 cases based on the material default under the Plan.

31.     Before a court can grant conversion, however, it must consider whether conversion, as opposed to another remedy, such as dismissal, is in the best interests of the creditors and the estate.  11 U.S.C. § 1112(b)(1).  The Court must consider the interests of all of the Debtors' creditors.  *Baroni*, 36 F.4th at 968 (internal citations omitted).

32.     As previously stated, in this case, it is in the best interests of all the Debtors' creditors, including TCB, to convert the Chapter 11 case to one under Chapter 7 of the Bankruptcy Code.  While it is unclear at this juncture how the TCB Dispute will conclude, there remains the possibility of future distributions being available to creditors.  If the Chapter 11 Cases were to be dismissed, all creditors, including TCB, could lose the opportunity to receive funds from the estate. Creditors would be in a better position if the Chapter 11 case converted to one under Chapter 7 which would remain and be preserved as a vessel that can resolve any remaining disputed unsecured claims, and distribute funds to all creditors, if TCB is successful in the TCB Dispute and thereafter returns funds to the estate.  Further, it is not prudent to have the Plan Administrator continue incurring administrative expense obligations given the little remaining funds available to the estate.  A chapter 7 trustee would be in a better position to effectively and efficiently carry out

these Chapter 11 Cases to the conclusion and conversion to Chapter 7 is necessary to minimize ongoing administrative expenses. There will also be a small fund set aside for the Chapter 7 trustee.

33.     Accordingly, the Plan Administrator respectfully submits that conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code is in the best interests of the Debtors' estates and creditors and respectfully requests that the Court enter an order converting the Chapter 11 Cases to chapter 7 cases, effective as of the Conversion Effective Date.

## NOTICE

34.     Notice of this Motion will be provided to: (i) the Office of the United States Trustee, (ii) all known creditors of the Debtors, and (iii) the parties entitled to notice under Local Bankruptcy Rule 2002-1.   In light of the nature of the relief requested herein, the Plan Administrator submits that no other or further notice is necessary.

## CONCLUSION

**WHEREFORE**, the Plan Administrator respectfully requests that the Court enter the Proposed Order converting the Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, effective as of the Conversion Effective Date, and granting such other and further relief as the Court may deem just and proper.

Dated: January 12, 2024

**AMANDA SWIFT, AS PLAN ADMINISTRATOR**

*/s/ Josef W. Mintz*
Regina Stango Kelbon, Esq. (DE No. 5444)
Josef W. Mintz, Esq. (DE No. 5644)
Lawrence R. Thomas III, Esq. (DE No. 6935)
**BLANK ROME LLP**
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:  302.425.6400

Facsimile:  302.425.6464
Email: regina.kelbon@blankrome.com
          josef.mintz@blankrome.com
          lorenzo.thomas@blankrome.com

-and-

Mark S. Indelicato, Esq. (admitted *pro hac vice*)
Mark T. Power, Esq. (admitted *pro hac vice*)
Joseph Orbach, Esq. (admitted *pro hac vice*)
**THOMPSON COBURN LLP**
488 Madison Avenue
New York, New York 10022
Telephone:  (212) 478-7200
Facsimile:   (212) 478-7400
Email: mindelicato@thompsoncoburn.com
          mpower@thompsoncoburn.com
          jorbach@thompsoncoburn.com


*Co-Counsel for the Plan Administrator*